UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GENERAL METALS OF TACOMA, INC., a Washington Corporation; and ARKEMA INC., a Pennsylvania Corporation,<br><br>Plaintiffs,<br><br>v.<br><br>BEAN ENVIRONMENTAL LLC, a Delaware limited liability company; and BEAN DREDGING LLC, a Louisiana limited liability company,<br><br>Defendants. | NO. CV05-5306 RBL<br>(Western District of Washington)<br><br>DECLARATION OF THOMAS W. FALKNER IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL |

I, Thomas W. Falkner, declare and state:

1.     I am an attorney with the law firm of Williams Kastner & Gibbs PLLC, and represent Plaintiff General Metals of Tacoma, Inc. ("General Metals") in this matter. I am over the age of eighteen, have personal knowledge of the matters set forth herein and am competent to testify. I am not a party to this matter.

2.     This declaration is submitted in support of Plaintiffs' Motion to Compel Deposition and Document Production of Boskalis Westminster, Inc., which follows Boskalis Westminster Inc.'s objection to a subpoena served by Plaintiffs General Metals and Arkema, Inc. (collectively, the "HHCG").

DECLARATION OF THOMAS W. FALKNER IN SUPPORT OF
PLAINTIFFS' MOTION TO COMPEL -1
(CV05-5306 RBL)

**Williams, Kastner & Gibbs PLLC**
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

1899725.1

3.      Boskalis Westminster, Inc. is believed to be a subsidiary of a Netherlands-based entity known as Royal Boskalis Westminster n.v. ("Royal Boskalis"). In addition to Boskalis Westminster, Inc., the only other known United States entity believed to be a subsidiary of Royal Boskalis is Stuyvesant Dredging Company ("Stuyvesant"), which is based in New Orleans, Louisiana. Like Boskalis Westminster, Inc., Stuyvesant was recently served with a subpoena at its offices in New Orleans. The subpoenas served on Boskalis Westminster, Inc. and Stuyvesant are virtually identical. The same counsel from the Washington, D.C. law firm Sher & Blackwell LLP appeared on behalf of both Stuyvesant and Boskalis Westminster, Inc. HHCG's counsel contacted counsel at Sher & Blackwell, who advised HHCG's counsel that Royal Boskalis entities would not be providing any additional documents responsive to the subpoena. A similar motion to compel directed at Stuyvesant is also being filed in New Orleans, Louisiana.

4.      Attached hereto as Exhibit A is a true and correct copy of the subpoena served by the HHCG on Boskalis. This subpoena is one of seven subpoenas served on entities believed to be either related to or affiliated with Boskalis Westminster, Inc. and believed to be connected to the dredging project that is the subject of this litigation. All seven subpoenas have been opposed and, until now, no motions to compel have been filed by HHCG.

5.      Attached hereto as Exhibit B is a true and correct copy of correspondence from Boskalis Westminster Inc.'s counsel objecting to the subpoena.

6.      Attached hereto as Exhibit C is a true and correct copy of the Complaint originally filed in this matter.

DECLARATION OF THOMAS W. FALKNER IN SUPPORT OF
PLAINTIFFS' MOTION TO COMPEL -2
(CV05-5306 RBL)

Williams, Kastner & Gibbs PLLC
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

1899725.1

7.      Attached hereto as Exhibit D is a true and correct copy of Delaware Secretary of State corporate information for Boskalis Westminster, Inc.  The only identified address for Boskalis is its registered agent located in Delaware.

8.      Attached hereto as Exhibit E is a true and correct copy of marking information available on the internet at www.cfbean.com/beanenvi/abouts.htm, which outlines the joint venture relationship between the Bean group of companies (including Bean Environmental, LLC ("BELLC")) and Royal Boskalis.

9.      Attached hereto as Exhibit F is a true and correct copy of information obtained from Royal Boskalis Westminster nv's webpage at www.boskalis.com/index.php?page_id=122&l=2.  On page four (of five) of this information the dredge Bonacavor is listed beside a "Note" 5.  Note 5 appears on page five and indicates that Boskalis Westminster, Inc. owns a 25% interest in all equipment identified with Note 5. Also attached as Exhibit F is a picture of the Bonacavor.  The performance of the Bonacavor is a critical issue in HHCG's lawsuit against BELLC.

10.     Attached as Exhibit G are true and correct copies of excerpts from the deposition of Arie Van Adel.

11.     Attached as Exhibit H is a true and correct copy of the First Amended Complaint for Breach of Contract, Fraud and Negligent Misrepresentation.  A motion to amend the complaint to add claims for fraud and negligent misrepresentation is currently pending in the Western District of Washington.

DECLARATION OF THOMAS W. FALKNER IN SUPPORT OF
PLAINTIFFS' MOTION TO COMPEL -3
(CV05-5306 RBL)

1899725.1

Williams, Kastner & Gibbs PLLC
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

1    12.    Attached hereto as Exhibit I is a true and correct copy of an August 22, 2006

2   letter concerning numerous unproduced documents.  The letter is authored by Arkema, Inc.'s

3   counsel, Marisa M. Bavand, and was sent to BELLC's counsel, William F. Cronin.

4    13.    Attached hereto as Exhibit J is a true and correct copy of one of several emails

5   in which BELLC's counsel, William F. Cronin, reiterates BELLC's refusal produce documents

6   from a third party that did not contract directly with the HHCG, such as [Royal] Boskalis.

7

8

9    The foregoing statement is made under penalty of perjury under the laws of the United

10  States of America, the State of Delaware, and the State of Washington and is true and correct.

11  Signed at Seattle, Washington, this 27th day of August, 2006.

12

13

14  Thomas W. Falkner

15

16

17

18

19

20

21

22

23

24

25

DECLARATION OF THOMAS W. FALKNER IN SUPPORT OF
PLAINTIFFS' MOTION TO COMPEL -4
(CV05-5306 RBL)

1899725.1

Williams, Kastner & Gibbs PLLC
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

# EXHIBIT A

# ABC Legal Messengers, Inc.

**Process Service Request**

| Seattle | Tacoma | Everett | Olympia | Bellevue |
|---|---|---|---|---|
| 910-5th Ave. | 943 Tacoma Ave. S. | 2927 Rockefeller | 119 W. Legion Way | 126-107th NE |
| Seattle, WA 98104 | Tacoma, WA 98402 | Everett, WA 98201 | Olympia, WA 98501 | Bellevue, WA 98004 |
| 206-623-5771 | 253-383-1791 | 425-258-4591 | 360-754-6595 | 425-455-0102 |
| 800-736-7295 | 800-736-7250 | 800-869-7785 | 800-828-0199 | |
| FAX: 206-625-9247 | | | | |

| Firm Name | Date | | | |
|---|---|---|---|---|
| Williams, Kastner & Gibbs PLLC | 6/13/06 | ☐ Regular Process | | Entered By |
| | | ☒ Special Process | | |
| **Address** | | ☐ Investigations | | Items Held |
| 601 Union Street, Suite 4100, Seattle WA 98101 | | | | |

| Client Matter Number | Phone | Ext | Attorney | Secretary |
|---|---|---|---|---|
| 83175.0109 | 206-628-6600 | 2939 | T. Falkner | Joan |

| Case Name | Cause Number | ABC Client Number |
|---|---|---|
| General Metals of Tacoma, Inc. v. Bean Environmental | CB05-5306 RBL | 11300 |

| Documents |
|---|
| Notice of Deposition and Subpoena Duces Tecum to Records Custodian for Boskalis Wminster, Inc. |

## Filing

| LAST DAY FOR FILING | County | Court | File 1st Then Serve | Serve Civil Case Schedule | Serve 1st Then File | Serve Only | Return Conformed Copy | File Original/Affidavit With Court | | Statute Runs |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Yes | No | Date: |
| | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | |

## Process

| SERVE BY DATE: | Number Of Sets To Serve | Number To Post | Number To Mail | Corp. | Individually Only Him | Only Her | Abode Service Co-Res OK | Hearing Date/Time |
|---|---|---|---|---|---|---|---|---|
| 6/14/2006 | 1 | | | ☒ | | | | |

## Investigations

**Locate:**
☐ Person  ☐ Assets  ☐ Bank Account
☐ Information  ☐ Background Report
☐ Other

Residence ☒ CALL WHEN COMPLETED

Serve On:

Phone
SS #
DOB

Business / Employment

Records Custodian of Boskalis Westminster, Inc.
c/o Registered Agent
Corporation Trust Company
1209 Orange Street
Wilmington, DE 19801

Business Phone
Working Hours _____

**Special Handling Information:**
Please have delivered on June 14, 2006, if there are any problems at all, contact Joan
Kattenhorn @ 206-628-6600 immediately.  Thank you.

CUSTOMER COPY

---

| | | | For ABC Use Below This Line | | | **3924955** |
|---|---|---|---|---|---|---|

| Rec'd.By:X | | | Title | Date | Time | # Of Copies | Srv. By |
|---|---|---|---|---|---|---|---|

| Date/Time | By | Age: | Wt: | Ht: | Race Sex | Hair Color | Disting. Marks | Lic. Plate |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | TP # |
| | | | | | | | | RTM |
| | | | | | | | | BA Fee |
| | | | | | | | | Trace $ |
| | | | | | | | | Misc $ |
| | | | | | | | | For |
| | | | | | | | | Spec $ |
| | | | | | | | | Check # |
| | | | | | | | | Check $ |
| | | | | | Template Code | | | Split |
| Date/Time | Reported Serve To | ☐ Receptionist | ☐ Voice Mail | | After Entered By | | | Amount this WO |

AO88 (Delaware Rev. 7/00) Subpoena in a Civil Case

### Issued by the

# UNITED STATES DISTRICT COURT

## DISTRICT OF DELAWARE

GENERAL METALS OF TACOMA, INC. a
Washington Corporation, et al

V.

BEAN INVIRONMENTAL LLC, a Delaware
Limited Liability company, et al

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] CV05-5306 RBL
(Western District of Washington)

TO: RECORDS CUSTODIAN OF BOSKALIS WESTMINSTER, INC.
c/o Registered Agent: 9000010
Corporation Trust company
1209 Orange Street
Wilmington, DE 19801

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Wilcox & Fetzer, 1330 King Street, Wilmington, DE 19801 | June 30, 2006, 10:00 a.m. |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

SEE ATTACHED EXHIBIT A

| PLACE | DATE AND TIME |
|---|---|
| Wilcox & Fetzer, 1330 King Street, Wilmington, DE 19801 | June 30, 2006, 10:00 a.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Attorney for Plaintiff  *Tom Falkner* | June 14, 2006 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Thomas W. Falkner, WSBA # 28429
Williams, Kastner & Gibbs, PLLC, 601 Union Street #4100, Seattle, WA 98101 206-628-6600

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

**FILE COPY**

AO88  (Delaware Rev. 7/00) Subpoena in a Civil Case

---

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
          DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## EXHIBIT A TO SUBPOENA

A.    The term "**document**" as used herein refers to all written or graphic matter, however produced or reproduced, including but not limited to papers, photographs, maps, objects, tangible things, correspondence, telegrams, memoranda, inter-office communications, reports, studies, surveys, contracts, licenses, agreements, ledgers, invoices, drafts, working papers, statistical records, desk calendars, appointment books, diaries, daily reports, timesheets of logs, notations, plans, schematic drawings, modes, change orders, computer printouts, or emails, punch cards, magnetic tapes, magnetic disks, notes or sound records of any conversation, notes of meetings or conferences, and minutes of any meetings.  The term "document" shall include any tangible thing on which information can be stored, recorded, processed, transmitted, inscribed, or memorialized in any way by any means regardless of technology or form, and includes drafts, originals, and non-identical copies,  This definition of the term "document" includes such documents whether or not a particular document is privileged or within defendant's possession, custody or control.

B.    The term "**Communication**" means any and all forms of communication between or among two or more persons, including but not limited to in-person meetings and conversations, telephone calls, voicemails or answering machine messages, letters, notes, memoranda, e-mail, and facsimile forms as applicable.

C.    The term "**Agreement**" refers to the contract, titled "Agreement Between General Metals of Tacoma, Inc. and Atofina Chemicals, Inc. and Bean Environmental L.L.C. on the Basis of Cost Plus," including all exhibits, attachments, and

**Williams, Kastner & Gibbs PLLC**
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

1 supplements, that was executed between the parties to the pending lawsuit on or
2 about April 13, 2004.

3     D.    The term **"Project"** refers to the remediation effort performed at the head
4 of the Hylebos Waterway in Washington.  This also includes the work performed by
5 Bean Environmental, L.L.C. at the Hylebos Waterway (which is the subject of
6 paragraph C above), as well as remediation efforts by other parties at the Hylebos
7 waterway.

8     E.    The term **"Bean"** refers to Bean Environmental L.L.C., Bean Dredging,
9 L.L.C., and/or any other "Bean" entity, parent, subsidiary or affiliated entities, for which
10 you performed services, and any person acting or purporting to act on their behalf,
11 including attorneys, agents, investigators, accountants, consultants, representatives
12 and employees.

13     F.    **"HHCG"** refers collectively to Plaintiffs General Metals of Tacoma, Inc.
14 and Arkema Inc.

15     G.    The term **"relating to"**, **"relates to"** or **"related to"** means, without
16 limitation, compromising, concerning, containing, embodying, referring to, alluding to,
17 responding to, about, regarding, announcing, explaining, discussing, showing,
18 describing, studying, reflecting, analyzing or constituting.

19     H.    The terms **"you"** and **"your"** refer to Boskalis Westminster, Inc. (and its
20 respective agents, attorneys, and employees), and includes any predecessor or
21 successor entities, any past or current parent, subsidiary or affiliated entities, or any
22 former and present employees, officers, directors, representative, or agents of
23 Boskalis Westminster, Inc. and/or other persons acting or purporting to act on their
24 behalf.

25

NOTICE OF DEPOSITION AND SUBPOENA DUCES TECUM TO
RECORDS CUSTODIAN FOR BOSKALIS WESTMINSTER, INC. -
5
(CV05-5306 RBL)

1864209.1

Williams, Kastner & Gibbs PLLC
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

1    I.    In responding to this subpoena, you are required to produce all

2    documents and electronic files requested which are in your possession, custody or

3    control in any of your offices or branches, or otherwise available to you.

4    ## DOCUMENTS TO BE PRODUCED

5    1.    All documents, communications, reports, summaries, illustrations,

6    photos, video, surveys, data and/or memoranda in your possession or control

7    that relate in any way to the Project.

8    2.    All documents, including but not limited to letters, memoranda, e-mails,

9    message notes, etc., evidencing communications between you and Bean.

10    3.    All contracts and/or agreements between you and Bean.

11    4.    All documents relating to any and all of your equipment used or billed to

12    the Project, including:

13    a.    Equipment subsidiary and general ledgers from 1999 through 2005;

14    b.    Equipment purchase and sale or trade records from 1999 through 2005;

15    c.    Equipment overhaul records and analyses from 1999 through 2005;

16    d.    Equipment repair records and analyses from 1999 through 2005;

17    e.    Equipment utilization records and analyses from 1999 through 2005;

18    f.    Equipment bid and usage rate records and analyses from 1999 through

19    2005;

20    g.    All equipment insurance cost records from 1999 through 2005;

21    h.    All equipment lease records from 1999 through 2005;

22    i.    All equipment debt and financing records from 1999 through 2005; and

23    j.    All equipment and fixed asset and depreciation schedules from 1999

24    through 2005.

25    5.    All personnel files or employee records for all individuals employed or

contracted by you to perform work on the Project.

NOTICE OF DEPOSITION AND SUBPOENA DUCES TECUM TO
RECORDS CUSTODIAN FOR BOSKALIS WESTMINSTER, INC. -
6
(CV05-5306 RBL)

1864209.1

Williams, Kastner & Gibbs PLLC
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

6.    All documents, including reports, estimates, communications, summaries and illustrations, related to the planned or actual volume of material dredged or calculated to be dredged on the Project.

7.    All internal documents, including but not limited to organizational charts, procedures, instructions or guidelines regarding your personnel working on the Project, including the authority, responsibility and accountability of each member of your personnel working on the Project.

8.    All documents relating to your budgets and profit plans, including comparisons of your planned-versus-actual costs, and planned-versus-actual revenues on the Project.

9.    All documents relating to cash flow analyses and cash flow reports for the Project.

10.    All documents relating to charges recorded in job cost reports including, but not limited to:  subcontracts/supply agreements, subcontractor/vendor invoices, equipment utilization records and support for cost rates, supervision and crew rates and labor timecards.  To the extent any equipment, labor or other services were provided by Bean-related entities, please produce underlying accounting support for the derivation of cost and/or billed amounts by the related entity.

11.    All payroll registers for labor on the Project.

12.    All labor distribution reports for labor on the Project.

13.    All documents related to the negotiation, execution or performance of the Agreement.

14.    All equipment and/or service agreements related to the Project.

15.    All documents, drawings, electronic files, maps, plans and blueprints that reflect or in any way pertain to the proposed or actual dredging plan for the Project.

16.    All communications in connection with any phase of the design, financing, engineering or performance of the Project.

17.    All calculations relating to the Project, including those handwritten or generated by computer, mechanical or electrical devices, performed by or for you in connections with the Project.

18.    All reports, summaries, communications and documents regarding the planned or actual performance of Bean Environmental on the Project.

NOTICE OF DEPOSITION AND SUBPOENA DUCES TECUM TO
RECORDS CUSTODIAN FOR BOSKALIS WESTMINSTER, INC. -
7
(CV05-5306 RBL)

1864209.1

Williams, Kastner & Gibbs PLLC
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

19.    All documents relating to the productivity or production schedule of Bean Environmental on the Project.

20.    All equipment utilization records detailing mobilization, operating, idle and down time for all equipment used or billed to the Project.

21.    All documents, communications, and memoranda in your possession relating to insurance coverage, guarantees, and/or bonds for the Project.

NOTICE OF DEPOSITION AND SUBPOENA DUCES TECUM TO
RECORDS CUSTODIAN FOR BOSKALIS WESTMINSTER, INC. -
8
(CV05-5306 RBL)

1864209.1

Williams, Kastner & Gibbs PLLC
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

# EXHIBIT B

**WILLIAMS KASTNER & GIBBS**



**Sher**
**Blackwell**
A T T O R N E Y S   A T   L A W

Suite 900 • 1850 M Street, N.W. • Washington, D.C. 20036
Telephone: 202.463.2500 • Facsimile: 202.463.4950 • www.sherblackwell.com

ʃJUN 2 8 2006

**RECEIVED**

A LIMITED LIABILITY PARTNERSHIP

Writer's Direct Dial:
(202) 463-2504/2516

June 27, 2006

Thomas W. Falkner, Esq.
William, Kastner & Gibbs PLLC
Two Union Square, Suite 4100
Seattle, WA 98101-2380

Re:  Subpoenas Duces Tecum in General Metals of Tacoma, Inc. v.
Bean Environmental LLC, No. CV05-5306 RBL

Dear Mr. Falkner:

This letter constitutes the objections of Boskalis Westminster, Inc. ("BWI") to the above-referenced subpoenas pursuant to Civil Rules 30 and 45.

1.     BWI objects to the subpoena in its entirety on grounds that the subpoena has been interposed to harass, to cause unnecessary delay, and to cause needless increase in the cost of the litigation involving Bean Environmental LLC.

2.     BWI objects to the extent that the subpoena seeks production of documents that are protected by the attorney-client privilege, the work product doctrine, or other applicable privilege.

3.     BWI objects to the subpoena on the grounds that the requests are vague, ambiguous, and grossly overbroad, seek information and documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, and would impose an undue burden and expense.

4.     BWI objects to the extent that the subpoena seeks production of documents unrelated to the work of Bean Environmental LLC on the Hylebos Project.

5.     BWI objects to the subpoena in its entirety for failing to provide reasonable time for compliance.

6.     BWI objects to the extent that the subpoena seeks documents that are not in its possession, custody or control.

7.     BWI objects to the production of a witness for deposition for all of the above stated reasons, particularly the lack of reasonable notice.

8.    BWI objects to the production of a witness for deposition on the basis to the extent the request would require a witness to travel more than 100 miles from his principal place of business.

Please direct all further communications on this issue to me.

Sincerely,

Jeffrey F. Lawrence
Heather M. Spring

*Counsel for Stuyvesant Dredging Company*



**Sher Blackwell**

ATTORNEYS AT LAW

Suite 900 • 1850 M Street, N.W. • Washington, D.C. 20036
Telephone: 202.463.2500 • Facsimile: 202.463.4950 • www.sherblackwell.com

JUN 28 2006

**RECEIVED**

A LIMITED LIABILITY PARTNERSHIP

Writer's Direct Dial:
(202) 463-2504/2516

June 27, 2006

Thomas W. Falkner, Esq.
William, Kastner & Gibbs PLLC
Two Union Square, Suite 4100
Seattle, WA 98101-2380

Re:    Subpoenas Duces Tecum in General Metals of Tacoma, Inc. v.
       Bean Environmental LLC, No. CV05-5306 RBL

Dear Mr. Falkner:

Enclosed please find the objections of Boskalis Westminster, Inc. ("BWI") to the subpoenas served on it in the above referenced matter. Please also be advised that BWI had no involvement with the project at issue in this case. As such, it has no responsive documents in its custody or control. Accordingly, even if the subpoenas were not objectionable, there would be nothing to produce.

If you have any questions, please contact the undersigned.

Sincerely,

Jeffrey F. Lawrence
Heather M. Spring

*Counsel for Boskalis Westminster, Inc.*

cc:    Clay Beery
       Robert Dugas

# EXHIBIT C

1

2

3                                                  ——— FILED ——— ENTERED
                                                   ——— LODGED ——— RECEIVED

4                                                  MAY 0 3 2005    MR

5                                                  AT SEATTLE
                                                   CLERK U.S. DISTRICT COURT
                                                   WESTERN DISTRICT OF WASHINGTON
                                                                      DEPUTY

6

7

8                           UNITED STATES DISTRICT COURT
                            WESTERN DISTRICT OF WASHINGTON
9                                     AT TACOMA

10   GENERAL METALS OF TACOMA, INC., a
     Washington Corporation, and ARKEMA INC.,          NO.  **CV05-5306**
11   a Pennsylvania Corporation,

12                      Plaintiffs,                     COMPLAINT FOR BREACH OF
                                                       CONTRACT WITH
              v.                                       JURY DEMAND
13
     BEAN ENVIRONMENTAL LLC, a Delaware
14   Limited Liability Company, and BEAN
     DREDGING LLC, a Louisiana Limited
15   Liability Company,

16                      Defendants.

17          Plaintiffs General Metals of Tacoma, Inc., and Arkema Inc. (hereinafter collectively

18   referred to as "Head of Hylebos Cleanup Group" or "HHCG"), by and through their

19   attorneys, Williams, Kastner & Gibbs PLLC, for General Metals of Tacoma, Inc., and Groff

20   Murphy Trachtenberg & Everard PLLC, for Arkema Inc., allege as follows:

21                                       I. PARTIES

22          1.1     Plaintiff General Metals of Tacoma, Inc. ("General Metals"), is a Washington

23   corporation, with its principal place of business located at 1902 Marine View Drive,

24   Tacoma, Washington 98424.

25

COMPLAINT FOR BREACH OF CONTRACT WITH JURY        **Williams, Kastner & Gibbs PLLC**
DEMAND - 1                                         Two Union Square, Suite 4100 (98101-2380)
                                                   Mail Address: P.O. Box 21926
                                                   Seattle, Washington 98111-3926
                                                   (206) 628-6600

1699523.1

1.2     Plaintiff Arkema Inc. ("Arkema"), previously known as ATOFINA Chemicals, Inc., is a Pennsylvania corporation, with its principal place of business located at 2000 Market Street, Philadelphia, PA 19103-3222.

1.3     Defendant Bean Environmental LLC ("BELLC") is a Delaware limited liability company, with its principal place of business located at 1055 St. Charles Avenue, Suite 500, New Orleans, Louisiana 70130.

1.4     Defendant Bean Dredging LLC is a Louisiana Limited Liability Company, with its principal place of business located at 1055 St. Charles Avenue, Suite 500, New Orleans, Louisiana 70130.

## II.  JURISDICTION AND VENUE

2.1     This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1332.

2.2     The amount in controversy exceeds $250,000.

2.3     Venue is proper in Western Washington Federal District Court at Tacoma pursuant to 28 U.S.C. § 1391.

## III.   PLAINTIFFS' CLAIM FOR BREACH OF CONTRACT

3.1     In 2002, HHCG was directed by the EPA to perform environmental cleanup work at the Head of the Hylebos Waterway in the Tacoma tide flats by dredging the contaminated sediment and disposing of it off site.  For the dredging portion of the work, HHCG considered several contractors specializing in environmental dredging.

3.2     BELLC represented itself as an expert in the precise removal of contaminated sediments.  BELLC claimed it was the only company utilizing proprietary computerized dredging, which would minimize removal of clean native material, thereby lowering the overall cost of the cleanup work.

COMPLAINT FOR BREACH OF CONTRACT WITH JURY
DEMAND - 2

**Williams, Kastner & Gibbs PLLC**
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

1699523.1

1    3.3    BELLC also represented that it would complete the work in one "fish window"

2  season (July 16, 2004 to February 14, 2005).

3    3.4    Based upon these representations, HHCG entered into written contract with

4  BELLC on April 13, 2004, for the dredging work (the "Contract").

5    3.5    Incorporated into the Contract is a written unconditional Guaranty by Bean

6  Dredging LLC for the full performance by BELLC of all liabilities arising under the Contract.

7    3.6    BELLC breached the Contract by its failure to substantially complete the

8  dredging work within the time allowed under the Contract, by its failure to perform the work in

9  compliance with the Contract Documents, and by its failure to seek reimbursement of project

10  costs in accordance with the Contract Documents.

11    3.7    As a result of BELLC's failure to timely complete the dredging, HHCG will

12  incur substantial costs to extend the cleanup work into a second "fish window" season, which

13  poses the additional risk that dredged areas may recontaminated, thereby causing additional

14  costs.

15    3.8    As a result of BELLC's breach of Contract, HHCG has been damaged in an

16  amount to be proven at trial.

17    3.9    BELLC has refused to provide HHCG with access to, or an accounting of

18  records that allegedly justify BELLC's reimbursement claims under the Contract.

19    3.10    As a result of BELLC's refusal to provide access to, or an accounting of such

20  records, HHCG cannot verify the accuracy of BELLC's reimbursement claims.

21                              IV.    JURY DEMAND

22    4.1    Plaintiffs elect to have this case tried before a 12 member jury.

23

24

25

COMPLAINT FOR BREACH OF CONTRACT WITH JURY
DEMAND - 3

**Williams, Kastner & Gibbs PLLC**
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

1699523.1

1

## V.    REQUEST FOR RELIEF

2   WHEREFORE, Plaintiffs pray for relief as follows:

3   a.    Damages for breach of contract in an amount proven at trial;

4   b.    Plaintiffs' reasonable attorneys fees and costs;

5   c.    Such other and further relief, which the court finds just and equitable.

6
    DATED this 3rd day of May, 2005.
7
                                    Respectfully submitted,
8
                                    WILLIAMS, KASTNER & GIBBS PLLC
9

10
                                    By _____
11                                       John P. Evans, WSBA No. 08892
                                         Mark M. Myers, WSBA No. 15362
12                                       Heidi L. Evatt, WSBA No. 29527
                                    Attorneys for Plaintiff
13                                  General Metals of Tacoma, Inc.

14                                  GROFF MURPHY TRACHTENBERG &
                                    EVERARD PLLC
15

16
                                    By _____
17                                       Stephen T. Parkinson WSBA No. 21111
                                         Attorneys for Plaintiff Arkema Inc.
18

19

20

21

22

23

24

25

COMPLAINT FOR BREACH OF CONTRACT WITH JURY
DEMAND - 4

Williams, Kastner & Gibbs PLLC
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

1699523.1

# EXHIBIT D

Detail Information

 LexisNexis™

## Delaware Secretary of State Gateway

This data is for information purposes only, certification can only be obtained through the Division of Corporations, or from a Delaware Registered Agent's office located within the State of Delaware.

Source Info

## Detail Information

Date/Time of Results: 05-31-2006 at 21:14

File Number: 0901263

Name: BOSKALIS WESTMINSTER INC.

Kind: Corporation General

Residency: Domestic

Original Country:

Proclamation Date:

Bankruptcy Status:

Case Number:

Federal ID: 510256877

Registered Agent: 9000010
THE CORPORATION TRUST COMPANY
CORPORATION TRUST CENTER
1209 ORANGE STREET
WILMINGTON , DE19801

Name Type: Delaware Company

Status: Good Standing as of 10-17-1980

State of Incorp: DE

Incorp/Qualify Date: 10-17-1980

Renewal Date:

Bankruptcy Date:

Merged To:

Quarterly Filing?:

Registered Agent County: New Castle

Phone: 302-658-7581

Fax: 302-655-5049

Stock Co Flag: Stock Company

Tax Type: A/R Filing Required

Country: US

Foreign Incorporation Date:

Expiration Date:

State:

State:

Last Annual Report: 2005

| Stock Information: | | | | | | |
|---|---|---|---|---|---|---|
| Amendment Number: 000    Effective Date: 10-17-1980    Effective Time: 00:00 | | | | | | |
| Stock Seq Number | Description | Series | Class | Authorized | | Par Value |
| 1 | COMMON | | | | | 1.000000 |

| Filing History: | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Seq Number | Filing Year | Doc Code | Doc Code Desc | Doc Pages | Dom Pages | Doc Filing Date | Doc Filing Time | Doc Effective Date | Doc Filing Status | Co Prev Name | Merger Type |
| 1 | 1984 | 0134 | Change of Agent Address | 0 | | 07-27-1984 | 16:30 | 07-27-1984 | | | |

| Tax Info: | | | | | | | |
|---|---|---|---|---|---|---|---|
| As Of Date: 05-31-2006Tax Balance: .00 | | | | | | | |
| Tax Year | Total Filing | Total Taxes | Total Penalty | Total Interest | Total Other | Total Paid | Total Balance |
| 2005 | 25.00 | 35.00 | .00 | .00 | .00 | 60.00 | .00 |
| 2004 | 25.00 | 35.00 | .00 | .00 | .00 | 60.00 | .00 |
| 2003 | 25.00 | 35.00 | .00 | .00 | .00 | 60.00 | .00 |

Go Back

Detail Information

Go Back to Search

About LexisNexis | Terms and Conditions | Change Password
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.
Delaware graphic courtesy of The General Libraries, The University of Texas at Austin.

# EXHIBIT E

# About Our Company - Bean Environmental LLC

 

Bean Environmental offers sophisticated technologies available for removal and transport of contaminated marine sediment. A member of the Bean family of companies, we benefit from Bean's track record of more than 50 years of experience in dredging and marine excavation.

The company also builds on Bean's position as a technology leader in the dredging industry. With U.S. patents granted or pending for both removal and transport systems, Bean Environmental is actively advancing the state of the art in environmental dredging.

## An Important Partnership

Bean Environmental combines the capabilities and experiences of C.F. Bean, L.L.C. and is a joint venture of Bean and Royal Boskalis Westminster, N.V. Based in The Netherlands, Boskalis is the world's largest dredging organization, with operations worldwide. The affiliation with Boskalis gives Bean Environmental (and our clients) access to the world-class expertise and resources of this global industry leader.

For more information on Boskalis, visit the company's web site, at www.boskalis.com.

# EXHIBIT F

# List of Equipment

- Trailing suction hopper dredgers
- Self-propelled sea-going cutter suction dredgers
- Cutter suction and bucket wheel dredgers
- Suction dredgers
- Bucket dredgers
- Backhoes
- Grabdredgers
- Stone dumping vessels
- Fall pipe vessels
- Environmental disc cutter
- Others

## Trailing suction hopper dredgers

| Name | Capacity m$^3$ | Note |
|---|---|---|
| WD Fairway | 35,508 | |
| Queen of the Netherlands | 23,347 | |
| Prins der Nederlanden | 15,961 | |
| Oranje | 15,961 | |
| Seaway | 13,255 | |
| Cornelis Zanen | 8,530 | |
| Stuyvesant | 8,460 | 3 |
| Barent Zanen | 8,116 | |
| Cornelia | 6,388 | |
| Cosmos I | 5,854 | |
| Coastway | 4,906 | |
| Waterway | 4,906 | |
| Nautilus | 4,405 | |
| Freeway | 4,043 | 2 |
| WD Medway | 3,513 | |
| Beachway | 3,480 | |
| Puerto de Altamira | 3,285 | 2 |
| Atlantico | 2,185 | 2 |
| Flevo | 2,130 | |
| Gema | 2,063 | |
| Sospan ® Dau | 1,400 | |
| Puebla | 1,400 | 2 |
| WD Severn | 1,324 | |
| Meerval | 1,210 | |
| Norstone | 1,075 | |
| Pacifico | 1,040 | 2 |

| Sospan ® | 970 |
|---|---|
| Donald Redford | 512 |
| Berbiceway | 500 |

**Self-propelled sea-going cutter suction dredgers**

| Name | Capacity kW | Note |
|---|---|---|
| Ursa | 15,871 | |
| Taurus | 15,618 | |
| Cyrus | 12,904 | |

**Cutter suction and bucket wheel dredgers**

| Name | Capacity kW | Note |
|---|---|---|
| Meridian | 10,300 | 4 |
| Edax | 9,197 | |
| Amstel | 6,152 | 2 |
| Jokra | 5,128 | |
| Orion | 4,848 | |
| Zuiderklip | 3,998 | |
| Mercurius | 3,843 | 2 |
| Gemini | 3,239 | |
| Para | 2,928 | |
| Seine | 2,541 | |
| SMV 10 | 2,610 | |
| Gironde | 2,564 | |
| Maasvlakte | 2,332 | |
| Martina | 2,285 | |
| Noorderklip | 2,090 | |
| Yaqui | 1,851 | 2 |
| Ceres | 1.425 | |
| Tejo | 1,381 | |
| Beaver St. Lawrence | 1,282 | 2 |
| Colima | 1,220 | 2 |
| Sinaloa | 1,220 | 2 |
| Kelani Ganga | 1,137 | |
| Guaymas | 1,122 | |
| Bonny | 1,113 | 1 |
| Donau | 1,073 | |

| Pekka 1 | 1,050 |
| Eneias | 1,027 |
| Tarasca | 593 |
| Vilma | 509 |
| Azteca | 476 |
| IMU3 | 432 |

### Suction dredgers

| Name | Capacity kW | Note |
| --- | --- | --- |
| Nordland | 6.332 | |
| Mosa | 4,050 | |
| Hollandsch Diep | 2,350 | |
| Marcolien | 1,739 | |
| Rosalien | 1,546 | |
| Olst | 1,312 | |
| Den Otter | 935 | |
| Kil | 721 | |
| Jacolien | 656 | |

### Bucket dredgers

| Name | Capacity kW | Note |
| --- | --- | --- |
| Holland I | 1,055 | |
| Hansa | 918 | |
| Tor Viking | 669 | |
| Saturnus | 465 | |

### Backhoes

| Name | Capacity kW | Note |
| --- | --- | --- |
| Nordic Giant | 2,000 | |
| Tauracavor | 1,674 | 5 |
| Rocky | 1,524 | |
| Colbart | 1,312 | |
| Maricavor | 1,210 | 5 |
| Manu-Pekka | 1,077 | |
| Cornelius | 1,046 | 2 |
| Koura II | 1,003 | |
| HH-48 | 589 | |

| Bonacavor | 581 | 5 |
|---|---|---|
| Kuokka-Pekka 2 | 560 | |
| Pulteri | 460 | |
| Graevelingen | 459 | |
| Mari | 372 | |
| Goodwin Sand | 349 | |
| Kuokka-Pekka 3 | 272 | |
| Kuokka-Pekka 5 | 272 | |
| Gunfleet Sand | 223 | |
| Ameland | 137 | |

**Grabdredgers**

| Name | Capacity kW | Note |
|---|---|---|
| Altlas Nova | 853 | |
| Swampland | 819 | 1 |
| Ilajeland | 809 | 1 |
| Warri | 765 | |
| Meri-Pekka | 745 | |
| W.H. Goomai | 701 | |
| Elisa | 677 | |
| Strekker | 591 | |
| Long Reach | 440 | |
| Eendracht | 422 | |
| Triton | 371 | |
| Kahmari | 317 | |

**Stone dumping vessels**

| Name | Capacity ton | Note |
|---|---|---|
| Cetus | 1,400 | |
| Arca | 700 | |
| Lauwerszee | 692 | |

**Fall pipe vessels**

| Name | Capacity ton | Note |
|---|---|---|
| Sandpiper | 18,000 | |
| Seahorse | 18,000 | 6 |

**Environmental disc cutter**

| Name | Capacity kW | Note |
|------|-------------|------|
| Vecht | 1,674 | |

**Others**

| Description | Approx | Note |
|-------------|--------|------|
| · hopper and transportation barges | 125 | |
| · floating hoisting pontoons | 5 | |
| · tracked underwater dredging unit | 1 | |
| · screeder pontoons | 7 | |
| · booster stations | 25 | |
| · stone transportation barges | 47 | |
| · launches, tugs, supply and crew boats | 231 | |
| · remote-controlled underwater dredging units | 3 | |
| · barge unloading dredgers | 4 | |
| · workboats | 34 | |
| · drill barges | 7 | |

1: Owned by Nigerian Westminster Dredging and Marine Ltd, 60% interest Boskalis
2: Owned by Dragamex SA de CV, 50% interest Boskalis
3: Owned by Bank of America, long term charter to Stuyvesant Dredging Company
4: Owned by Bean Meridian, 25% interest Boskalis Westminster Inc.
5: Owned by Bean Excavation, 25% interest Boskalis Westminster Inc.
6: Joint ownership

# Backhoe Dredges

These dredges use a barge-mounted backhoe to remove both hard and soft materials. They offer the horsepower to work effectively in heavy, compacted soil and rock at depths as great as 75 ft.

Our backhoes also use a sophisticated digital positioning system, coupled with equally precise excavator controls to allow the dredge to achieve very tight dredging tolerances - as low as 0.1 meters - even when working at the dredge's maximum depth.

The exceptional accuracy and precision of Bean's backhoe dredges make them ideal for the close tolerances found in many crowded harbors and ports. They are also well suited for environmental remediation projects, where their accuracy combines with Bean's in situ excavation techniques to minimize environmental risks.

Another important feature of our backhoe dredges is their flexibility. Because of their modular design, the dredges can be extensively reconfigured to handle a wide range of bottom types, from very hard rock to soft, loose sediments. Modifying the backhoe geometry also lets the dredges adapt to an equally wide range of reach/depth/capacity combinations.

We currently operate three highly capable backhoe dredges:

## TAURACAVOR



The largest and most powerful of our backhoe dredges, the *Tauracavor* fittingly takes its name from the Latin word for bull. To request additional information regarding the *Tauracavor* from our marketing department, click here.

## MARICAVOR



The *Maricavor* is our mid-sized backhoe, with the horsepower to work in rock and heavy soil, and the flexibility to adapt to virtually any project. To request additional information regarding the *Maricavor* from our marketing department, click here.

## BONACAVOR



The smallest of our backhoe dredges, the *Bonacavor,* offers unparalleled precision and accuracy, coupled with the flexibility to adapt to difficult conditions. To request additional information regarding the *Bonacavor* from our marketing department, click here.

# EXHIBIT G

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

----------------------------------------------------------

GENERAL METALS OF TACOMA, INC.,    )

a Washington corporation, and      )

ARKEMA, INC., a Pennsylvania       )    No. C05-5306 RBL

corporation,                       )

        Plaintiffs,            )

     vs.                        )

BEAN ENVIRONMENTAL L.L.C., a       )

Delaware limited liability         )

company, and BEAN DREDGING         )

L.L.C., a Louisiana limited        )

liability company,                 )

        Defendants.            )

----------------------------------------------------------

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

ARIE VAN DEN ADEL

Volume I, Pages 1 - 274

----------------------------------------------------------

8:58 a.m.; May 22, 2006

300 East Pine Street

Seattle, Washington

REPORTED BY:  MARGUERITE E. PRICHARD, CCR

Arie Van Den Adel

May 22, 2006

Page 54

1  the Bean company.
2      Q.  Do you know if he's president for one
3  particular Bean company, or multiple companies?
4      A.  I don't know.
5      Q.  What was his involvement, if you know, at
6  the Hylebos project?
7      A.  Ancil was involved in the contract phase.
8      Q.  And by the contract phase, he was involved
9  in negotiating the contract?
10     A.  I believe he was, yes.
11     Q.  And was he involved in anything after the
12 contract was executed, to your knowledge?
13     A.  He also gave follow-up on the Hylebos
14 project.  He was very interested in the Hylebos
15 project.
16     Q.  Do you know why?
17     A.  Because it actually gave a lot of high
18 technology.  He was very interested in that.
19     Q.  He considered there were to be a lot of
20 high technology involved that Bean was using on the
21 Hylebos project and expressed an interest in that?
22     A.  That's correct.
23     Q.  Any other involvement that he had other
24 than follow-up or expressing interest?
25     A.  Whenever there were problems on the

Page 55

1  Hylebos project, you could fall back on Rinus or
2  Ancil.  They could actually assist you with problems.
3      Q.  Gerard Hoogewerff?
4      A.  Gerard Hoogewerff.
5      Q.  Hoogewerff?
6      A.  Yes.
7      Q.  What was his involvement?
8      A.  He works for hydronamic Boskalis.
9      Q.  What is hydronamic?
10     A.  It's an engineering department within
11 Boskalis.
12     Q.  Do you understand it to be a separate
13 entity that is owned by Boskalis?
14     A.  It is owned by Boskalis.
15     Q.  What did he do with respect to the Hylebos
16 project?
17     A.  He had a lot of input in the setup for
18 Hylebos, contract-wise, but also equipment, which
19 equipment to use.
20     Q.  Do you know whether he had any involvement
21 with the design documents?
22     A.  He had involvement with the design
23 documents.
24     Q.  And what about after the contract was
25 executed, did he have any involvement in post

Page 56

1  execution phase of the work?
2      A.  No, he did not.  You could call on him for
3  advice, and he would give you advice.  So you can
4  always fall back on Gerard Hoogewerff in the event
5  you have problems, questions, whatever.
6      Q.  Is there any particular kind of category
7  of issues that you would rely on Gerard related to?
8      A.  Gerard had a lot of experience with
9  environmental dredging, dredging with HPG bucket,
10 horizontal positioning bucket.
11     Q.  So when you had questions on the site
12 related to an environmental dredging issue
13 particularly, you would call Gerard?
14     A.  That he was one of the persons you could
15 call, yes.
16     Q.  John Lally?
17     A.  Business developer for Bean Environmental.
18     Q.  And do you know what his involvement on
19 the project was?
20     A.  He was involved with the setup for the
21 project contract-wise.
22     Q.  Do you know whether he was involved or had
23 any involvement in review of design documents?
24     A.  Yes, he did.
25     Q.  And what about post contract execution,

Page 57

1  did he have any involvement with the actual
2  performance of the work?
3      A.  Yes, he did.
4      Q.  And what was that?
5      A.  John is, as a business developer, of
6  course, very interested in how we perform on the
7  project, because he is on the market to look for new
8  projects, so he was very much interested how we would
9  perform, so he would come by very often to check on
10 our performance.
11     Q.  Was his role during the performance then
12 just to follow up and make inquiries?
13     A.  Yes, often, very often, but you could also
14 fall back on his expertise in environmental dredging.
15     Q.  Would you ask him questions if you had any
16 concerns?
17     A.  Yes, I would.
18     Q.  I'm not sure of the individual's first
19 name, but the last name is Brandwijk,
20 B-R-A-N-D-W-I-J-K.
21     A.  Brandwijk.  Sorry.
22     Q.  Who is that?
23     A.  He is the person who receives all the
24 reporting documents that we have on the project and
25 gathers them at home and sends them to the different

15  (Pages 54 to 57)

5c61a6f9-f615-4f47-8edd-3c510fcd4569

Arie Van Den Adel

May 22, 2006

Page 58

1 departments.
2     Q. Is it just an administrative function?
3     A. That is.
4     Q. Would you ever have any more substantive
5 discussions with him related to the project?
6     A. No.
7     Q. William Castleton?
8     A. William Castleton is a calculator,
9 prediction estimator for Bean Stuyvesant.
10     Q. Did he have any involvement with the
11 Hylebos project?
12     A. Yeah, but very minor.
13     Q. And what was his involvement?
14     A. He would actually -- you could have -- let
15 me repeat. If you had questions about productions of
16 an excavator, you could fall back on William and he
17 could make calculations.
18     Q. And what do you mean by "productions of an
19 excavator"?
20     A. When dredging different soil types,
21 different height of layers that you would have, you
22 could actually have him to calculate for you an
23 estimate of production that you would have.
24     Q. And you indicated he had some minor
25 involvement in the Hylebos?

Page 59

1     A. He came over to check on our production of
2 the Bonacavor on my request.
3     Q. And when was that, do you recall?
4     A. I don't recall the date.
5     Q. Do you recall how far along you were with
6 the project at that point?
7     A. No, I don't recall.
8     Q. Do you recall what he did, why he visited
9 the project?
10     A. He went on board and he checked cycle
11 times. He'd check bucket filling ratios. Just to
12 get a good grip on the productions that we would
13 have.
14     Q. What did he do after he checked the cycle
15 times and bucket filling ratios?
16     A. He would report back to me.
17     Q. And what did he report back to you?
18     A. That depends on the situation we were
19 dredging. He would report cycle times. He would
20 report bucket fillings.
21     Q. He would provide you simply with the data
22 that he had gathered?
23     A. That's correct. And actually he talked it
24 over and gave advice how you could improve.
25     Q. Do you recall what advice he gave you on

Page 60

1 how you could improve?
2     A. He had some ideas about cycle time which
3 we already came up with ourselves as well, so that
4 was pretty much supporting what we already thought of
5 ourselves.
6     Q. Do you recall what his ideas on the cycle
7 times were?
8     A. No. I don't.
9     Q. And other than that one visit, did he have
10 any other involvement with the Hylebos?
11     A. He would call and check just being
12 interested.
13     Q. Did he ever participate again in any sort
14 of official capacity?
15     A. I don't remember, sorry.
16     Q. Koek, K-O-E-K? I'm butchering these
17 names.
18     A. Gijs Koek, K-O-E-K. Gijs Koek.
19     Q. How do you spell his first name?
20     A. Gijs, G-I-J-S.
21     Q. What was his involvement on the project?
22     A. He runs the technical department within
23 Boskalis.
24     Q. And what did he do on the Hylebos?
25     A. He would give technical support to the

Page 61

1 performance of the Bonacavor, but also to the newly
2 built bucket, whatever questions you came with
3 technically.
4     Q. And when you said the newly built bucket,
5 are you referring to the HPG bucket?
6     A. Yes.
7     Q. Was the HPG bucket used for the first time
8 on the Hylebos project?
9     A. That's correct.
10     Q. Do you know whether it was actually
11 designed for the Hylebos project?
12     A. It was.
13     Q. Can you explain to me what, if anything,
14 was special about the HPG bucket?
15     A. It was specially designed with the water
16 depths that we would have on the job site, it was
17 specially designed for the Bonacavor, taking into
18 account its lifting capacities. Of course, trying to
19 get as big as possible bucket so you could remove
20 with relatively high productions.
21     Q. Do you know whether it was -- if there was
22 some sort of a -- strike that. Would the length of
23 the stick, is that something that's done to the
24 bucket? Does that make any sense?
25     A. It does somehow. It's very important.

16 (Pages 58 to 61)

5c61a6f9-f615-4f47-8edd-3c510fcd4569

Arie Van Den Adel

May 22, 2006

**Page 62**

1    Q.   Was that modified on the HPG bucket?
2    A.   The whole configuration of the Bonacavor
3  was laid out for the Hylebos project.
4    Q.   And what about the -- was there anything
5  else just about the bucket specifically that you
6  would consider unique to the Hylebos project other
7  than the things you said, the lifting capacity, the
8  size of it?
9    A.   Well, the bucket, of course, was unique
10  because it closes horizontally, and it was -- in
11  environmental dredging that's the bucket you want to
12  dredge with.  And we later engineered ourselves what
13  we called water bleeding valves on the bucket, which
14  is quite unique.
15    Q.   What is a water bleeding valve?
16    A.   It allows you to drain water from -- if
17  you have sediment captured in your closed bucket, you
18  have water on top of the sediment, and the water
19  bleeding valves allow you to drain the excessive
20  water off and only get the dry sediment into the
21  barges.
22    Q.   Anything else unique about the HPG bucket?
23    A.   I can't think of it right now.
24    Q.   So Mr. Koek -- I'm horrible with these
25  names -- he provided some technical support for the

**Page 63**

1  HPG bucket, and for other aspects of the Bonacavor,
2  is that --
3    A.   That is correct.
4    Q.   Anything else that he did?
5    A.   He was also, together with Gerard
6  Hoogewerff, the supporting team within Boskalis.
7    Q.   And what did he do on the supporting team
8  within Boskalis?
9    A.   If you had special requirements for the
10  project that came up during the preparation, you
11  could fall back on Gijs and Gerard and ask them to
12  modify, build, construct, whatever.
13    Q.   Was their involvement primarily related to
14  the equipment?
15    A.   For Gijs it was, yes.
16    Q.   And did he have any involvement after the
17  project commenced, after the dredging commenced?
18    A.   He did.  I would report back to Gijs, not
19  officially, but by phone.  I would report back to him
20  about Bonacavor performance, requirements that I
21  might have.
22    Q.   Did he assist in any repairs that needed
23  to be performed on the equipment at the site?
24    A.   He would oversee repairs from a distance.
25    Q.   When you needed to have a piece of

**Page 64**

1  equipment repaired, would you contact him?
2    A.   No, we would not.
3    Q.   Who would you contact?
4    A.   I would have my chief engineer aboard to
5  do the repairs or to get the repairs done.
6    Q.   Who was your chief engineer on board?
7    A.   Aaron Randolph.
8    Q.   Was there anything else that Mr. Koek did
9  in terms of support for you on your performance?
10    A.   He visited us once.
11    Q.   What did he do during his visit?
12    A.   He was very interested in our whole setup.
13    Q.   And what did he do other than express
14  interest?
15    A.   Like I said, he was very interested
16  because he thought we took the technology to the next
17  level, so he was very curious how we had everything
18  set up.
19    Q.   Was he there just to observe the
20  operation?
21    A.   Yes, he was.
22    Q.   Did he offer any comments or anything like
23  that?
24    A.   Yes, he did.
25    Q.   In what way?

**Page 65**

1    A.   I can't remember.  More general comments
2  about how we were working, how we could improve
3  certain things on the Bonacavor.
4    Q.   Do you remember the types of things that
5  he said you can improve on the Bonacavor?
6    A.   No, I don't remember.
7    Q.   Did he ever visit the site but for that
8  one time?
9    A.   He visited the site once prior to my
10  arrival there just in the preparation for -- during
11  the preparation of the whole project, it was prior to
12  my arrival and the actual execution of the project.
13    Q.   What about Mr. Koomer, K-O-O-M-E-R?
14    A.   John Koomer.
15    Q.   Koomer.  Who is he?
16    A.   He is the guy, the man within Boskalis who
17  has all the buckets under his supervision, so if you
18  need something, you call him.  If you need a special
19  bucket, you call him.
20    Q.   Did you have any dealings with Mr. Koomer?
21    A.   I called him once or twice to check on the
22  availability of a visor bucket, which he send as
23  well.
24    Q.   What is a visor bucket?
25    A.   It's a special excavation bucket which has

17 (Pages 62 to 65)

Arie Van Den Adel

May 22, 2006

Page 66

1  what we call a visor that you can close after you
2  have caught the sediment in the bucket, so you
3  actually bring a bucket up which is completely closed
4  and you don't have any mixture or leakage of sediment
5  from the bucket.
6      Q.  Is the visor bucket primarily used on
7  environmental dredging projects, to your knowledge?
8      A.  Yes, it is.
9      Q.  Had you ever had experience using a visor
10 bucket previously?
11     A.  No, I had not.
12     Q.  Why was a visor bucket used on this
13 project versus the HPG bucket, or at what times, I
14 should say, was the visor bucket used versus an HPG
15 bucket?
16     A.  We used it for dredging on the dock
17 because you could not access it with the HPG bucket.
18 You needed a special configuration of the excavator
19 to allow you to dredge with the visor bucket.
20     Q.  Was it used in any other locations on the
21 project?
22     A.  No, it was not.
23     Q.  And other than your contact with Mr.
24 Koomer requesting a visor bucket, do you know whether
25 he had any other involvement with the Hylebos

Page 67

1  project?
2      A.  No, I don't.
3      Q.  How about Mr. Korver?
4      A.  He is the designer within Boskalis who is
5  very much involved in designing HPG buckets.
6      MR. EVANS:  Could I get the name again,
7  because that siren was going by.
8      MS. BAVAND:  Korver, K-O-R-V-E-R.
9      Q.  I'm sorry, he designed the HPG bucket?
10     A.  He is involved in designing the HPG
11 bucket, yes.
12     Q.  And did you have any dealings with Mr.
13 Korver on the project?
14     A.  Yes, I did.
15     Q.  And in what way?
16     A.  He was very much involved when we built
17 the second excavator on the project site, he was
18 involved with, again, the configuration that was
19 possible for that excavator.
20     Q.  When you say the second excavator, is that
21 the Hitachi excavator that was used?
22     A.  That's correct.
23     Q.  And when you say he was very involved in
24 the configuration of the Hitachi, what are you
25 referring to?

Page 68

1      A.  He would, again, make calculations what a
2  Hitachi could lift, with which boom and stick
3  lengths, which bucket you can attach to the excavator
4  to optimize production.
5      Q.  Do you know whether anybody else within
6  the Bean or Boskalis entities were involved in the
7  configuration of the Hitachi dredge?
8      A.  John Lally was involved, but he was more
9  involved with the size of the bucket which might be
10 adequate for the Hylebos project.  The actual design
11 of the bucket and the construction is done in
12 Holland, overseas.
13     Q.  And that was primarily done by Mr. Korver?
14     A.  That's correct.
15     Q.  How about Onno Sheffe?
16     A.  Onno is an auto CAD designer within
17 Boskalis.
18     Q.  And what involvement do you know or are
19 you aware that he had on the project?
20     A.  Onno was involved in the early stages of
21 the project with calculating volumes of material to
22 be removed.
23     Q.  Did you have any dealings with him in that
24 capacity?
25     A.  No, I did not.

Page 69

1      Q.  Do you know specifically what he did?
2      A.  Based on the information we got from the
3  consulting engineer, DOF, he calculated the volume to
4  be removed.
5      Q.  So to your knowledge, he was provided the
6  design documents, plans and specifications, and
7  calculated volume?
8      A.  He was given the design depths to simply
9  calculate it.
10     Q.  Do you know who he was given the design
11 depths by?
12     A.  It was given by John Lally.
13     Q.  And when you say "design depths," what do
14 you mean?  Can you explain that for me?
15     A.  The historical RM depths that were made
16 available by DOF.
17     Q.  Is that also referred to as like the
18 deepest historical surface data?
19     MR. CRONIN:  Object to the form.  It's
20 vague.
21     A.  That is correct.
22     Q.  And to your knowledge, this process was
23 done before you started working on the Hylebos, is
24 that correct?
25     A.  That is correct.

18 (Pages 66 to 69)

Arie Van Den Adel

May 22, 2006

**Page 70**

1    Q.  H.W. Van Dam?
2    A.  Harry Van Dam works for an affiliate
3 company of Boskalis called Boskalis Dolman.  He was
4 involved with trying to help assist DOF with a water
5 treatment setup.
6    Q.  Did he have any other involvement other
7 than related to the water treatment facility?
8    A.  No, he did not.
9    Q.  Ruud Van --
10    A.  Ruud Van Maagstrigt.
11    Q.  And who is he?
12    A.  He's a production calculator, which later
13 on was followed up by William Castleton.
14    Q.  And what is a production calculator?
15    A.  These are guys you can call on, ask them
16 to visit you if you have a project, they will call
17 and they will make an analysis of how your equipment
18 performs.
19    Q.  And did Ruud do this on your project, on
20 the Hylebos?
21    A.  I called him a few times about production.
22 I don't remember if he visited us.  We had a lot of
23 people visiting us.
24    Q.  Do you know whether he ever provided you
25 with a report or an analysis or anything like that?

**Page 71**

1    A.  No, he did not.
2    Q.  Do you remember what you asked him when
3 you called him?
4    A.  General questions about productions.  We'd
5 been on many projects together.
6    Q.  And when you say "general questions on
7 productions," what are some examples of that?
8    A.  Again, how the production of the equipment
9 related to stepping of the equipment, if you have to
10 set back to a new cut, as we say.  Swing times,
11 operator performance.
12    Q.  All right.  Van Hoogstraten?
13    A.  Marcel Van Hoogstraten.
14    Q.  And what is his title, do you know?
15    A.  He's a colleague project manager.
16    Q.  Did he have any involvement on the
17 Hylebos?
18    A.  No, not at all.
19    Q.  And how about this individual, Willekes?
20    A.  Gerard Willekes.  He was the -- he follows
21 our projects from Papendrecht, main office, and he
22 follows our projects in the United States.
23    Q.  Do you know why?
24    A.  That's his task as a desk manager.
25    Q.  And when you say follow-up, what types of

**Page 72**

1 things does he follow up on, do you know?
2    A.  He would call and ask if you need certain
3 assistance in certain ways, and that's pretty much
4 it.
5    Q.  And did he make that call to you on the
6 Hylebos project?
7    A.  No, he did not.
8    Q.  Did you speak with him at all in your
9 performance?
10    A.  Sporadically.
11    Q.  What types of things would you speak
12 about?
13    A.  Just general performance on the project.
14 Not into detail.
15    Q.  Were there any other individuals that you
16 dealt with on the Hylebos project that were not
17 located on site?
18    A.  For technical support, you could also fall
19 back on the organization in New Orleans, fall back on
20 Scott Serose, which together with Gijs Koek forms a
21 team in technical department.
22    Q.  Gijs Koek, that's the K-O-E-K?
23    A.  That's the guy.
24    Q.  So Scott Serose was also a technical
25 support individual?

**Page 73**

1    A.  That's correct.
2    Q.  And he worked for what Bean entity, do you
3 know?
4    A.  He worked for Bean Dredging.
5    Q.  And how did you rely on him on the Hylebos
6 project?
7    A.  If I needed direct technical support, I
8 would call on Scott.  If it was more specific, and
9 maybe above Scott's head, with all respect, then I
10 would call on Gijs.
11    Q.  And when you say "technical support," what
12 specifically were you requesting from -- let's start
13 with Scott.
14    A.  Anything needed to have the excavator
15 perform, so anything from hydraulic hoses to pumps to
16 making sure the unit runs.
17    Q.  And what about Gijs, what types of
18 technical things would you ask him about?
19    A.  If Scott or myself needed assistance from
20 the Boskalis main organization, we would call on
21 Gijs, being the person present in that office.
22    Q.  Who would you call on for questions
23 related to CMS?
24    A.  I would call the CMS help desk in Holland.
25    Q.  Was there anyone in particular that you

19 (Pages 70 to 73)

# EXHIBIT H

The Honorable Ronald B. Leighton

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| 9   GENERAL METALS OF TACOMA, INC., a <br> 10   Washington Corporation, and ARKEMA INC., <br> a Pennsylvania Corporation, <br><br> 11              Plaintiffs, <br> 12      v. <br><br> 13   BEAN ENVIRONMENTAL LLC, a Delaware <br> Limited Liability Company, and BEAN <br> 14   DREDGING LLC, a Louisiana Limited <br> Liability Company, <br><br> 15              Defendants. | NO. C05-5306 RBL <br><br> FIRST AMENDED COMPLAINT FOR <br> BREACH OF CONTRACT, FRAUD <br> AND NEGLIGENT <br> MISREPRESENTATION AND <br> JURY DEMAND |

16

17       Plaintiffs General Metals of Tacoma, Inc., and Arkema Inc. (hereinafter collectively

18 referred to as "Head of Hylebos Cleanup Group" or "HHCG"), by and through their

19 attorneys, Williams, Kastner & Gibbs PLLC, for General Metals of Tacoma, Inc., and Groff

20 Murphy Trachtenberg & Everard PLLC, for Arkema Inc., allege as follows:

I. <u>PARTIES</u>

22       1.1      Plaintiff General Metals of Tacoma, Inc. ("General Metals"), is a Washington

23 corporation, with its principal place of business located at 1902 Marine View Drive,

24 Tacoma, Washington 98424.

25

FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT,
FRAUD AND NEGLIGENT MISREPRESENTATION AND JURY
DEMAND - 1

(C05-5306RBL)

1890937.1

**Williams, Kastner & Gibbs PLLC**
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

1.2    Plaintiff Arkema Inc. ("Arkema"), previously known as ATOFINA Chemicals, Inc., is a Pennsylvania corporation, with its principal place of business located at 2000 Market Street, Philadelphia, PA 19103-3222.

1.3    Defendant Bean Environmental LLC ("BELLC") is a Delaware limited liability company, with its principal place of business located at 1055 St. Charles Avenue, Suite 500, New Orleans, Louisiana 70130.

1.4    Defendant Bean Dredging LLC is a Louisiana Limited Liability Company, with its principal place of business located at 1055 St. Charles Avenue, Suite 500, New Orleans, Louisiana 70130.

## II.  JURISDICTION AND VENUE

2.1    This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1332.

2.2    The amount in controversy exceeds $250,000.

2.3    Venue is proper in Western Washington Federal District Court at Tacoma pursuant to 28 U.S.C. § 1391.

## III.  PLAINTIFFS' CLAIM FOR BREACH OF CONTRACT

3.1    In 2002, HHCG was directed by the EPA to perform environmental cleanup work at the Head of the Hylebos Waterway in the Tacoma tide flats by dredging the contaminated sediment and disposing of it off site.  For the dredging portion of the work, HHCG considered several contractors specializing in environmental dredging.

3.2    BELLC represented itself as an expert in the precise removal of contaminated sediments.  BELLC claimed it was the only company utilizing proprietary computerized dredging, which would minimize removal of clean native material, thereby lowering the overall cost of the cleanup work.

FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT, FRAUD AND NEGLIGENT MISREPRESENTATION AND JURY DEMAND - 2

(C05-5306RBL)

1890937.1

Williams, Kastner & Gibbs PLLC
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

3.3     BELLC also represented that it would complete the work in one "fish window" season (July 16, 2004 to February 14, 2005).

3.4     Based upon these representations, HHCG entered into written contract with BELLC on April 13, 2004, for the dredging work (the "Contract").

3.5     Incorporated into the Contract is a written unconditional Guaranty by Bean Dredging LLC for the full performance by BELLC of all liabilities arising under the Contract.

3.6     BELLC breached the Contract by its failure to substantially complete the dredging work within the time allowed under the Contract, by its failure to perform the work in compliance with the Contract Documents, and by its failure to seek reimbursement of project costs in accordance with the Contract Documents.

3.7     As a result of BELLC's failure to timely complete the dredging, HHCG will incur substantial costs to extend the cleanup work into a second "fish window" season, which poses the additional risk that dredged areas may be recontaminated, thereby causing additional costs.

3.8     As a result of BELLC's breach of Contract, HHCG has been damaged in an amount to be proven at trial.

3.9     BELLC has refused to provide HHCG with access to, or an accounting of records that allegedly justify BELLC's reimbursement claims under the Contract.

3.10     As a result of BELLC's refusal to provide access to, or an accounting of such records, HHCG cannot verify the accuracy of BELLC's reimbursement claims.

## IV.  PLAINTIFFS' CLAIMS FOR FRAUD AND NEGLIGENT MISREPRESENTATION REGARDING BELLC'S ALLEGED EXPERIENCE IN ENVIRONMENTAL SEDIMENT REMEDIATION

4.1     Paragraphs 1.1 through 3.10 are incorporated herein as though fully set forth.

FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT,
FRAUD AND NEGLIGENT MISREPRESENTATION AND JURY
DEMAND - 3

(C05-5306RBL)

1890937.1

Williams, Kastner & Gibbs PLLC
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

1    4.2    In order to induce the HHCG to contract with it, BELLC orally and in writing

2    represented that it had significant experience in environmental sediment remediation. Those

3    writings were in the parties' contract and within a brochure, a copy of which is attached as

4    Exhibit A.

5    4.3    BELLC's representations regarding its experience in environmental sediment

6    remediation were a material representation to the HHCG.

7    4.4    The HHCG had a right to rely and did rely upon BELLC's representations

8    regarding its experience in environmental sediment remediation in determining whether to

9    contract with BELLC.

10    4.5    BELLC's representations regarding its environmental sediment remediation

11    were false. In fact, BELLC's prior environmental sediment remediation experience was

12    limited to minimal dredging during a pilot effort for which BELLC was not chosen as the

13    contractor to perform the environmental sediment remediation.

14    4.6    BELLC knew its experience in environmental remediation was limited to the

15    prior pilot effort and that it did not have significant experience in environmental sediment

16    remediation at the time it made its representations to the HHCG.

17    4.7    BELLC intended for the HHCG to rely upon its false representations.

18    4.8    Until discovery well after the commencement of this action, the HHCG was not

19    aware of the falsity of BELLC's representations regarding its experience in environmental

20    sediment remediation.

21    4.9    As a direct result of BELLC's knowing and false representations regarding its

22    experience in environmental sediment remediation, the HHCG has been damaged in an amount

23    to be proven at trial.

24

25

FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT,
FRAUD AND NEGLIGENT MISREPRESENTATION AND JURY
DEMAND - 4

(C05-5306RBL)

1890937.1

Williams, Kastner & Gibbs PLLC
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

1      4.10    BELLC's false representations as described herein constitute fraud and/or

2  negligent misrepresentation.

3               V.  <u>PLAINTIFFS' CLAIMS FOR FRAUD AND NEGLIGENT</u>

4             <u>MISREPRESENTATION REGARDING BELLC'S INVOICES</u>

5      5.1    Paragraphs 1.1 through 4.10 are incorporated herein as though fully set forth.

6      5.2    In order to induce the HHCG to contract with it, BELLC orally and in the

7  parties' contract represented that it would invoice the HHCG on the basis of its actual costs in

8  performing the work plus an overhead fee of 9%.

9      5.3    BELLC's representations that it would invoice the HHCG at its cost plus 9%

10 overhead were a material representation to the HHCG to contract with BELLC. The actual

11 invoices to the HHCG were material representations by BELLC to the HHCG with respect to

12 BELLC's actual costs.

13     5.4    The HHCG had a right to rely and did rely upon BELLC's representations that it

14 would invoice at its cost plus 9% in contracting with BELLC. The HHCG had a right to rely

15 and did rely upon BELLC's written invoices that such invoices represented BELLC's actual

16 costs.

17     5.5    BELLC's representations that it would invoice the HHCG at its actual costs plus

18 a 9% overhead fee, at least with respect to surveying equipment and labor, were false. In fact,

19 BELLC invoiced the HHCG for its costs, at least with respect to surveying equipment and

20 labor, at its actual costs plus 10% plus an additional 9% for the overhead fee.

21     5.6    BELLC knew or should have known that its representations that it would

22 invoice the HHCG at actual cost plus a 9% overhead fee were false. BELLC knew that its

23 invoices were false and contained an additional undisclosed mark-up at least with respect to

24 surveying equipment and labor.

25

FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT,
FRAUD AND NEGLIGENT MISREPRESENTATION AND JURY
DEMAND - 5

(C05-5306RBL)

1890937.1

**Williams, Kastner & Gibbs PLLC**
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

1      5.7    BELLC intended for the HHCG to rely upon its false representations.

2      5.8    Until discovery well after the commencement of this action, the HHCG was not

3   aware of the falsity of BELLC's representations contained within the parties' contract and

4   within BELLC's invoices at least with respect to surveying equipment and labor.

5      5.9    BELLC's false representations and actions described herein constitute fraud

6   and/or negligent misrepresentation.

7      5.10   As a direct result of BELLC's knowing and false representations and its actions

8   regarding its costs, the HHCG has been damaged in an amount to be proven at trial.

9                          VI.  JURY DEMAND

10     4.1    Plaintiffs elect to have this case tried before a 12 member jury.

11                       VII.  REQUEST FOR RELIEF

12     WHEREFORE, Plaintiffs pray for relief as follows:

13     a.     Damages for breach of contract in an amount proven at trial;

14     b.     Damages for defendant BELLC'S fraud and negligent misrepresentation in an

15   amount to be proven at trial.

16     b.     Plaintiffs' reasonable attorneys fees and costs;

17     c.     Such other and further relief, which the court finds just and equitable.

18     DATED this 9th day of August, 2006.

s/John P. Evans, WSBA # 08892
19                                     Thomas A. Falkner, WSBA #28429
                                       Attorneys for Plaintiff General Metals of
20                                     Tacoma, Inc.
                                       WILLIAMS, KASTNER & GIBBS PLLC
21                                     601 Union Street, Suite 4100
                                       Seattle, WA 98101
22                                     Telephone: 206.628.6600
                                       Facsimile:  206.628.6611
23                                     E-mail:  jevans@wkg.com;
                                                 tfalkner@wkg.com
24

25                             and

FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT,          **Williams, Kastner & Gibbs PLLC**
FRAUD AND NEGLIGENT MISREPRESENTATION AND JURY           Two Union Square, Suite 4100 (98101-2380)
DEMAND - 6                                                Mail Address: P.O. Box 21926
                                                          Seattle, Washington 98111-3926
(C05-5306RBL)                                             (206) 628-6600

1890937.1

1

2          s/Marisa M. Bavand, WSBA # 27929
           David C. Groff WSBA # 04706
3          Attorneys for Plaintiff Arkema Inc.
           GROFF MURPHY TRACHTENBERG &
           EVERARD PLLC
4          300 East Pine Street
           Seattle, WA 98122
5          Telephone:  206-628-9500
           Facsimile:   206-628-9506
6          E-mail:  mbavand@groffmurphy.com
                     dgroff@groffmurphy.com
7

8                    **CERTIFICATE OF SERVICE**

9          I hereby certify that on the 9th day of August, 2006, I caused the foregoing to be

10    presented to the Clerk of the Court for filing and uploading to the CM/ECF system, which will

11    send notification of such filing to the following:

12    Counsel for Defendants:
      William F. Cronin
13    Kevin J. Craig
      Corr Cronin Michelson
14    Baumgardner & Preece LLP
      1001 Fourth Avenue, Suite 3900
15    Seattle, WA 98154-1051

16    *Attorneys for Defendants*
      *Bean Environmental L.L.C. and*
17    *Bean Dredging L.L.C.*

18          Signed at Seattle, Washington, this 9th day of August, 2006.

19          s/John P. Evans, WSBA # 08892
           Attorneys for Plaintiff General Metals of
20         Tacoma, Inc.
           WILLIAMS, KASTNER & GIBBS PLLC
21         601 Union Street, Suite 4100
           Seattle, WA 98101
22         Telephone: 206.628.6600
           Facsimile: 206.628.6611
23         E-mail:  jevans@wkg.com

24

25

FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT,        **Williams, Kastner & Gibbs PLLC**
FRAUD AND NEGLIGENT MISREPRESENTATION AND JURY         Two Union Square, Suite 4100 (98101-2380)
DEMAND - 7                                             Mail Address: P.O. Box 21926
                                                       Seattle, Washington 98111-3926
(C05-5306RBL)                                          (206) 628-6600

1890937.1

# EXHIBIT I



**Marisa M. Bavand**
E-Mail: mbavand@groffmurphy.com

August 22, 2006

**Via E-Mail and Regular Mail**

William F. Cronin, Esq.
Corr, Cronin, Michelson, Baumgardner & Preece LLP
1001 Fourth Avenue, Suite 3900
Seattle, WA 98154

    Re:    Arkema, Inc. / Hylebos Waterway Remediation

Dear Bill:

    During the course of the Holland depositions, testimony confirmed that records exist which originate both with Bean entities, and Boskalis entities that are directly related to the Hylebos project, Bean's claim for damages against the HHCG and that are responsive to Plaintiffs' discovery requests.

    We question why these documents have not been produced to date, and continue to be troubled by Bean's repeated failure to produce documents that go to the heart of Bean's claims in this case. Documents that I reference include:

1. Rinus van de Ven's notebooks related to the Hylebos project: Mr. Van de Ven testified that he maintained a series of notebooks related to various projects on which he was involved, which include documents related to the Hylebos project. He testified that he left his notebooks in the United States upon his retirement.

2. Rinus van de Ven's reports and/or correspondence to Boskalis: Mr. Van de Ven testified that he regularly reported to his superior at Boskalis, Mr. Sanders, regarding projects in the United States on which Boskalis equipment or personnel were being used, including the Hylebos project. He also testified that he reported to Jim Bean orally and in writing. He has no written communications between Mr. Van de Ven and Mr. Bean. He further stated that Ancil Taylor reported to Mr. Bean. We do not have written communications between Mr. Taylor and Mr. Bean.

3. Boskalis entered into agreements and invoiced Bean entities or Stuyvesant Dredging, Inc, related to employees and/or equipment on the Hylebos project. Mr. Van de Ven testified that Boskalis invoiced Stuyvesant Dredging, Inc., or Bean entities for equipment or

William F. Cronin, Esq.
August 22, 2006
Page 2

personnel "rented out" by Boskalis to those entities. He also testified that Stuyvesant Dredging and/or Bean entities, will then invoice those costs to another Bean entity and ultimately to the particular project. Bean failed to produce these integral invoicing records. In fact there are no internal records showing the "renting" of employees or equipment from Boskalis, and then down through Bean entities to the Hylebos project. No invoices or records provided to date even reference any of the Boskalis employees that worked on the project, including Gerard Hoogewerff, Onno Sheffe, or the various other Boskalis employees. We know from emails that Boskalis employees charged their time to the Hylebos project. Where are the records that document the charges through the Boskalis/Stuyvesant/Bean entities?

4. Documents supporting the sale of the HPG bucket and CMS equipment. Mr. Van de Ven testified that the HPG bucket was manufactured in Holland and purchased by Boskalis, and that Boskalis then sold the HPG bucket to Stuyvesant Dredging and then to one of the Bean entities. It was ultimately charged to and used on the Hylebos project. He also testified that the CMS system was sold by Boskalis to Stuyvesant and then it also was sold to one of the Bean entities for use on the Bonacavor during the Hylebos project. We have no records of these sales.

5. Project book keeping records and all of Tom Davis' files related to any equipment or employees used on the Hylebos project, and all Hylebos cost accounting records.

6. Any internal Bean equipment rental rates (for rental between Bean companies).

7. Records of any costs being charged or invoices between Bean Stuyvesant and Bean Environmental which are referenced in the Bean Services Agreements related to the project.

8. Records of any costs being charged or invoices between Bean Stuyvesant and Stuyvesant Dredging related to the project.

9. All files, records and documents within Boskalis related to work done on the Hylebos project. This includes records and files from Gerard Hoogewerff and Onno Sheffe. We are entitled to all electronic documents, all CAD files, all internal emails, all correspondence and all agreements. It is clear that Mr. Hoogewerff and Mr. Sheffe have maintained files and there are existing questions regarding the cross sections and basis of the calculations performed by Boskalis employees for the Hylebos project.

With respect to Boskalis documents requested, during previous communications, you indicated that the Defendants would not produce any Boskalis files because Boskalis is a "third party" and Defendants have "no control" over Boskalis. As you should know, during the depositions of Ancil Taylor, John Lally and Rinus van de Ven, the witnesses testified that Boskalis is in fact a part owner of Bean Environmental, and also has ownership interests in

William F. Cronin, Esq.
August 22, 2006
Page 3

several other Bean entities. Moreover, during Mr. Hoogewerff's deposition in Holland, Mr. Craig asserted the attorney-client privilege for communications between Mr. Hoogewerff and Bean employees, in which Mr. Clay Beery was cc'd. Mr. Evans questioned Mr. Craig as to why he was asserting the attorney client privilege on a communication where Mr. Hoogewerff (an employee of "third party" Boskalis) was included. Mr. Craig continued to assert the privilege.

Please let me know by August 23 as to whether Defendants will continue to maintain the position that Boskalis is a third party, over which Defendants have no control. If you continue to maintain that position, Plaintiffs believe that our CR 37 "meet and confer" requirements are met. Also, please confirm that all other requested documents will be produced immediately. If I do not hear from you on the issue by August 23, I will assume that you continue to assert the same position and that no additional documents will be produced. I require a quick deadline for your response due to pending court deadlines for filing discovery motions. Please respond in writing as I am traveling until August 26.

Please be advised that Plaintiffs reserve their right to supplement expert reports and rebuttal expert reports based on information obtained from newly produced documents. Plaintiffs also reserve the right to request additional depositions or the continued deposition of individuals as needed based on information provided in the documents responsive to Plaintiffs' discovery requests that Defendants have failed to produce despite repeated demands.

Very truly yours,

GROFF MURPHY TRACHTENBERG
& EVERARD, PLLC

*Sent Without Signature to Avoid Delay*

Marisa M. Bavand

cc:    John Evans/Tom Falkner
       Kristi Favard

# EXHIBIT J

**From:** Cronin, William [mailto:wcronin@corbin.com]
**Sent:** Monday, June 05, 2006 2:04 PM
**To:** Evans, John
**Cc:** Craig, Kevin; Lesnick, Ed
**Subject:** Discovery of Boskalis

My client is unwilling to assume an obligation to either produce witnesses or documents from a third party such as Boskalis. On the other hand, we will try to work with you regarding scheduling any depositions that you are able to arrange of Boskalis employees.

**NOTICE:**

This electronic message transmission contains information which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, please be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you received this electronic transmission in error, please notify the sender and delete the copy you received.

## CERTIFICATE OF SERVICE

It is hereby certified that this 28th day of August, 2006, copies of the forgoing document, **Declaration of Thomas W. Falker and Exhibits A-J in Support of the Declaration of Thomas W. Walker**, were hereby served as indicated.

| | |
|---|---|
| William F. Cronin<br>Kevin J. Craig<br>Corr Cronin Michelson<br>Baumgardner & Preece LLP<br>1001 Fourth Avenue, Suite 3900<br>Seattle, WA 98154-1051<br><br>*Attorneys for Defendants*<br>*Bean Environmental L.L.C. and*<br>*Bean Dredging L.L.C.* | ☑ **Via Federal Express**<br>☐ **Via Facsimile**<br>☐ **Via U.S. Mail**<br>☐ **Via Electronic Mail** |
| Jeffrey F. Lawrence<br>Heather M. Spring<br>Sher & Blackwell<br>1850 M Street, N.W.<br>Washington, D.C. 20036<br><br>*Attorneys for Stuyvesant Dredging Co.* | ☑ **Via Federal Express**<br>☐ **Via Facsimile**<br>☐ **Via U.S. Mail**<br>☐ **Via Electronic Mail** |
| Registered Agent: 9000010<br>Corporation Trust Company<br>1209 Orange Street<br>Wilmington, DE 19801<br><br>*Registered Agent for Boskalis*<br>*Westminster, Inc.* | ☐ **Via Federal Express**<br>☐ **Via Facsimile**<br>☐ **Via U.S. Mail**<br>☐ **Via Electronic Mail**<br>☑ **Via Hand Delivery** |

Fotini Antonia Skouvakis (I.D. No. 4793)