## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

GENERAL METALS OF TACOMA, INC.,
a Washington Corporation and ARKEMA
INC., a Pennsylvania Corporation,

        Plaintiffs,

    v.

BEAN ENVIRONMENTAL LLC, a
Delaware limited liability company and
BEAN DREDGING LLC, a Louisiana
limited liability company,

        Defendants.

Misc. Case No. 06-MC-165 (GMS)

Case Pending in the Western District
of Washington

Case No: CV05-5306 RBL

## REPLY IN SUPPORT OF GENERAL METALS OF TACOMA, INC.'S
## MOTION TO COMPEL COMPLIANCE WITH THE SUBPOENA
## SERVED ON BOSKALIS WESTMINSTER, INC.
## FOR ATTENDANCE AT A DEPOSITION *DUCES TECUM*

Of Counsel:

John P. Evans
Thomas W. Falkner
Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101
(206) 628-6600

*Attorneys for General Metals of
Tacoma, Inc.*

David Groff
Marisa Bavand
Groff Murphy Trachtenberg
300 East Pine Street
Seattle, WA 98122

*Attorneys for Plaintiff Arkema, Inc.*

MORRIS, JAMES, HITCHENS & WILLIAMS LLP
James W. Semple (I.D. No. 396)
Fotini Antonia Skouvakis (I.D. No. 4793)
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19899
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
Email: jsemple@morrisjames.com
     fskouvakis@morrisjames.com

*Attorneys for Plaintiffs General Metals of Tacoma,
Inc. and Arkema, Inc.*

DATED: September 15, 2006

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ii

I.    DUGAS DECLARATION SHOULD BE STRICKEN FOR LACK OF
PERSONAL KNOWLEDGE .............................................................................1

II.    THE COURT SHOULD COMPEL DEPOSITION OF AND
PRODUCTION BY BOSKALIS WESTMINSTER, INC. .................................1

        A.    Because BWI Admits it is the Parent of
SDC and SII, BWI Must Produce Documents
In SDC and SII's Control...........................................................2

        B.    BWI also Has Control Over Documents Responsive
to the Subpoena, Independent of SDC and SII ............................4

        C.    The Legal Authority Upon Which BWI Relies is
Factually Distinct by Virtue of BWI's Ownership
of the Bonacavor, its Ownership of SDC and SII,
and its Involvement in the Hylebos Project .................................6

        D.    The Hague Convention does not Apply and Need
Not be Used as a First Resort......................................................7

        E.    The Liberal Rules of Discovery do not Limit HHCG To
Obtaining Documents from Party Litigants, Especially
when (as here) the Related Part has Refused To Produce
Relevant Documents ...................................................................9

        F.    100 Mile Radius is a Red Herring................................................9

CONCLUSION...........................................................................................................11

i

## TABLE OF AUTHORITIES

__Cites__                                                                                                __Page__

Advance Labor Service, Inc. v. Hartford Acc. & Indem. Co.,
    60 F.R.D. 632 (N.D. Ill 1973)...................................................................... 2, 4, 8

Alimenta (U.S.A.), Inc. v. Anheuser-Busch Corp.,
    99 F.R.D. 309 (N.D. Ga. 1983)........................................................................ 2, 4

Camden Iron & Metal, Inc. v. Marubeni America Corp.,
    138 F.R.D. 438 (D. N.J. 1991)......................................................................... 2, 4

Choice-Intersil Microsystems, Inc. v. Agere Systems, Inc.,
    224 F.R.D. 471 (2004) ........................................................................................ 7

Haworth v. Herman Miller, Inc.,
    998 F.2d 975 (Fed. Cir. 1993)............................................................................. 9

Hubbard v. Rubbermaid, Inc.,
    78 F.R.D. 631 (D. Md. 1978).............................................................................. 8

In re ATM Fee Antitrust Litigation,
    233 F.R.D at 544 (N.D. Cal. 2005).................................................................. 2, 4

In re Investigation of World Arrangements, Etc.,
    13 F.R.D. 280 (D.D.C. 1952)........................................................................... 2, 4

Societe Nationale Industrielle Aerospatiale v. United States District Court of Iowa,
    482 U.S. 522 S. Ct. 2542, 96 L. Ed 2d 461 (1987)............................................. 7

Superfilmof Am. v. UCB Films, Inc.,
    219 F.R.D. 649 (D. Kans. 2004) ........................................................................ 8

United States v. Int'l Union of Petro. and Indus. Workers,
    AFL-CIO, 870 F.2d 1450 (9th Cir. 1989)........................................................... 2

U.S. Int'l Trade Comm'n v. ASAT, Inc.,
    411 F.3d 245 (D.C. Ct. App. 2005) .................................................................... 6

**Other Cites**

9A Wright & Miller, Federal Practice and Procedure § 2454 (2d ed. 1994)....................10

Federal Rules of Evidence 602 .......................................................................................1

## I.    DUGAS DECLARATION SHOULD BE STRICKEN FOR LACK OF PERSONAL KNOWLEDGE

In Opposition to HHCG's Motion to Compel, Boskalis Westminster, Inc. ("BWI")

relies almost entirely on the Declaration of Robert Dugas.  Mr. Dugas's Declaration does not

state that he has personal knowledge of the assertions made in his declaration.  On the contrary,

Mr. Dugas admits that he is merely the accountant for BWI's subsidiary, Suyvesant Dredging

Company ("SDC").  While one might generously infer that Mr. Dugas has knowledge of

SDC's finances, there is absolutely no evidence allowing for the inference that Mr. Dugas has

knowledge of: (1) BWI's corporate structure; (2) BWI's "sole purpose"; (3) whether BWI has

an ownership interest in the Bonacavor dredge; (4) whether BWI has authority to direct the

actions of Boskalis or BELLC; (4) whether BWI has control of additional documents

responsive to HHCG's subpoena; (6) the scope of BWI's involvement in the Hylebos project;

and (7) whether all responsive documents have been provided by BWI, SDC, or Bean

Environmental, LLC ("BELLC").  BWI has failed to establish that Mr. Dugas satisfies

FRE 602's personal knowledge requirement.[1]  HHCG respectfully requests that the Court

strike Paragraphs 3-9 of the Dugas declaration.  At a minimum, Mr. Dugas's declaration cannot

rebut HHCG's affirmative evidence to the contrary.

## II.    THE COURT SHOULD COMPEL DEPOSITION OF AND PRODUCTION BY BOSKALIS WESTMINSTER, INC.

As Boskalis Westminster, Inc. ("BWI") concedes in its Opposition, the issue is not

whether BWI has *possession* of documents responsive to the subpoena.  The issue is whether

BWI has *control* over such documents.  "Control is defined as the legal right to obtain

---

[1] The Federal Rules of Evidence 602 specifically states that "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness own testimony. . . ."

documents upon demand." Motion to Compel at 6-7; Opposition at 4.  By virtue of its status as

the parent of SDC and Stuyvesant, Inc. ("SII"), Dugas Decl. ¶ 4, by virtue of its ownership

interest in the Bonacavor dredge, Falkner Decl., Ex. F, and by virtue of its involvement in the

Hylebos project, Id., BWI has control over documents that are responsive to HHCG's

subpoena.  HHCG respectfully requests that the Court compel deposition and production.

     A.      **Because BWI Admits it is the Parent of SDC and SII, BWI Must Produce Documents in SDC and SII's Control.**

     BWI admits SDC and SII have documents responsive to the subpoena, Opposition at 3-

4, and HHCG has evidence suggesting SDC and SII have still more responsive documents that

have not been produced.  Yet, from the moment it received HHCG's subpoena, BWI has

maintained that it has no control over any documents responsive to the subpoena.  As a matter

of law "[a] corporation must produce documents possessed by a subsidiary that the parent

corporation owns or controls."  In re ATM Fee Antitrust Litigation, 233 F.R.D 542 (N.D. Cal.

2005) (quoting United States v. Int'l Union of Petro. and Indus. Workers, AFL-CIO, 870 F.2d

1450, 1452 (9th Cir. 1989)); See also In re Investigation of World Arrangements, Etc., 13

F.R.D. 280, 285 (D.D.C. 1952) (corporation has control over subsidiary and must produce

subpoenaed documents); Advance Labor Service, Inc. v. Hartford Acc. & Indem. Co., 60

F.R.D. 632, 633-634 (N.D. Ill 1973) (corporation required to produce books and records of

sister corporation with same directors and shareholders); Camden Iron & Metal, Inc. v.

Marubeni America Corp., 138 F.R.D. 438, 442 (D. N.J. 1991) ("[I]n parent/subsidiary

situations, the determination of control turns upon whether the intracorporate relationship

established some legal right, authority, or ability to obtain the requested documents on

demand."); Cf. Alimenta (U.S.A.), Inc. v. Anheuser-Busch Corp., 99 F.R.D. 309, 313 (N.D.

Ga. 1983) (control of documents was established when two sister corporations had acted "as

one" in relation to the transaction giving rise to the litigation, and the nonparty corporation had

provided assistance to the litigant corporation in connection with this case.); 8A Wright &

Miller, Federal Practice and Procedure § 2210 (2d ed. 1994). As an owner of SDC and SII,

BWI has and always has had control over documents in SDC or SII's possession. E.g., Dugas

Decl. ¶ 4. BWI's representations to HHCG's counsel and to this Court that it lacks control

over responsive documents are false as they are dispelled by BWI's own admissions. HHCG

respectfully submits that this Court should bear BWI's misrepresentation in mind when

evaluating the credibility of other representations in BWI's Opposition and the Dugas

Declaration.[2]

While BWI admits that its subsidiaries SDC and SII have control over responsive

documents, BWI contends that all responsive documents have already been produced by SDC.

Opposition at 3-4. BWI admits in its Opposition before this Court: Technical services, certain

equipment, and a Project Manager were provided to the project by BWI's Dutch parent

company [RBW] through [SDC] . . . ." Opposition at 3. But HHCG has learned that SDC

played a far more intricate role in the Hylebos Project. As HHCG pointed out before the

Federal District Court for the Eastern District of Louisiana in its Motion to Compel SDC,

testimony from the SDC president during the Hylebos project, Rinus Van de Ven, confirms

---

[2] Moreover, the credibility of Mr. Dugas's declaraton is further undermined by the fact that Mr. Dugas misleadingly stated, in his sworn declaration, that "SDC has already turned over all relevant, responsive documents *to the parties* for production." Dugas Decl. ¶ 5 (emphasis added). Mr. Dugas made a similar statement in an earlier declaration filed approximately 10 days ago in New Orleans. In reality, however, responsive documents were not previously produced, as evidence by the fact that just two days ago select and randomly organized documents from Stuyvesant Dredging were produced to the HHCG, which was *after* Mr. Dugas signed his declaration declaring that everything had been produced "to the parties." Also inadvertently included with the documents produced is an unbates stamped document, stating "To Clay from Bob Dugas." Supplemental Declaration of Thomas W. Falkner ("Supp. Falkner Decl."), Ex. A. "Clay" is presumably Clay Berry, who is in-house counsel for BELLC and its affiliated and related companies. Mr. Dugas's misleading representations further exemplify the necessity to depose Mr. Dugas or a designated corporate representative for BWI. There is simply no way of knowing the accuracy and completeness of the limited documentation from SDC belatedly produced just two days ago – let alone the relevant documentation from RBW and its related entities for which production has been refused by BELLC and by RBW's US based subsidiaries.

that SDC has control over additional documents related to the Hylebos Project. In sworn testimony, Mr. Van de Ven has testified that SDC has: (1) an interest in the Bonacavor, the dredge whose performance is at the center of this dispute, Appendix I,[3] Ex. F at 16:11-18:3; (2) documents related to the importation and sale of other dredging equipment at issue, Id. at 106:21-107:2; (3) a contract between SDC and Bean Environmental, LLC ("BELLC"), Id., Ex. E. In addition to providing equipment and resources through SDC, Mr. Van de Ven also testified that various RBW employees working on the Project were employed in the United States through SDC. Id., Ex. F at 20:15-24:22. Mr. Van de Ven also admitted that Stuyvesant was involved in the importation and sale of dredging equipment used specifically for the Hylebos project. Id. at 16:11-18:3, 20:15-24:22, and 106:21-107:2. And, by Mr. Van de Ven's own admission, SDC has (or should have) control of paperwork detailing the sale of that equipment. Id. at 106:21-107:2. Because SDC is a subsidiary of BWI, BWI has control over such documents and must produce such documents in response to HHCG's subpoena. See In re ATM Fee Antitrust Litigation, 233 F.R.D at 544; Int'l Union of Petro. and Indus. Workers, 870 F.2d at 1452; In re Investigation of World Arrangements, Etc., 12 F.R.D. 285; Advance Labor Service, Inc., 60 F.R.D. at 633-634; Camden Iron, 138 F.R.D. at 442; Cf. Alimenta (USA), Inc., 99 F.R.D. at 313.

  B.  <u>BWI Also Has Control Over Documents Responsive to the Subpoena,
Independent of SDC and SII.</u>

  As BWI admits in its Opposition, BWI is a subsidiary of Royal Bosaklis Westminster, nv. ("RBW"). On the website of parent company RBW, RBW declares that BWI owns a 25 % interest in the Bonacavor, the dredge at the heart of this litigation. Falkner Decl., Ex. F. In its

---

[3] Attached as Appendix I is the Declaration of Thomas Falkner filed in the Eastern District of Louisiana in support of HHCG's Motion to Compel SDC. To avoid duplication and confusion, this Falkner declaration is attached simply as Appendix I and should not be confused with the Falkner declaration filed originally with this Court in support of the underlying motion.

Response, BWI relies on the declaration of SDC's CPA in Louisiana, Robert Dugas, for the proposition that BWI has no assets and, thus, "does not itself own the dredge." Opposition at 3. Mr. Dugas provides no supporting documentation and, as set forth above, there is no evidence establishing that Mr. Dugas has personal knowledge of BWI's ownership interest in the Bonacavor. HHCG's written evidence of BWI's ownership of the Bonacavor, obtained from BWI's own parent is far more credible and persuasive than Mr. Dugas's unsupported conclusory statements. Based on the evidence of BWI's ownership of the Bonacavor, this Court should find that BWI has the legal right to obtain documents related to the Bonacavor on demand.

In addition, as set forth in the underlying Motion to Compel, testimony from defendant's project manager, Arie Van den Adel, suggests that BWI may very well have employees who were involved in the Hylebos project. Mr. Van den Adel spoke of several "Boskalis" employees who performed a substantial amount of work at Hylebos, but did not clarify whether the "Boskalis" employees were from BWI or RBW.[4] While Mr. Dugas again insists that BWI has no employees, he does not affirmatively establish who the "Boskalis"

---

[4] Their names, employer, and roles, drawn from Mr. Van den Adel's deposition testimony, are summarized as follows. Excerpts from the deposition of Arie Van den Adel are attached to the Falkner Declaration as Exhibit D.

| Name | Employer | Role | Cite |
|------|----------|------|------|
| Gijs Koek | Boskalis | • "runs the technical department within Boskalis" <br> • "give technical support to the performance of the Bonacavor" <br> • Tech Support for HPG Bucket <br> • "Supporting team" <br> • Oversee repairs | Van den Adel at 60-61, 63 |
| John Koomer | Boskalis | • Bucket Supervisor | Van den Adel at 65 |
| Mr. Krover | Boskalis | • Designed HPG Bucket <br> • "Very much involved" with second excavator, Hitachi, on the project site | Van den Adel at 67 |
| Onmo Sheffe | Boskalis | • CAD Designer <br> • Calculated volumes of material to be removed | Van den Adel at 68 |

employer of the employees listed in the underlying motion is.  Moreover, Mr. Dugas's

credibility is suspect in light of the fact that he lacks personal knowledge and falsely declared

that BWI has no responsive documents.  HHCG's Motion to Compel should be granted.

> C.  The Legal Authority Upon Which BWI Relies is Factually Distinct by Virtue of
> BWI's Ownership of the Bonacavor, its Ownership of SDC and SII, and its
> Involvement in the Hylebos Project.

U.S. Int'l Trade Comm'n v.  ASAT, Inc., relied upon heavily by BWI, is inapposite.  In

ASAT, Inc. the court of appeals found "neither the ALJ's findings, nor the record, indicate

whether ASAT Inc.'s relationship with its parent companies would give it access to the

subpoenaed documents in the ordinary course of business." 411 F.3d 245, 255 (D.C. Ct. App.

2005).  Contrarily, in the present case, HHCG has presented evidence that BWI has a 25%

interest in the Bonacavor dredge at the heart of the underlying dispute.  Falkner Decl., Ex. F.

BWI also owns SDC and SII, Dugas Decl. ¶ 4, and by virtue of such ownership has a legal

obligation to produce documents in SDC and SII's control as set forth above, including

"paperwork referencing the sale of the [HPG] bucket from the manufacturer to Boskalis

International, paperwork for the bucket from Boskalis International to Stuyvesant Dredging

Company, and paperwork for the sale of the bucket from [SDC] company to a Bean entity that

we know is not Bean Environmental" Appendix I, Ex. F at 106:21-107:2.  Furthermore, SDC,

and thus BWI, has control of documents related to the importation and sale of dredging

equipment used specifically for the Project.  Id. at 16:11-18:3, 20:15-24:22, and 106:21-107:2.

Based on this substantial evidence of the nexus between the subpoenaed documents and BWI's

relationship with RBW, this Court should grant HHCG's Motion to Compel.

D.    The Hague Convention Does Not Apply and Need Not Be Used as a First
      Resort.

The Hague Convention does not apply because the subpoena at issue seeks those

document's in the control of BWI, a U.S. corporation.  Nevertheless, BWI suggests HHCG is

obligated to employ the Hague Convention to obtain documents directly from RBW.  Yet the

U.S. Supreme Court has specifically rejected the proposition that a party must employ the

Hague Convention before resorting to discovery permitted under the Federal Rules of Civil

Procedure:

> [W]e cannot accept petitioners' invitation to announce a new rule of law that
> would require first resort to Convention procedures whenever discovery is
> sought from a foreign litigant. Assuming, without deciding, that we have the
> lawmaking power to do so, we are convinced that such a general rule would be
> unwise. In many situations the Letter of Request procedure authorized by the
> Convention would be unduly time consuming and expensive, as well as less
> certain to produce needed evidence than direct use of the Federal Rules.  A rule
> of first resort in all cases would therefore be inconsistent with the overriding
> interest in the "just, speedy, and inexpensive determination" of litigation in our
> courts.

Societe Nationale Industrielle Aerospatiale v. United States District Court of Iowa, 482 U.S.

522, 542, 107 S. Ct. 2542, 96 L. Ed 2d 461 (1987).  The Federal Rules of Civil Procedure

provide a specific mechanism for the production of documents from non-party witnesses such

as BWI.  BWI cannot shirk its obligations under CR 45 by simply suggesting that HHCG seek

documents in BWI's control from a foreign entity rather than directly from BWI.  Moreover,

BWI's argument (through BELLC's counsel) that HHCG should have employed the Hague

Convention ignores the facts – namely, that HHCG's motion to obtain documents from SDC is

based primarily on the uncontroverted deposition testimony of Rinus Van de Ven, taken only a

few weeks ago in the Netherlands on August 17, 2006.  Although the discovery cutoff in this

case is fast approaching, BWI and BELLC's counsel now apparently argue that HHCG should

7

use the Hague Convention to obtain documents controlled by SDC.[5]  Such an argument is disingenuous at best.[6]

When a United States corporation has possession and control over documents existing at its foreign counterpart's office, the documents must be produced.  See Choice-Intersil Microsystems, Inc. v. Agere Systems, Inc., 224 F.R.D. 471 (2004).  Indeed, the non-party status of a related company does not shield it from producing documents because the question is whether the party has possession, custody or control.  See Hubbard v. Rubbermaid, Inc., 78 F.R.D. 631 (D. Md. 1978); see also Advance Labor Service, Inc. v. Hartford Acc. & Indem. Co., 60 F.R.D. 632 (N.D. Ill. 1973) (corporation required to produce books and records of sister corporation).

In fact, even where a third-party is not a subsidiary but is closely related to the litigation and has documents, it may be subject to the control of the party from whom documents have been requested.  See Superfilmof Am. v. UCB Films, Inc., 219 F.R.D. 649, 654 (D. Kans. 2004) (expanding legal control test to avoid frustrating rules of discovery).  The purpose of this expanded scope is to honor the liberal treatment of the discovery rules and "disclose the real points of dispute between the parties and to afford adequate factual basis in preparation for trial."  Id.  The Court may order production of documents to prevent fraud, deceit, or sharp practices.  Id.

---

[5] The discovery deadline in this case is September 18, 2006, but HHCG is seeking from the Western District of Washington (and based, in part, on newly discovered evidence) to have the discovery deadline extended to obtain documents that are the subject of various motions to compel from SDC and other affiliated entities.

[6] Furthermore, the fact that HHCG retained counsel in the Netherlands to assist in scheduling Mr. Van de Ven's deposition is completely immaterial to requesting documents under the Hague Convention.  Two current Royal Boskalis Westminster employees were made available for deposition in the Netherlands in mid-August 2006, but HHCG also wanted to depose Mr. Van de Ven, who is now retired from SDC and Royal Boskalis Westminster and currently lives in the Netherlands.  HHCG, therefore, retained counsel in the Netherlands in July 2006 for the sole purpose of assisting with scheduling the deposition of Mr. Van de Ven, which was voluntarily attended by Mr. Van de Ven without any legal assistance from counsel in the Netherlands.

E.    The Liberal Rules of Discovery do not Limit HHCG To Obtaining Documents
      From Party Litigants, Especially when (as here) the Related Party has Refused
      To Produce Relevant Documents.

BWI attempts to district the Court with Haworth v. Herman Miller, Inc., 998 F.2d 975

(Fed. Cir. 1993), wherein one party sought production of a settlement agreement between the

opposing party and a third party non-litigant.  The court determined that production of the

settlement agreement should first be sought from the party litigant.  Unlike Haworth, it is

entirely unclear whether the documents under BWI's control overlap with the documents under

BELLC's control.  Throughout this litigation, however, BELLC makes it perfectly clear that its

position is that it has no control over any of the requested documents.  E.g., Falkner Decl.,

Ex. J.  Haworth is inapplicable and unpersuasive.  BWI cannot have it both ways.

In addition, even if BWI does have control over documents which are also under

BELLC's control, applying Haworth would work an injustice, hindering discovery and

rewarding BWI and BELLC's efforts to stonewall HHCG.  As noted in both the Motion to

Compel and in the Opposition, BELLC has resisted HHCG's discovery requests, forcing

HHCG to file a motion to compel against BELLC.  Apparently, BELLC is coordinating its

efforts to delay discovery with its affiliates, including SDC and BWI, in an effort to pass the

discovery cutoff.  See, supra, n. 4.  BWI's attempt to lure this Court into restricting its

discovery efforts to BELLC is in furtherance of a coordinated effort to block HHCG's

legitimate discovery efforts.  This Court should not reward BELLC and BWI for such

behavior, but should instead compel production of the documents requested in the subpoena to

BWI.

F.    100 Mile Radius is a Red Herring.

BWI's argues, without citation to legal authority, that despite the fact that BWI is

registered in Delaware, it need not produce a witness for deposition because that individual

witness is located more than 100 miles away from Delaware. Fed. R. Civ. P. 45(b)(2) provides that "a subpoena may be served at any place within the district of the court within which it is issued, or at any place without the district that is within 100 miles of the place of deposition." In the present case, BWI's registered agent is located in the District of Delaware. HHCG served BWI's agent in Delaware. Pursuant to CR 45 service within the district was proper, and whether or not BWI chooses a representative who resides more than 100 miles away is irrelevant. Moreover, personal service of a subpoena on a registered agent is sufficient, even though the agent on whom service is made does not have control of the books and records required to be produced, since it is not the agent who is to respond to the subpoena but the corporation, and the agent in that situation is merely the vehicle for reaching the corporation. 9A Wright & Miller, Federal Practice and Procedure, §2454 (2d ed 1994). Nevertheless, HHCG's counsel in the Washington State litigation is based in Seattle and will have to travel across the country to attend the records deposition of BWI. If the court orders the requested deposition, HHCG's counsel is more than happy to then negotiate in good faith with BWI to have the deposition take place at a location that BWI claims is more convenient.

## CONCLUSION

For the aforementioned reasons, HHCG respectfully requests that the Court compel BWI to produce a witness and documents in response to the subpoena at issue.

Of Counsel:

John P. Evans
Thomas W. Falkner
Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101
(206) 628-6600

*Attorneys for General Metals of Tacoma, Inc.*

David Groff
Marisa Bavand
Groff Murphy Trachtenberg
300 East Pine Street
Seattle, WA 98122

*Attorneys for Plaintiff Arkema, Inc.*

September 15, 2006

**MORRIS, JAMES, HITCHENS & WILLIAMS LLP**

James W. Semple (I.D. No. 396)
Fotini Antonia Skouvakis (I.D. No. 4793)
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19899
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
Email: jsemple@morrisjames.com
         fskouvakis@morrisjames.com

*Attorneys for Plaintiffs General Metals of Tacoma, Inc.
and Arkema, Inc.*

## CERTIFICATE OF SERVICE

I, Fotini Antonia Skouvakis, herby certify that a copy of the **Reply in Support of General Metals of Tacoma, Inc.'s Motion To Compel Compliance with the Subpoena Served on Boskalis Westminster, Inc. for Attendance at a Deposition *Duces Tecum*** was served electronically via CM/ECF this 15th day of September, 2006, upon the following:

    Brian E. Farnan, Esquire
    Phillips, Goldman & Spence, P.A.
    1200 North Broom Street
    Wilmington, DE 19806

                                    _____
                                    Fotini Antonia Skouvakis (Bar I.D. 4793)

1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

8

| | |
|---|---|
| GENERAL METALS OF TACOMA, INC., a Washington Corporation; and ARKEMA INC., a Pennsylvania Corporation, | NO. CV05-5306 RBL (Western District of Washington) |
| Plaintiffs, | DECLARATION OF THOMAS W. FALKNER IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL |
| v. | |
| BEAN ENVIRONMENTAL LLC, a Delaware limited liability company; and BEAN DREDGING LLC, a Louisiana limited liability company, | |
| Defendants. | |

9

10

11

12

13

14

15

16

I, Thomas W. Falkner, declare and state:

17

1.      I am an attorney with the law firm of Williams Kastner & Gibbs PLLC, and

18

represent Plaintiff General Metals of Tacoma, Inc. ("General Metals") in this matter.  I am over

19

the age of eighteen, have personal knowledge of the matters set forth herein and am competent

20

to testify.  I am not a party to this matter.

21

2.      This declaration is submitted in support of Plaintiffs' Motion to Compel

22

Deposition and Document Production of Stuyvesant Dredging Company ("Stuyvesant"), which

23

follows Stuyvesant's objection to a subpoena served on Stuyvesant on behalf of Plaintiffs

24

General Metals and Arkema, Inc. (collectively, the "HHCG") on May 4, 2006.

25

DECLARATION OF THOMAS W. FALKNER IN SUPPORT OF
PLAINTIFFS' MOTION TO COMPEL -1
(CV05-5306 RBL)

**Williams, Kastner & Gibbs PLLC**
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

1899721.1

3.      Stuyvesant is believed to be a subsidiary of a Netherlands-based entity known as Royal Boskalis Westminster n.v. ("Royal Boskalis"). In addition to Stuyvesant, the only other known United States entity believed to be a subsidiary of Royal Boskalis is Boskalis Westminster, Inc. ("Boskalis"), which has its registered agent in Delaware. Like Stuyvesant, Boskalis was recently served with a subpoena through its registered agent in Delaware. The subpoenas served on Boskalis and Stuyvesant are virtually identical. The same counsel from the Washington, D.C. law firm Sher & Blackwell LLP appeared on behalf of both Stuyvesant and Boskalis. HHCG's counsel contacted this counsel for Boskalis and Stuyvesant, who advised HHCG's counsel that Royal Boskalis entities would not be providing any additional documents responsive to the subpoena. A similar motion to compel directed at Boskalis is also being filed in Delaware.

4.      Attached hereto as Exhibit A is a true and correct copy of the subpoena served by the HHCG on Stuyvesant. This subpoena is one of seven subpoenas served on entities believed to be either related to or affiliated with Stuyvesant and believed to be connected to the dredging project that is the subject of this litigation. All seven subpoenas have been opposed and, until now, no motions to compel have been filed by HHCG.

5.      Attached hereto as Exhibit B is a true and correct copy of a letter from Stuyvesant's counsel, dated May 16, 2006, in which Stuyvesant objects to the subpoena.

6.      Attached hereto as Exhibit C is a true and correct copy of the Complaint originally filed in this matter.

7.      Attached hereto as Exhibit D is a true and correct copy of the First Amended Complaint for Breach of Contract, Fraud and Negligent Misrepresentation. A motion to amend

DECLARATION OF THOMAS W. FALKNER IN SUPPORT OF
PLAINTIFFS' MOTION TO COMPEL -2
(CV05-5306 RBL)

Williams, Kastner & Gibbs PLLC
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

1899721.1

1   the complaint to add claims for fraud and negligent misrepresentation is currently pending in

2   the Western District of Washington.

3       8.      Attached hereto as Exhibit E are true and correct copies of a two page invoice

4   dated July 24, 2004 from Bean Stuyvesant, LLC for "Hylebos Invoice Survey Equipment and

5   Personnel," as well as the June 15, 2004 agreement (upon which the invoice is premised)

6   between Bean Environmental, LLC ("BELLC") and Bean Stuyvesant, LLC "for survey work"

7   to be performed at the Head of the Hylebos Waterway in Tacoma, Washington.

8       9.      Attached hereto as Exhibit F is a true and correct copy of excerpts from the

10  Deposition of Rinus Van de Ven taken on August 17, 2006.

11      10.     Attached hereto as Exhibit G is a true and correct copy of an August 22, 2006

12  letter concerning numerous unproduced documents.  The letter is authored by Arkema, Inc.'s

13  counsel, Marisa M. Bavand, and sent to Bean Environmental, LLC's ("BELLC's") counsel,

14  William F. Cronin.

16      11.     Attached hereto as Exhibit H is a true and correct copy of one of several emails

17  in which BELLC's counsel, William F. Cronin, reiterates BELLC's refusal produce documents

18  from a third party that did not contract directly with the HHCG, such as [Royal] Boskalis.

19

20

21      The foregoing statement is made under penalty of perjury under the laws of the United

22  States of America, the State of Louisiana, and the State of Washington and is true and correct.

23  Signed at Seattle, Washington, this 27th day of August, 2006.

24

25                          _Tom Falkner_
                            Thomas W. Falkner

DECLARATION OF THOMAS W. FALKNER IN SUPPORT OF
PLAINTIFFS' MOTION TO COMPEL -3
(CV05-5306 RBL)

**Williams, Kastner & Gibbs PLLC**
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

1899721.1

# EXHIBIT A

AO 88 (rev. 1/94) Subpoena in a Civil Case

Issued by the

# UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **GENERAL METALS OF TACOMA, INC.**, a Washington Corporation, and **ARKEMA, INC.**, a Pennsylvania corporation, | **SUBPOENA IN A CIVIL CASE** |

Plaintiffs,

v.

**BEAN ENVIRONMENTAL LLC**, a Delaware Limited Liability Company,

CASE NUMBER:[1] CV05-5306
(Western District of Washington)

Defendant.

TO:    CUSTODIAN OF RECORDS
       STUYVESANT DREDGING CO.
       3525 N. CAUSEWAY BLVD., SUITE 612
       METAIRIE, LA  70002

☐ **YOU ARE COMMANDED** to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☒ **YOU ARE COMMANDED** to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| **Affiliated Conference Center** **650 Poydras St., Suite 2610** **New Orleans, LA  70130** | **May 19, 2006 at 3:00 p.m.** |

☒ **YOU ARE COMMANDED** to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):  **SEE ATTACHMENT A**

| PLACE | DATE AND TIME |
|---|---|
| **Affiliated Conference Center** **650 Poydras St., Suite 2610** **New Orleans, LA  70130** | **May 19, 2006 at 3:00 p.m.** |

☐ **YOU ARE COMMANDED** to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

   Any organization not a party to this suit is subpoenaed for taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure 30(b)(6).

---

1 If action is pending in district other than district of issuance, state district under case number.

10942 0006 je033411

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *[signature]*  Attorney for Plaintiff Arkema, Inc. | 5/4/06 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Marisa M. Bavand, Groff Murphy Trachtenberg & Everard, PLLC, 300 E. Pine, Seattle, WA 98122, Phone: (206) 628-9500

*(See Rule 45, Federal Rules of Civil Procedures, Parts C & D on Reverse)*

## PROOF OF SERVICE

| | SERVED | DATE<br>May 4, 2006 | PLACE<br>3525 N. Causeway Blvd., Suite 612<br>Metairie, LA 70002 |
|---|---|---|---|
| SERVED ON (PRINT NAME)<br>Custodian of Records<br>Stuyvesant Dredging Co. | | | MANNER OF SERVICE<br>Certified Mail, Return Receipt Requested |
| SERVED BY (PRINT NAME)<br>Darla Moran | | | TITLE<br>Legal Secretary |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the forgoing information contained in the Proof of Service is true and correct.

Executed on _____May 4, 2006_____          _____Darla Moran_____
Date                                         Signature of Server

300 E. Pine, Seattle, WA 98122
Address of Server

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.
    (1)  A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

    (2)(A)  A person commanded to produce and permit inspection and copying of designated books, papers, documents, or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

    (B)  Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises.  If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued.  If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expenses resulting from the inspection and copying commanded.

    (3)(A)  On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
        (i)  fails to allow reasonable time for compliance;
        (ii)  requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place

within the state in which the trial is held, or
        (iii)  requires disclosure of privileged or other protected material and no exception or waiver applies, or
        (iv)  subjects a person to undue burden.

    (B)  If a Subpoena
        (i)  requires disclosure of a trade secret or other confidential research, development, or commercial information, or
        (ii)  requires disclosure of an unretained expert's opinion or information not describing specific events or occurrence in dispute and resulting from the expert's study made not at the request of any party, or
        (iii)  requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.
    (1)  A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.
    (2)  When information subject to a subpoena is withheld on a claim that is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

10942 0006 je033411

<u>**Attachment A**</u>

**I.    Definitions.**

As used in this subpoena, the following terms have the meaning described below:

1.    **You.** "You," "yours," and similar terms refer to Stuyvesant Dredging Co. (and its respective agents, attorneys, and employees), and includes any predecessor or successor entities, any past or current parent, subsidiary or affiliated entities, or any former and present employees, officers, directors, representatives, or agents of Stuyvesant Dredging Co. and/or other persons acting or purporting to act on their behalf.

2.    **Stuyvesant.** "Stuyvesant" refers to Stuyvesant Dredging Co., and its agents, attorneys, and employees. "Stuyvesant" also includes any predecessor or successor entities, any past or current parent, subsidiary or affiliated entities, or any former and present employees, officers, directors, representatives or agents of Stuyvesant Dredging Co.

3.    **Communication.** "Communication" means any and all forms of communication between or among two or more persons, including but not limited to in-person meetings and conversations, telephone calls, voicemail or answering machine messages, letters, notes, memoranda, e-mail, and facsimile forms as applicable.

4.    **Relating, Regarding, or Concerning.** The terms "relating to," "concerning" or "regarding" shall mean concerning, in whole or in part and without limitation, relating to, regarding, constituting, pertinent, relevant or material to, evidencing, having a bearing on, or affecting, discussing and/or otherwise dealing with the subject matter in any manner whatsoever.

5.    **Agreement.** The "Agreement" refers to the contract, titled "Agreement Between General Metals of Tacoma, Inc. and Atofina Chemicals, Inc. and Bean Environmental L.L.C. on the Basis of Cost Plus," including all exhibits, attachments, and supplements, that was executed between the parties to the pending lawsuit on or about April 13, 2004.

6.    **HHCG.** "HHCG" refers collectively to Plaintiffs General Metals of Tacoma, Inc., and Arkema Inc.

7.    **Project.** "Project," means the remediation work at the Head of the Hylebos Waterway, which is the subject of the Agreement identified in Paragraph 5 above.

8.    **Relating or pertaining to.** "Relating to pertaining to" as used herein shall mean any document which is relevant in any way to the subject matter.

9.    **Document, Memoranda and/or Communication.** The terms "document," "memoranda," and "communication" mean and include, but are not limited to, any printed, typewritten, handwritten, computer generated, recorded or other graphic matter of whatsoever character and every other form of recording upon any tangible thing or any transcripts thereof, and computer files or emails in your possession and/or control, or in the possession or control of your employees, servants, agents, or counsel, or known by you to exist, and all copies of documents by whatever means made.

**II.    Document Request.**

Please make the following documents available for inspection and copying:

1.    All documents, communications, reports, summaries, illustrations, photos, video, surveys, data

10942 0006 je033411

and/or memoranda that relate in any way to the Project.

2.      All documents relating to any and all of your equipment used or billed to the Project, including:

a.      Equipment subsidiary and general ledgers from 1999 through 2005;

b.      Equipment purchase and sale or trade records from 1999 through 2005;

c.      Equipment overhaul records and analyses from 1999 through 2005;

d.      Equipment repair records and analyses from 1999 through 2005;

e.      Equipment utilization records and analyses from 1999 through 2005;

f.      Equipment bid and usage rate records and analyses from 1999 through 2005;

g.      All equipment insurance cost records from 1999 through 2005;

h.      All equipment lease records from 1999 through 2005;

i.      All equipment debt and financing records from 1999 through 2005; and

j.      All equipment and fixed asset and depreciation schedules from 1999 through 2005.

3.      All personnel files or employee records for all individuals employed or contracted by you to perform work on the Project.

4.      All documents, including reports, estimates, communications, summaries and illustrations, related to the planned or actual volume of material dredged or calculated to be dredged on the Project.

5.      All internal documents, including but not limited to organizational charts, procedures, instructions or guidelines regarding your personnel working on the Project, including the authority, responsibility and accountability of each member of your personnel working on the Project.

6.      All documents relating to your budgets and profit plans, including comparisons of your planned-versus-actual costs, and planned-versus-actual revenues on the Project.

7.      All documents relating to cash flow analyses and cash flow reports for the Project.

8.      All documents relating to charges recorded in job cost reports including, but not limited to: subcontracts/supply agreements, subcontractor/vendor invoices, equipment utilization records and support for cost rates, supervision and crew rates and labor timecards.  To the extent any equipment, labor or other services were provided by Bean-related entities, please produce underlying accounting support for the derivation of cost and/or billed amounts by the related entity.

9.      All payroll registers for labor on the Project.

10.    All labor distribution reports for labor on the Project.

11.    All documents related to the negotiation, execution or performance of the Agreement.

12.    All equipment and/or service agreements related to the Project.

13.    All documents, drawings, electronic files, maps, plans and blueprints that reflect or in any way pertain to the proposed or actual dredging plan for the Project.

14.    All communications in connection with any phase of the design, financing, engineering or performance of the Project.

15.    All calculations relating to the Project, including those handwritten or generated by computer, mechanical or electrical devices, performed by or for you in connections with the Project.

16.    All reports, summaries, communications and documents regarding the planned or actual performance of Bean Environmental on the Project.

17.    All documents relating to the productivity or production schedule of Bean Environmental on the Project.

18.    All equipment utilization records detailing mobilization, operating, idle and down time for all equipment used or billed to the Project.

19.    All documents, communications, and memoranda in your possession relating to insurance coverage, guarantees, and/or bonds for the Project.

# EXHIBIT B



**Sher** ⌬
**Blackwell**
ATTORNEYS AT LAW

Suite 900 • 1850 M Street, N.W. • Washington, D.C. 20036
Telephone: 202.463.2500 • Facsimile: 202.463.4950 • www.sherblackwell.com

A LIMITED LIABILITY PARTNERSHIP

Writer's Direct Dial:
(202) 463-2504/2516

RECEIVED
MAY 19 2006
GROFF & MURPHY PLLC

May 16, 2006

Marisa M. Bavand
Groff Murphy Trachtenberg &
    Everard PLLC
300 E. Pine St.
Seattle, WA 98122

Re:  Subpoenas Duces Tecum in General Metals of Tacoma, Inc. v. Bean Environmental LLC

Dear Ms. Bavand:

This letter constitutes the objections of Stuyvesant Dredging Company ("Stuyvesant Dredging") to the above-referenced subpoenas pursuant to Civil Rules 30(b)(6) and 45.

1.    Stuyvesant Dredging objects to the subpoena in its entirety on grounds that the subpoena has been interposed to harass, to cause unnecessary delay, and to cause needless increase in the cost of the litigation involving Bean Environmental LLC.

2.    Stuyvesant Dredging objects to the extent that the subpoena seeks production of documents that are protected by the attorney-client privilege, the work product doctrine, or other applicable privilege.

3.    Stuyvesant Dredging objects to the subpoena on the grounds that the requests are vague, ambiguous, and grossly overbroad, seek information and documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, and would impose an undue burden and expense.

4.    Stuyvesant Dredging objects to the extent that the subpoena seeks production of documents unrelated to the work of Bean Environmental LLC on the Hylebos Project.

5.    Stuyvesant Dredging objects to the subpoena in its entirety for failing to provide reasonable time for compliance.

7.    Stuyvesant Dredging objects to the extent that the subpoena seeks documents that are not in its possession, custody or control.

8.    Stuyvesant Dredging incorporates by reference the general and specific objections made by Bean Environmental LLC to the corresponding requests for production in the underlying litigation.

Stuyvesant Dredging also objects to the production of a witness for deposition for all of the above stated reasons, particularly the lack of reasonable notice.

Subject to the foregoing objections, Stuyvesant Dredging is providing to Bean Environmental for production in the underlying litigation this week a copy of the personnel file that it has for Arie van den Adel, as well as invoices for the Stuyvesant Dredging costs charged to the Hylebos project.  These are the only responsive documents possessed by Stuyvesant Dredging.  Please direct all further communications on this issue to me.

Sincerely,

Jeffrey F. Lawrence
Heather M. Spring

*Counsel for Stuyvesant Dredging Company*

cc:     Robert Dugas
         Clay Beery

2

# EXHIBIT C

1

2

3

————— FILED  ————— ENTERED
————— LODGED ————— RECEIVED

4

MAY 0 3 2005   MR

5

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
DEPUTY

6

7

8

## UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF WASHINGTON
### AT TACOMA

9

10

GENERAL METALS OF TACOMA, INC., a
Washington Corporation, and ARKEMA INC.,
a Pennsylvania Corporation,

NO.   **CV05-5306**

11

12

Plaintiffs,

COMPLAINT FOR BREACH OF
CONTRACT WITH
JURY DEMAND

v.

13

BEAN ENVIRONMENTAL LLC, a Delaware
Limited Liability Company, and BEAN
DREDGING LLC, a Louisiana Limited
Liability Company,

14

15

16

Defendants.

17     Plaintiffs General Metals of Tacoma, Inc., and Arkema Inc. (hereinafter collectively

18   referred to as "Head of Hylebos Cleanup Group" or "HHCG"), by and through their

19   attorneys, Williams, Kastner & Gibbs PLLC, for General Metals of Tacoma, Inc., and Groff

20   Murphy Trachtenberg & Everard PLLC, for Arkema Inc., allege as follows:

21                                    I. PARTIES

22        1.1     Plaintiff General Metals of Tacoma, Inc. ("General Metals"), is a Washington

23   corporation, with its principal place of business located at 1902 Marine View Drive,

24   Tacoma, Washington 98424.

25

COMPLAINT FOR BREACH OF CONTRACT WITH JURY
DEMAND - 1

**Williams, Kastner & Gibbs PLLC**
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

1699523.1

1      1.2     Plaintiff Arkema Inc. ("Arkema"), previously known as ATOFINA

Chemicals, Inc., is a Pennsylvania corporation, with its principal place of business located at

2000 Market Street, Philadelphia, PA 19103-3222.

      1.3     Defendant Bean Environmental LLC ("BELLC") is a Delaware limited

liability company, with its principal place of business located at 1055 St. Charles Avenue,

Suite 500, New Orleans, Louisiana 70130.

      1.4     Defendant Bean Dredging LLC is a Louisiana Limited Liability Company,

with its principal place of business located at 1055 St. Charles Avenue, Suite 500, New

Orleans, Louisiana 70130.

## II.  JURISDICTION AND VENUE

      2.1     This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1332.

      2.2     The amount in controversy exceeds $250,000.

      2.3     Venue is proper in Western Washington Federal District Court at Tacoma

pursuant to 28 U.S.C. § 1391.

## III.  PLAINTIFFS' CLAIM FOR BREACH OF CONTRACT

      3.1     In 2002, HHCG was directed by the EPA to perform environmental cleanup

work at the Head of the Hylebos Waterway in the Tacoma tide flats by dredging the

contaminated sediment and disposing of it off site.  For the dredging portion of the work,

HHCG considered several contractors specializing in environmental dredging.

      3.2     BELLC represented itself as an expert in the precise removal of contaminated

sediments.  BELLC claimed it was the only company utilizing proprietary computerized

dredging, which would minimize removal of clean native material, thereby lowering the overall

cost of the cleanup work.

COMPLAINT FOR BREACH OF CONTRACT WITH JURY
DEMAND - 2

**Williams, Kastner & Gibbs PLLC**
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

1699523.1

1    3.3    BELLC also represented that it would complete the work in one "fish window"

2  season (July 16, 2004 to February 14, 2005).

3    3.4    Based upon these representations, HHCG entered into written contract with

4  BELLC on April 13, 2004, for the dredging work (the "Contract").

5    3.5    Incorporated into the Contract is a written unconditional Guaranty by Bean

6  Dredging LLC for the full performance by BELLC of all liabilities arising under the Contract.

7    3.6    BELLC breached the Contract by its failure to substantially complete the

8  dredging work within the time allowed under the Contract, by its failure to perform the work in

9  compliance with the Contract Documents, and by its failure to seek reimbursement of project

10  costs in accordance with the Contract Documents.

11    3.7    As a result of BELLC's failure to timely complete the dredging, HHCG will

12  incur substantial costs to extend the cleanup work into a second "fish window" season, which

13  poses the additional risk that dredged areas may recontaminated, thereby causing additional

14  costs.

15    3.8    As a result of BELLC's breach of Contract, HHCG has been damaged in an

16  amount to be proven at trial.

17    3.9    BELLC has refused to provide HHCG with access to, or an accounting of

18  records that allegedly justify BELLC's reimbursement claims under the Contract.

19    3.10    As a result of BELLC's refusal to provide access to, or an accounting of such

20  records, HHCG cannot verify the accuracy of BELLC's reimbursement claims.

21    IV.    JURY DEMAND

22    4.1    Plaintiffs elect to have this case tried before a 12 member jury.

23

24

25

COMPLAINT FOR BREACH OF CONTRACT WITH JURY
DEMAND - 3

**Williams, Kastner & Gibbs PLLC**
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

1699523.1

1

## V.    REQUEST FOR RELIEF

2

WHEREFORE, Plaintiffs pray for relief as follows:

3

a.    Damages for breach of contract in an amount proven at trial;

4

b.    Plaintiffs' reasonable attorneys fees and costs;

5

c.    Such other and further relief, which the court finds just and equitable.

6

DATED this 3rd day of May, 2005.

7

8                                              Respectfully submitted,

9                                              WILLIAMS, KASTNER & GIBBS PLLC

10

By _____
11      John P. Evans, WSBA No. 08892
        Mark M. Myers, WSBA No. 15362
12      Heidi L. Evatt, WSBA No. 29527
        Attorneys for Plaintiff
13      General Metals of Tacoma, Inc.

14      GROFF MURPHY TRACHTENBERG &
        EVERARD PLLC
15

16
By _____
17      Stephen T. Parkinson WSBA No. 21111
        Attorneys for Plaintiff Arkema Inc.

18

19

20

21

22

23

24

25

COMPLAINT FOR BREACH OF CONTRACT WITH JURY
DEMAND - 4

Williams, Kastner & Gibbs PLLC
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

1699523.1

# EXHIBIT D

The Honorable Ronald B. Leighton

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| GENERAL METALS OF TACOMA, INC., a Washington Corporation, and ARKEMA INC., a Pennsylvania Corporation,<br><br>               Plaintiffs,<br><br>     v.<br><br>BEAN ENVIRONMENTAL LLC, a Delaware Limited Liability Company, and BEAN DREDGING LLC, a Louisiana Limited Liability Company,<br><br>               Defendants. | NO.  C05-5306 RBL<br><br>FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT, FRAUD AND NEGLIGENT MISREPRESENTATION AND JURY DEMAND |

Plaintiffs General Metals of Tacoma, Inc., and Arkema Inc. (hereinafter collectively referred to as "Head of Hylebos Cleanup Group" or "HHCG"), by and through their attorneys, Williams, Kastner & Gibbs PLLC, for General Metals of Tacoma, Inc., and Groff Murphy Trachtenberg & Everard PLLC, for Arkema Inc., allege as follows:

## I. PARTIES

1.1     Plaintiff General Metals of Tacoma, Inc. ("General Metals"), is a Washington corporation, with its principal place of business located at 1902 Marine View Drive, Tacoma, Washington 98424.

FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT, FRAUD AND NEGLIGENT MISREPRESENTATION AND JURY DEMAND - 1

(C05-5306RBL)

1890937.1

**Williams, Kastner & Gibbs PLLC**
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

1.2     Plaintiff Arkema Inc. ("Arkema"), previously known as ATOFINA Chemicals, Inc., is a Pennsylvania corporation, with its principal place of business located at 2000 Market Street, Philadelphia, PA 19103-3222.

1.3     Defendant Bean Environmental LLC ("BELLC") is a Delaware limited liability company, with its principal place of business located at 1055 St. Charles Avenue, Suite 500, New Orleans, Louisiana 70130.

1.4     Defendant Bean Dredging LLC is a Louisiana Limited Liability Company, with its principal place of business located at 1055 St. Charles Avenue, Suite 500, New Orleans, Louisiana 70130.

## II.  JURISDICTION AND VENUE

2.1     This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1332.

2.2     The amount in controversy exceeds $250,000.

2.3     Venue is proper in Western Washington Federal District Court at Tacoma pursuant to 28 U.S.C. § 1391.

## III.  PLAINTIFFS' CLAIM FOR BREACH OF CONTRACT

3.1     In 2002, HHCG was directed by the EPA to perform environmental cleanup work at the Head of the Hylebos Waterway in the Tacoma tide flats by dredging the contaminated sediment and disposing of it off site.  For the dredging portion of the work, HHCG considered several contractors specializing in environmental dredging.

3.2     BELLC represented itself as an expert in the precise removal of contaminated sediments.  BELLC claimed it was the only company utilizing proprietary computerized dredging, which would minimize removal of clean native material, thereby lowering the overall cost of the cleanup work.

FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT, FRAUD AND NEGLIGENT MISREPRESENTATION AND JURY DEMAND - 2

(C05-5306RBL)

1890937.1

**Williams, Kastner & Gibbs PLLC**
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

1        3.3    BELLC also represented that it would complete the work in one "fish window"

2    season (July 16, 2004 to February 14, 2005).

3        3.4    Based upon these representations, HHCG entered into written contract with

4    BELLC on April 13, 2004, for the dredging work (the "Contract").

5        3.5    Incorporated into the Contract is a written unconditional Guaranty by Bean

6    Dredging LLC for the full performance by BELLC of all liabilities arising under the Contract.

7        3.6    BELLC breached the Contract by its failure to substantially complete the

8    dredging work within the time allowed under the Contract, by its failure to perform the work in

9    compliance with the Contract Documents, and by its failure to seek reimbursement of project

10   costs in accordance with the Contract Documents.

11       3.7    As a result of BELLC's failure to timely complete the dredging, HHCG will

12   incur substantial costs to extend the cleanup work into a second "fish window" season, which

13   poses the additional risk that dredged areas may be recontaminated, thereby causing additional

14   costs.

15       3.8    As a result of BELLC's breach of Contract, HHCG has been damaged in an

16   amount to be proven at trial.

17       3.9    BELLC has refused to provide HHCG with access to, or an accounting of

18   records that allegedly justify BELLC's reimbursement claims under the Contract.

19       3.10    As a result of BELLC's refusal to provide access to, or an accounting of such

20   records, HHCG cannot verify the accuracy of BELLC's reimbursement claims.

21         IV.  PLAINTIFFS' CLAIMS FOR FRAUD AND NEGLIGENT

22       MISREPRESENTATION REGARDING BELLC'S ALLEGED EXPERIENCE IN

23           ENVIRONMENTAL SEDIMENT REMEDIATION

24       4.1    Paragraphs 1.1 through 3.10 are incorporated herein as though fully set forth.

25

FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT,
FRAUD AND NEGLIGENT MISREPRESENTATION AND JURY
DEMAND - 3

(C05-5306RBL)

1890937.1

**Williams, Kastner & Gibbs PLLC**
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

1    4.2    In order to induce the HHCG to contract with it, BELLC orally and in writing

2    represented that it had significant experience in environmental sediment remediation. Those

3    writings were in the parties' contract and within a brochure, a copy of which is attached as

4    Exhibit A.

5    4.3    BELLC's representations regarding its experience in environmental sediment

6    remediation were a material representation to the HHCG.

7    4.4    The HHCG had a right to rely and did rely upon BELLC's representations

8    regarding its experience in environmental sediment remediation in determining whether to

9    contract with BELLC.

10    4.5    BELLC's representations regarding its environmental sediment remediation

11    were false. In fact, BELLC's prior environmental sediment remediation experience was

12    limited to minimal dredging during a pilot effort for which BELLC was not chosen as the

13    contractor to perform the environmental sediment remediation.

14    4.6    BELLC knew its experience in environmental remediation was limited to the

15    prior pilot effort and that it did not have significant experience in environmental sediment

16    remediation at the time it made its representations to the HHCG.

17    4.7    BELLC intended for the HHCG to rely upon its false representations.

18    4.8    Until discovery well after the commencement of this action, the HHCG was not

19    aware of the falsity of BELLC's representations regarding its experience in environmental

20    sediment remediation.

21    4.9    As a direct result of BELLC's knowing and false representations regarding its

22    experience in environmental sediment remediation, the HHCG has been damaged in an amount

23    to be proven at trial.

24

25

FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT,
FRAUD AND NEGLIGENT MISREPRESENTATION AND JURY
DEMAND - 4

(C05-5306RBL)

1890937.1

**Williams, Kastner & Gibbs PLLC**
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

1    4.10    BELLC's false representations as described herein constitute fraud and/or

2    negligent misrepresentation.

3    V.  <u>PLAINTIFFS' CLAIMS FOR FRAUD AND NEGLIGENT</u>

4    <u>MISREPRESENTATION REGARDING BELLC'S INVOICES</u>

5    5.1    Paragraphs 1.1 through 4.10 are incorporated herein as though fully set forth.

6    5.2    In order to induce the HHCG to contract with it, BELLC orally and in the

7    parties' contract represented that it would invoice the HHCG on the basis of its actual costs in

8    performing the work plus an overhead fee of 9%.

9    5.3    BELLC's representations that it would invoice the HHCG at its cost plus 9%

10   overhead were a material representation to the HHCG to contract with BELLC.  The actual

11   invoices to the HHCG were material representations by BELLC to the HHCG with respect to

12   BELLC's actual costs.

13   5.4    The HHCG had a right to rely and did rely upon BELLC's representations that it

14   would invoice at its cost plus 9% in contracting with BELLC.  The HHCG had a right to rely

15   and did rely upon BELLC's written invoices that such invoices represented BELLC's actual

16   costs.

17   5.5    BELLC's representations that it would invoice the HHCG at its actual costs plus

18   a 9% overhead fee, at least with respect to surveying equipment and labor, were false.  In fact,

19   BELLC invoiced the HHCG for its costs, at least with respect to surveying equipment and

20   labor, at its actual costs plus 10% plus an additional 9% for the overhead fee.

21   5.6    BELLC knew or should have known that its representations that it would

22   invoice the HHCG at actual cost plus a 9% overhead fee were false.  BELLC knew that its

23   invoices were false and contained an additional undisclosed mark-up at least with respect to

24   surveying equipment and labor.

25

FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT,
FRAUD AND NEGLIGENT MISREPRESENTATION AND JURY
DEMAND - 5

(C05-5306RBL)

1890937.1

**Williams, Kastner & Gibbs PLLC**
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

1    5.7    BELLC intended for the HHCG to rely upon its false representations.

2    5.8    Until discovery well after the commencement of this action, the HHCG was not

3    aware of the falsity of BELLC's representations contained within the parties' contract and

4    within BELLC's invoices at least with respect to surveying equipment and labor.

5    5.9    BELLC's false representations and actions described herein constitute fraud

6    and/or negligent misrepresentation.

7    5.10    As a direct result of BELLC's knowing and false representations and its actions

8    regarding its costs, the HHCG has been damaged in an amount to be proven at trial.

9                    VI.  <u>JURY DEMAND</u>

10    4.1    Plaintiffs elect to have this case tried before a 12 member jury.

11                    VII.  <u>REQUEST FOR RELIEF</u>

12    WHEREFORE, Plaintiffs pray for relief as follows:

13    a.    Damages for breach of contract in an amount proven at trial;

14    b.    Damages for defendant BELLC'S fraud and negligent misrepresentation in an

15    amount to be proven at trial.

16    b.    Plaintiffs' reasonable attorneys fees and costs;

17    c.    Such other and further relief, which the court finds just and equitable.

18    DATED this <u>9th</u> day of August, 2006.

s/John P. Evans, WSBA # 08892
19    Thomas A. Falkner, WSBA #28429
Attorneys for Plaintiff General Metals of
20    Tacoma, Inc.
WILLIAMS, KASTNER & GIBBS PLLC
21    601 Union Street, Suite 4100
Seattle, WA 98101
22    Telephone: 206.628.6600
Facsimile:  206.628.6611
23    E-mail:  jevans@wkg.com;
             tfalkner@wkg.com
24
25                    and

FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT,
FRAUD AND NEGLIGENT MISREPRESENTATION AND JURY
DEMAND - 6

(C05-5306RBL)

1890937.1

**Williams, Kastner & Gibbs PLLC**
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

1

2                          s/Marisa M. Bavand, WSBA # 27929
David C. Groff WSBA # 04706

3                          Attorneys for Plaintiff Arkema Inc.
GROFF MURPHY TRACHTENBERG &
EVERARD PLLC

4                          300 East Pine Street
Seattle, WA 98122

5                          Telephone:  206-628-9500
Facsimile:  206-628-9506

6                          E-mail:  mbavand@groffmurphy.com
                                        dgroff@groffmurphy.com

7

8                    **CERTIFICATE OF SERVICE**

9      I hereby certify that on the 9th day of August, 2006, I caused the foregoing to be

10 presented to the Clerk of the Court for filing and uploading to the CM/ECF system, which will

11 send notification of such filing to the following:

12 Counsel for Defendants:
William F. Cronin

13 Kevin J. Craig
Corr Cronin Michelson

14 Baumgardner & Preece LLP
1001 Fourth Avenue, Suite 3900

15 Seattle, WA 98154-1051

16 *Attorneys for Defendants*
*Bean Environmental L.L.C. and*

17 *Bean Dredging L.L.C.*

18      Signed at Seattle, Washington, this 9th day of August, 2006.

19

20                          s/John P. Evans, WSBA # 08892
Attorneys for Plaintiff General Metals of
Tacoma, Inc.

21                          WILLIAMS, KASTNER & GIBBS PLLC

22                          601 Union Street, Suite 4100
Seattle, WA 98101

23                          Telephone: 206.628.6600
Facsimile: 206.628.6611

24                          E-mail:  jevans@wkg.com

25

FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT,
FRAUD AND NEGLIGENT MISREPRESENTATION AND JURY
DEMAND - 7

(C05-5306RBL)

**Williams, Kastner & Gibbs PLLC**
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

1890937.1

# EXHIBIT E



From: Kevin W. Pearse
To:    Tom Davis

Re:    Hylebos Invoice Survey Equipment and Personnel
Date:  July 24, 2004                                          pages 1


**Period 7 2004 Survey Invoice Report**

Start Date 6/21/04 to 7/18/04

Equipment Sum:  3 Desktop PC          $240.00   ( 2 Office, 1 Boat )
                2 Trimble 4000       $1040.00 ( Base Station, Boat )
                1 Trimble ms750      $1000.00 (Boat)
                1 HP Plotter          $250.00   (Office)
                Odom Echosounder     $1025.00 (Boat)
                1 Trimble 132         $250.00  (Boat)    **Sum: $3,805.00**

**CREDIT TO 099310 EG(PROJECT) 97500-010-0**


Personnel Sum:   Doug Dupre:      8 Days  Salary  $2,160.00  Per Diem $384.00
                 Robert Shaw:    21 Days Salary  $5,670.00  Per Diem $1,008.00
                 Greg Smith:     28 Days Salary $10,220.00  Per Diem $1,344.00
                 James Dunkley:  12 Days Salary  $3,900.00  Per Diem $576.00


                                       **Sum: $25,262.00**

**CREDIT TO G23007340-001-734003**

7-27-08; 3:01PM;Schniter.IT    Mat Cusma    ;503 286 6960    # 2/ 2

## SURVEY

| | RATE | BOAT | OFFICE | DREDGE | TOTAL |
|---|---|---|---|---|---|
| DESKTOP PC | 80.00 | 1 — 80.00 | 2 — 160.00 | | 240.00 |
| BASE STATION | 520.00 | 1 — 520.00 | 1 — 520.00 | | 1,040.00 |
| TRIMBLE MS750 | 1,000.00 | 1 — 1,000.00 | 0 — 0.00 | | 1,000.00 |
| HP PLOTTER | 250.00 | | 1 — 250.00 | | 250.00 |
| ODOM ECHOSOUNDER | 1,025.00 | 1 — 1,025.00 | | | 1,025.00 |
| TRIMBLE 132 | 250.00 | 1 — 250.00 | | | 250.00 |
| | CODE | $2,875.00 | $930.00 | $0.00 | $3,805.00 |
| | | 606303-310020 | 606313-310020 | 606323-310020 | |

## PERSONNEL

| | | GREG | ROBERT S | DOUG D | JAMES D | |
|---|---|---|---|---|---|---|
| SAL | 606310-500010 | 10,220.00 | | | 10,220.00 | |
| | 606340-500010 | | 5,670.00 | 2,160.00 | 3,800.00 | 11,730.00 |
| PER DIEM | 606340-330010 | 1,344.00 | 1,008.00 | 384.00 | 576.00 | 1,968.00 |
| | 606310-330010 | | | | 1,344.00 | 1,344.00 |
| | | 11,564.00 | 6,678.00 | 2,544.00 | 4,476.00 | 25,262.00 |

## AGREEMENT

This Agreement, made and entered into this 15th day of June 2004 by and between:

**Bean Environmental L.L.C.**    ("CONTRACTOR"), represented by its duly authorized representative; and

**Bean Stuyvesant, L.L.C.**    ("SUBCONTRACTOR"), a Delaware limited liability company represented by its duly authorized officer.

WHEREAS, CONTRACTOR entered into a written Agreement ("Prime Contract") with the Head of Hylebos Cleanup Group ("OWNER") regarding dredging of the Head of Hylebos Waterway in Tacoma, Washington (the "Project"); and

WHEREAS, CONTRACTOR desires to enter into a SUBCONTRACT with SUBCONTRACTOR relating to the survey work to be performed under the Prime Contract.

NOW, THEREFORE, the parties do hereby mutually agree as follows:

1.    SCOPE OF SUBCONTRACT WORK

SUBCONTRACTOR agrees to furnish all equipment (with the exception of the survey boat to be provided by CONTRACTOR), labor, and materials to complete the following work at the following price:

All pre-project, interim and final surveys required to be performed under the Prime Contract, and completion of all required survey-related submittals for the Owner under the Prime Contract, for costs plus 10%.

2.    RESPONSIBILITIES

SUBCONTRACTOR shall provide the services defined under Scope of Subcontract Work (Paragraph 1)(the "Subcontract Work") in a professional manner in conformance with any and all applicable modifications thereto, normally accepted standards and practices, and all applicable and existing federal, state and local laws and regulations, ordinances, and licensing requirements.

3.    PAYMENT FOR SUBCONTRACT WORK

SUBCONTRACTOR shall bill CONTRACTOR monthly for work completed. Within seven (7) calendar days after receipt of monies from OWNER,

CONFIDENTIAL    BEAN020744

B228    

CONTRACTOR will pay SUBCONTRACTOR the approved invoice amount less the aggregate of all payments previously made or credited to SUBCONTRACTOR. CONTRACTOR may, as a condition precedent to any such payment to SUBCONTRACTOR, require SUBCONTRACTOR to submit complete waivers and releases of any and all claims and/or liens of any person, firm or corporation in connection with or in any way related to the performance of this Agreement. Upon request, SUBCONTRACTOR shall in addition furnish acceptable evidence that all such claims have been satisfied.

Any reasonable amounts otherwise payable under the Agreement may be withheld, in whole or in part, if:

  a.  any liens or encumbrances arising specifically out of SUBCONTRACTOR'S work are filed against the Project, the real property upon which the project is situated, any vessels owned or chartered by CONTRACTOR or OWNER, or any funds payable to CONTRACTOR (hereinafter "Project Liens"); or

  b.  SUBCONTRACTOR is in default of any condition of this Agreement or the Prime Contract; or

CONTRACTOR will pay such withheld payments if SUBCONTRACTOR:

  a.  pays, satisfies or discharges all Project Liens; and

  b.  cures all defaults in the performance of this Agreement.

If Project Liens connected with performance under this Agreement are not promptly removed by SUBCONTRACTOR after receipt of written notice from CONTRACTOR to do so, CONTRACTOR may, in its sole discretion, remove such Project Liens and deduct all costs in connection with such removal from withheld payments or monies due, or which may become due, to SUBCONTRACTOR. If the amount of such withheld payment or other monies due SUBCONTRACTOR under the Agreement are insufficient to meet such costs, or if any Project Lien against SUBCONTRACTOR is discharged by CONTRACTOR after final payment is made, SUBCONTRACTOR shall promptly pay CONTRACTOR all costs incurred thereby.

Upon receipt by SUBCONTRACTOR of CONTRACTOR's written notice of final Acceptance of its Subcontract Work under this Agreement, SUBCONTRACTOR shall prepare an estimate in writing for CONTRACTOR's approval of the amount and value of all Subcontract Work satisfactorily completed under this Agreement. Upon CONTRACTOR's

CONFIDENTIAL

BEAN020745

approval of such estimate, SUBCONTRACTOR shall prepare and submit its final invoice in accordance with the approved estimate. Unless otherwise specified by applicable law, CONTRACTOR shall, within seven(7) calendar days following final written acceptance and after receipt of monies by CONTRACTOR from OWNER, pay to SUBCONTRACTOR the amount then remaining due, provided that, SUBCONTRACTOR shall have furnished to CONTRACTOR for itself, its SUBCONTRACTORS, laborers, and other parties acting through or under it, waivers and releases of any and all claims against CONTRACTOR and OWNER arising under or by virtue of this Agreement, except such claims, if any, as may with the consent of CONTRACTOR and OWNER be specifically excepted by SUBCONTRACTOR from the operation of the release in stated amounts to be set forth therein.

No payments of invoices or portions thereof shall at any time constitute approval or acceptance of the Subcontract Work under this Agreement, or be considered to be waiver of CONTRACTOR or OWNER of any of the terms of this Agreement.

4.   TIME OF THE ESSENCE

The time of performance on the part of SUBCONTRACTOR is an absolute consideration and is to be considered the essence of this Agreement. SUBCONTRACTOR shall commence and complete its work in a prompt and timely fashion and shall continue diligently to perform such work until completion.

SUBCONTRACTOR will perform its work hereunder in harmony with others employed on the project within the time stipulated.

5.   CHANGES

CONTRACTOR may order changes, modifications, deletions, and extra work by issuance of written Change Orders to this Agreement from time to time. SUBCONTRACTOR shall make no change in the work without receipt of a written Change Order. SUBCONTRACTOR shall not be entitled to compensation for any change work performed unless prior to commencing said work CONTRACTOR has issued a written Change Order designating the nature of the work. This Change Order shall contain a not to exceed amount or an agreed amount of additional or reduced compensation to be paid. The cost or credit to CONTRACTOR resulting from a change in the work shall be determined in one or more of the following ways:

   *   By mutual acceptance of a lump sum amount properly
       itemized and supported by sufficient substantiating data

CONFIDENTIAL

BEAN020746

to permit evaluation, or

\* Based on costs to be determined in a manner agreed upon by the parties and a mutually acceptable fixed fee.

Pending agreement by the parties to determine the value of or responsibility for changes, or additional costs or credits, the SUBCONTRACTOR shall continue with the prosecution of the work and will maintain an accurate accounting of the cost of such alleged changed work. In no event will a disagreement by the parties as to the responsibility for the cost of changed work be cause for suspension or delay in the prosecution of the work by SUBCONTRACTOR.

## 6. OPTIONAL TERMINATION

CONTRACTOR may, at its option, terminate for convenience any Subcontract Work this Agreement in whole or, from time to time, in part, at any time by written notice from CONTRACTOR to SUBCONTRACTOR.

Such notice shall specify the extent to which the performance of the Subcontract Work is terminated and the effective date of such termination. Upon receipt of such notice, SUBCONTRACTOR shall:

a. immediately discontinue Subcontract Work on the date and to the extent specified in the notice and place no further orders or subcontracts for materials, services, or facilities, other than as may be required for completion of such portion of Subcontract Work that is not terminated;

b. promptly obtain cancellation upon terms satisfactory to Owner of all purchase orders, subcontracts, rentals, or any other agreements existing for the performance of the terminated Subcontract Work or assign those agreements to CONTRACTOR as directed;

c. assist CONTRACTOR in the maintenance, protection, and disposition of Subcontract Work in progress, plant, tools, equipment, property, and materials acquired by SUBCONTRACTOR or furnished by SUBCONTRACTOR under this Agreement; and

d. complete performance of the Subcontract Work which is not terminated.

CONFIDENTIAL

BEAN020747

Upon any such termination SUBCONTRACTOR shall waive any claims for damages including loss of anticipated profit, on account thereof, but as the sole right and remedy of SUBCONTRACTOR, CONTRACTOR shall pay in accordance with the following:

    a.   all amounts due and not previously paid to SUBCONTRACTOR for Subcontract Work completed in accordance with the Agreement prior to such notice of termination, and for Subcontract Work thereafter completed as specified in such notice; and

    b.   reasonable administrative costs of settling and paying claims arising out of the termination of Subcontract Work under subcontract or purchase orders.

SUBCONTRACTOR shall submit within thirty (30) days after receipt of notice of termination, a proposal for an adjustment to the Subcontract price described in Appendix A including all incurred costs described herein. CONTRACTOR shall review, analyze, and verify such proposal, and negotiate an equitable adjustment, and this Agreement shall be amended in writing accordingly.

Those provisions of this Agreement that by their very nature survive final acceptance under this Agreement, shall remain in full force and effect after such termination.

7.    TERMINATION OF SUBCONTRACT WORK

SUBCONTRACTOR shall prosecute the work under this Agreement with due diligence without delay and shall not in any manner, by delay or otherwise, interfere with the work of CONTRACTOR or its other SUBCONTRACTORS. If Subcontractor is deficient in fulfilling its obligations under this Subcontract and fails to begin satisfactory correction of any deficiency within 3 days of receipt of written notice from CONTRACTOR, CONTRACTOR shall have the right to take whatever steps it deems necessary to correct any deficiency and charge the cost thereof to SUBCONTRACTOR. CONTRACTOR shall also have the right to issue a second written notice at that time stating that the contract will be terminated if SUBCONTRACTOR does not correct the deficiency. In the event the noticed deficiency remains uncured after the seven day period, CONTRACTOR may issue written notice of termination and thereafter charge SUBCONTRACTOR its costs in completing the Subcontract Work.

CONFIDENTIAL

BEAN020748

8.   TERMINATION BY SUBCONTRACTOR

If the Subcontract Work has been stopped, abandoned or suspended for an unreasonable period of time (longer than 7 days)not due to the fault or neglect of SUBCONTRACTOR, SUBCONTRACTOR may terminate this Agreement upon giving CONTRACTOR 7 days written notice. Subcontractor will then be entitled to recover payment for the work it has satisfactorily completed.

9.   DISPUTE RESOLUTION

CONTRACTOR and SUBCONTRACTOR agree that any proceeding or lawsuit involving this Agreement or the work performed pursuant to this Agreement shall be instituted in Louisiana, and any such suit or proceeding filed in the United States District Court for the Eastern District of Louisiana.

10.   CONCURRENT CONSTRUCTION

Construction work closely related to and/or located at the site of the work under Agreement may be in progress simultaneously with other work.  SUBCONTRACTOR shall cooperate with others as necessary in the interest of timely completion of all the work.  In the advent of interference, CONTRACTOR shall be notified immediately for resolution.

11.   PERMITS

CONTRACTOR shall obtain all permits necessary for the prosecution of the Subcontract Work.

12.   TAXES

SUBCONTRACTOR will be responsible for and will pay all excise, privilege, occupational, sales and use taxes and any other taxes applicable to the purchase and sale or use of materials and the cost of labor included in the performance of its work.

13.   ASSIGNMENT

SUBCONTRACTOR shall not assign or sublet any of the work or portion thereof that is included in this Agreement without the express written consent of CONTRACTOR.

CONFIDENTIAL

BEAN020749

14.  <u>NOTIFICATION OF DISCREPANCIES</u>

SUBCONTRACTOR shall check all Agreement documents, including drawings and specifications, furnished him immediately upon his receipt and shall promptly notify CONTRACTOR of any discrepancies noted.  Dimensions marked on drawings shall be followed in lieu of scale measurements.  Enlarged plans and details shall govern where the same work is shown in smaller scales.

CONFIDENTIAL

BEAN020750

15.  <u>INSURANCE REQUIREMENTS</u>

SUBCONTRACTOR shall carry and maintain the following insurance, all of which, with the exception of Workers' Compensation, shall name CONTRACTOR and OWNER as additional assureds to the extent and only to the extent of the indemnity obligations of SUBCONTRACTOR hereunder and/or the liability of SUBCONTRACTOR'S vessels and all of which shall provide that they may not be canceled or materially modified without thirty (30) days written notice to CONTRACTOR:

(a)  <u>Workers Compensation</u>

Statutory limits, including but not limited to Longshoreman and Harbor Workers' Compensation Act and Outer Continental Shelf Land Act coverages. The insurance coverages shall include coverage for any liability under the Jones Act, 46 U.S.C. Section 688, if such coverage is not included under other policies of insurance required herein.  Also including coverage "B" Employers' Liability.

(b)  <u>Automobile Liability</u>

Comprehensive Automobile Liability (Owned, Hired, Non-Owned)

Combined single limit $1,000,000 each occurrence

SUBCONTRACTOR agrees to furnish CONTRACTOR with certificates of insurance evidencing the above coverage within five (5) days of the execution of this Agreement.  Certificates shall stipulate that thirty (30) days advance written notice of cancellation or material change shall be given to CONTRACTOR.

SUBCONTRACTOR's compliance, or failure to comply, with the insurance provisions of this Agreement, shall not relieve or limit its obligation to indemnify or hold CONTRACTOR harmless where and to the extent so required by the provisions of this Agreement.

16.  <u>WARRANTY</u>

All materials and equipment incorporated into any of SUBCONTRACTOR's work pursuant to this Agreement shall be new and of the most suitable grade of their respective kinds for their

CONFIDENTIAL

BEAN020751

intended uses unless otherwise specified. All workmanship shall be in accordance with sound practices acceptable to CONTRACTOR and OWNER. SUBCONTRACTOR warrants all equipment, materials and labor it furnishes or performs under this contract against defects in design, materials, and workmanship. SUBCONTRACTOR further warrants that a) it has sufficiently trained and skilled personnel and suitable materials and equipment in good working order to perform its work in a safe, timely and workmanlike manner; and b) it has carefully read and is fully familiar with the Prime Contract and agrees to be bound to CONTRACTOR by the terms and conditions of the Prime Contract as they may pertain, in whole or in part, to the Subcontract Work.

17. SAFETY

SUBCONTRACTOR shall at all times conduct all operations under the Agreement in a manner to avoid the risk of bodily harm to persons and the risk of damage to any property. SUBCONTRACTOR shall continuously inspect all Subcontract Work, materials and equipment to discover and determine any conditions which might involve such risks and shall be solely responsible for discovery, determination and correction of any such conditions. SUBCONTRACTOR shall be solely responsible for complying with the safety requirements of the Prime Contract with respect to the Subcontract Work.

SUBCONTRACTOR shall report to CONTRACTOR as soon as possible all accidents or occurrences resulting in injuries or death to SUBCONTRACTOR's employees or third parties or damage to property of third parties arising out of or in connection with the work performed by SUBCONTRACTOR pursuant to this Agreement. When requested, SUBCONTRACTOR shall cooperate fully with any investigation performed by CONTRACTOR and shall furnish CONTRACTOR with copies of any accident reports prepared by SUBCONTRACTOR as well as any witness statements.

18. NOTICE

Any notice, communication or statement required to be given hereunder shall be in writing and deemed to have been sufficiently given when delivered in person, or sent by certified mail, return receipt requested, postage prepaid, to the address of the respective party set forth below, or to such other address for either party as that party may by written notice designate.

CONFIDENTIAL

BEAN020752

CONTRACTOR:  Bean Environmental L.L.C.

Attn:  Ancil Taylor
       President
       1055 St. Charles Avenue, Suite 500
       New Orleans, LA  70130

Tel.: 504-587-8701
Fax:  504-587-8717
SUBCONTRACTOR:

Bean Stuyvesant, L.L.C.
1055 St. Charles Avenue, Suite 520
New Orleans, LA 70130
Attn: Rinus van de Ven
      Chief Operating Officer
Tel.: 504-587-8702
Fax:  504-587-8717


19.  INDEMNIFICATION

SUBCONTRACTOR agrees to fully defend, protect, indemnify and hold
harmless CONTRACTOR and OWNER, their officers, directors,
employees, agents, shareholders, partners, parent, affiliated and
subsidiary companies (CONTRACTOR et al) from and against any and
all costs(including court costs and attorney fees) associated
with claims for bodily injury or death of any of SUBCONTRACTOR'S
employees or invitees, regardless of the cause of such injury or
death and even if CONTRACTOR or OWNER would otherwise be legally
responsible.  CONTRACTOR agrees to provide the same exact
indemnity just described to SUBCONTRACTOR, its officers,
directors, employees, agents, shareholders, partners, parent,
affiliated and subsidiary companies (SUBCONTRACTOR et al) with
respect to any injury or death of CONTRACTOR'S employees or
invitees.

With respect to all other personal injury or property damage
related to the Subcontract Work, SUBCONTRACTOR agrees to defend,
protect, indemnify and hold harmless CONTRACTOR et al for all
costs associated with such injury or damage, but only to the
extent of the negligence or other legal fault of SUBCONTRACTOR or
anyone employed directly or indirectly by SUBCONTRACTOR or anyone
else for whose acts SUBCONTRACTOR may be legally responsible.
CONTRACTOR will likewise provide the same exact indemnity just
described to SUBCONTRACTOR et al to the extent of CONTRACTOR'S
negligence or other legal fault.  It is agreed that CONTRACTOR is
responsible for the integrity of the adjacent pier with respect
to the performance of the Subcontract Work in accordance with the



CONFIDENTIAL      BEAN020753

plans referenced in Section 1 above.

The foregoing indemnity and defense obligations are separate from and in addition to any insurance that may be required of and/or otherwise carried by SUBCONTRACTOR. Such insurance shall not limit the amount or the scope of the defense and indemnity obligations of SUBCONTRACTOR.

20.  INDEPENDENT CONTRACTOR

It is expressly understood that SUBCONTRACTOR is an independent entity and that neither it nor its employees or lower tier SUBCONTRACTORS or their respective employees are servants, agents or employees of CONTRACTOR. The actual performance and superintendence of all work hereunder shall be by SUBCONTRACTOR and under the control and direction of SUBCONTRACTOR as to the details of the work; provided, however, CONTRACTOR is authorized to designate a representative, or representatives, who shall at all times have access to the location where the work is to be performed for the purpose of observing and inspecting the same, and assuring further that SUBCONTRACTOR's work shall be performed in accordance with this Agreement.

SUBCONTRACTOR and CONTRACTOR agree that all work and operations of SUBCONTRACTOR pursuant to this Agreement are an integral part of and are essential to the ability of CONTRACTOR to generate its goods, products and services. Irrespective of CONTRACTOR'S status as the statutory or special employer of SUBCONTRACTOR'S employees, SUBTRACTOR shall remain primarily responsible for the payment of workers compensation benefits to its employees, and shall not be entitled to seek reimbursement or contribution from Contractor for any such payments of benefits.

21.  CONFIDENTIAL INFORMATION

All parties agree that neither they nor their employees, SUBCONTRACTORS or agents will disclose or make known to any third party, other than as required in connection with the performance of their respective responsibilities, any documentary information of a confidential nature (including but not limited to plans, specifications, data, calculations, technology, practices, processes, and procedures or layouts) which pertain to the technical information supplied for the Project or the services provided by either party and which is acquired in connection with the services performed under this Agreement, without first obtaining the express written approval of the affected party(s). The foregoing obligation shall not apply to information which (a) was previously known to the parties or their employees,

CONFIDENTIAL

BEAN020754

SUBCONTRACOTS or agents, and (b) is or becomes available within the public domain.

## 22. CERTIFICATE OF COMPLIANCE

Any certificate required for demonstrating proof of compliance of materials with specification requirements shall be executed in three copies. Each certificate shall be signed by an official authorized to certify on behalf of the manufacturing company and shall contain the name and address of SUBCONTRACTOR, the project name and location, and the quantity and date or dates of shipment or delivery to which the certificates apply. Copies of laboratory tests reports submitted with certificates shall contain the name and address of the testing laboratory and the date or dates of the test to which the report applies. Certification shall not be construed as relieving SUBCONTRACTOR from furnishing satisfactory material, if, after tests are performed on selected samples, the material is found not to meet the specific requirements.

## 23. ATTORNEY FEES AND COSTS

In the event either party shall retain legal counsel or initiate litigation to enforce all or any portion of this Agreement, including the defense, indemnity and insurance provisions herein, then it is agreed that the non-prevailing party will reimburse all attorney fees and expenses incurred by the prevailing party in connection therewith.

## 24. GOVERNING LAWS

This agreement shall be construed under the laws of the State of Louisiana.

## 25. ENTIRE AGREEMENT

This Agreement constitutes the entire Agreement of the parties with respect to the subject matter hereof. No change, modification, addition or termination of this Agreement shall be enforceable unless in writing and signed by the party against whom enforcement is sought. All notices, demands, or requests provided for or permitted must be in writing and addressed to each party at the addresses shown in Paragraph 18, NOTICE.

CONFIDENTIAL       BEAN020755

Executed by the parties hereto as of the day and year first written above.

CONTRACTOR: Bean Environmental L.L.C.
By: _____
Name _____
Title _____

SUBCONTRACTOR:  Bean Stuyvesant, L.L.C.

By: _____
Name _____
Title _____

CONFIDENTIAL        BEAN020756

# EXHIBIT F

August 17, 2006

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA


GENERAL METALS OF TACOMA, INC., a )
Washington Corporation; and ARKEMA )
INC., a Pennsylvania Corporation, )
                                   )
              Plaintiffs,          )
                                   )
         vs                        ) No.
                                   ) CV05-5306 RBL
BEAN ENVIRONMENTAL LLC, a Delaware )
Limited Liability Company; and     )
BEAN DREDGING LLC, a Louisiana     )
Limited Liability Company,         )
                                   )
              Defendants.          )
                                   )


Videotaped deposition of Rinus Van de Ven

taken on

Thursday, August 17, 2006


Reported by:  Shelle Higgins

              CSR NO. 10455, CLVS

b9d60dc7-9f49-4f54-8007-d73d3f79e257

August 17, 2006

---

Page 10

1  way with any other entity?
2       MR. CRAIG: Object to the form of the
3  question.
4  BY MS. BAVAND:
5       Q. Do you understand my question?          09:12
6       A. Yes, I think I understand. I'll give you the
7  answer and then we'll conclude that -- you can
8  conclude that.
9       I was President at that time of Stuyvesant,
10  being the Boskalis representation in the United       09:12
11  States. And I was part of an organization called Bean
12  Stuyvesant, which is a joint venture between the Bean
13  companies and the Stuyvesant company.
14       Q. And what was your role with Bean Stuyvesant?
15       A. In Bean Stuyvesant I was Chief Operational    09:13
16  Officer, COO, as it's called in your language.
17       Q. And so just to clarify, you were President of
18  Stuyvesant?
19       A. Uh-huh.
20       Q. Is that the full name of the entity?          09:13
21       A. Stuyvesant Dredging, Inc., is the full name.
22       Q. Do you know who owns Stuyvesant Dredging,
23  Inc.?
24       A. Stuyvesant Dredging, Inc., is a Boskalis
25  company. It's an affiliate of Boskalis.              09:13

---

Page 11

1       Q. Okay. And how long had you been the President
2  of Stuyvesant Dredging, Inc.?
3       A. When I started off in the United States,
4  somewhere in the early Spring, February 2002. And
5  that was when I started also in that function, in that  09:14
6  role with Stuyvesant and with Bean Stuyvesant.
7       Q. And when you started in your role with
8  Stuyvesant Dredging, Inc., in the February 2002 time
9  frame, were you made President of Stuyvesant Dredging,
10  Inc.?                                                 09:14
11       A. Yes, that's when I was nominated to be
12  President there.
13       Q. So from roughly February 2002 to August 2005,
14  did you hold the title of President of Stuyvesant
15  Dredging, Inc.?                                       09:14
16       A. Yes, ma'am.
17       Q. And you also testified that you were the Chief
18  Operating Officer of Bean Stuyvesant. When did you
19  obtain that title?
20       A. Same time when I arrived in the United States.  09:14
21       Q. In the February --
22       A. Also February 2002. Maybe March, due to the
23  paperwork involved. I don't know the exact date.
24       Q. And did you hold that role of Chief Operating
25  Officer of Bean Stuyvesant until your retirement in    09:15

---

Page 12

1  August of 2005?
2       A. Yes, ma'am, affirmative.
3       Q. Did you have any other responsibilities or
4  roles with any other entity in the United States from
5  February 2002 to August of 2005?                      09:15
6       MR. CRAIG: Object to the form.
7       THE WITNESS: Always within that function as
8  COO. But as Bean Stuyvesant, we had working relations
9  with other American dredging contractors in several
10  jobs, joint ventures and what have you. And of course  09:15
11  I was involved in the execution of those works, but
12  always from the base point as being COO of Bean
13  Stuyvesant.
14  BY MS. BAVAND:
15       Q. Did you hold any position or titles with any   09:15
16  other Bean entity during your employment?
17       A. No, ma'am, I didn't.
18       Q. You were not on the Board or a Director of,
19  say, Bean Environmental?
20       A. No, ma'am, I wasn't. I was on the Board of    09:16
21  Bean Stuyvesant.
22       Q. Did you have any role with an entity by the
23  name of CF Bean?
24       A. No, ma'am, I hadn't.
25       Q. And what about Bean Dredging Inc., or LLC, did  09:16

---

Page 13

1  you have any title or responsibility with Bean
2  Dredging?
3       MR. CRAIG: Object to form.
4       THE WITNESS: Also not. No, ma'am.
5  BY MS. BAVAND:                                        09:16
6       Q. Prior to February of 2002, who were you
7  employed by?
8       A. Always, as I stated when we started off the
9  discussion, I was employed by Boskalis company, but in
10  other parts of the world. And my employment at that   09:17
11  time or my working place before coming into the United
12  States was Singapore.
13       Q. And what -- do you recall the name of the
14  entity that you were employed by while working in
15  Singapore?                                            09:17
16       A. For the clearness, if you say "employed by"
17  you mean on whose payroll I was?
18       Q. Let me back up then. In February of -- from
19  February of 2002 to August 2005, were you receiving a
20  -- who were you receiving your paycheck from?          09:17
21       A. From Boskalis.
22       Q. And at any time during your employment for
23  Boskalis, did you receive a paycheck from any other
24  entity other than Boskalis?
25       A. No, ma'am, I didn't.                          09:17

---

4 (Pages 10 to 13)

b9d60dc7-9f49-4f54-8007-d73d3f79e257

August 17, 2006

---

Page 14

1    Q. When did you begin working for Boskalis?
2    A. 1968.
3    Q. Going back to the February 2002 through August
4    of 2005, can you please provide me with a, an
5    accounting of what your duties were as the President    09:18
6    of Stuyvesant Dredging, Inc.?
7    A. As President of Stuyvesant Dredging, Inc., I
8    was responsible for checking with our, our
9    administrative people in Stuyvesant, the correct
10   invoicing from Boskalis Holland to Stuyvesant, Inc.,    09:18
11   and from Stuyvesant, Inc., to our joint venture
12   companies -- sorry -- company, Bean Stuyvesant.
13       Furthermore, I was responsible for the correct
14   charter rates from the equipment of Stuyvesant to be
15   brought in to working companies like Bean Stuyvesant.   09:19
16       I had to sign off, of course, on the yearly
17   fiscal documents, tax documents, whatever you call
18   them, towards the United States government, for
19   Stuyvesant had activities in several, several states,
20   so you have to fill in tax forms for several states,    09:19
21   as well. I had to sign all of those.
22       That's more or less it.
23   Q. Why was Stuyvesant Dredging, Inc., formulated,
24   if you know?
25   A. It's way back in, in the year that the    09:20

---

Page 15

1    American dredging market looked promising to Boskalis,
2    and Boskalis decided this company to erect an American
3    company. And that under the Jones Act it's only
4    possible if you, if you build American equipment in
5    the United States, if you crew it with American    09:20
6    people, and if you were financed by American capital.
7    So we fulfilled those three and erected an American
8    dredging company. That had to do with the philosophy
9    that the company had about the dredging market in the
10   U.S.    09:20
11   Q. When you say that you're required to build
12   American equipment, what equipment while you were
13   working with Stuyvesant Dredging, Inc., did you
14   oversee the, the development of?
15   A. No, ma'am, because the moment that I came down    09:21
16   to act as President of Stuyvesant, all our American
17   dredging equipment was built already, was constructed
18   already. It was ready, it was working. So I didn't
19   oversee the construction of this equipment because it,
20   it was, it was done already, it was working.    09:21
21   Q. Do you know when the equipment that Stuyvesant
22   Dredging, Inc., utilized in performance of work in the
23   United States, when that equipment was built?
24   A. No, ma'am, not, not the exact dates.
25   Q. Do you know whether it was built for    09:21

---

Page 16

1    Stuyvesant Dredging, Inc., or whether it was acquired
2    by, by them from other companies?
3    A. No, ma'am. At that time, I was not involved
4    in the erection of the company. I notice what I told
5    you by going through documentation, but I was not    09:22
6    involved in the erection of the company. So I'm, I'm
7    not sure I -- the equipment was newly built, I know
8    that, but whether, whether, whether it was built by
9    Stuyvesant or through other companies, I really don't
10   know.    09:22
11   Q. Do you know whether the Bonacavor, the dredge
12   Bonacavor was a piece of equipment that was within the
13   Stuyvesant dredging company, that it was owned by the
14   Stuyvesant dredging company when you began working
15   there in February of 2002?    09:22
16   A. I don't think it was, it was owned by
17   Stuyvesant, ma'am.
18   Q. I believe you testified that the Stuyvesant
19   Dredging, Inc., company affiliated itself in some way
20   to Bean Stuyvesant; is that correct?    09:23
21   A. That's correct, ma'am.
22   Q. And when did that happen?
23   A. Also before my time. It must have been around
24   about the year 2000 or maybe '99 or that, that -- when
25   I picked it up.    09:23

---

Page 17

1    Q. And do you know the, the manner in which the
2    two companies worked together, what their arrangement
3    is?
4    A. I can partly -- yeah, let me try to answer
5    your question as good as I can. It's a kind of a    09:23
6    working company, a joint venture where both companies
7    put in their resources of equipment and people. But
8    it's a working company in which Stuyvesant or
9    Boskalis, whoever you call it, has a minor interest
10   and that has, of course, to do with the regulations of    09:24
11   the United States Jones Act. One cannot have a
12   majority interest in an American company, not as a
13   foreigner, not an American dredging or marine company,
14   let me say it that way.
15   Q. Does Bean, does -- I'm sorry -- does    09:24
16   Stuyvesant Dredging have a 50-percent interest in Bean
17   Stuyvesant, or did it during your period of
18   involvement?
19   A. No, it has not, ma'am. It has a minor
20   interest and it's less than 50. Don't ask me -- you    09:24
21   can ask me, but I --
22   Q. I was going to ask you --
23   A. -- cannot answer how much it is. It is
24   somewhere in the vicinity between 30 and 50 percent,
25   but it's less, it's substantially less than    09:24

---

5 (Pages 14 to 17)

b9d60dc7-9f49-4f54-8007-d73d3f79e257

August 17, 2006

Page 18

1   50 percent.
2      Q.  But you believe it's over 30 percent?
3      A.  I believe it's over 30 percent, yeah.
4      Q.  From 2000 -- from February of 2002 to August
5   of 2005, what dredging projects in the United States    09:25
6   did you -- were you aware of in which Bean Stuyvesant
7   performed some -- had some duty or responsibility?
8      A.  There were quite some, some jobs executed
9   during that period.  Our main movers were employed in
10  New York, called the Kilven Kull (phonetics) projects.    09:25
11  We had, I think, over that period that I was in the
12  United States, we had three contracts executed in that
13  vicinity, Kilven Kull projects deepening.  We had
14  several beach replenishments along the coast of North
15  Carolina and Florida.    09:26
16      If you want me to call them all by name, then
17  I couldn't because we contracted about, as an average,
18  say about five, six or seven projects per year, and
19  some smaller ones, maintenance projects, on the
20  Mississippi river.  So then I have to make a short    09:26
21  list of, say, 30 to 40 projects and I cannot answer
22  you that on the top of my head.  But say roughly about
23  30, 30 to 40 projects we executed in that time frame
24  that was I working with the company.
25      Q.  What was -- how would you describe the    09:26

Page 19

1   business of Bean Stuyvesant?
2      A.  Dredging.
3      Q.  Did it have a particular focus or specialty?
4      A.  Yes.  Our activities were limited to, say,
5   three basic activities, being hopper dredging, cutter    09:27
6   dredging, and backhoe dredging.  Those are identified,
7   the three tools that are our main movers, that are our
8   main money makers or movers, as this is called.
9      Q.  Was Bean Stuyvesant involved in any
10  environmental remediation projects?    09:27
11      A.  Yes, ma'am.  But that is part of the backhoe
12  dredges because that is equipment on the pontoon, and
13  the excavator on a pontoon is called a backhoe.
14      The project that we executed there, but that
15  was, to be quite honest, before my arrival, was    09:27
16  Bedford, New Bedford project in -- I think it's
17  Massachusetts, as -- if I see it correctly on the map.
18      Q.  And did you understand that to be a Bean
19  Stuyvesant project?
20      A.  I don't think so, ma'am.  I think it was a    09:27
21  Bean Environmental project.
22      Q.  And what role did Bean Stuyvesant have in that
23  project?
24      A.  I was not there during the time of execution,
25  so I cannot tell.  But I guess it was the same    09:28

Page 20

1   construction or the same role that we played in the
2   Hylebos project.
3      Q.  And how would you describe that role?
4      A.  Boskalis or Stuyvesant has an interest in Bean
5   Environmental, not exactly as it has in Bean    09:28
6   Stuyvesant.  It's another, it's another construction
7   and I'm not exactly aware of what.  But as, as
8   operating company, Bean Stuyvesant had, of course, a
9   lot of resources that could be applied or could be
10  used in the execution of the work.  Moreover, Bean    09:28
11  Stuyvesant, due to his Stuyvesant part, has access to
12  resources that are not that easily accessible for Bean
13  Environmental.  And with those resources, I mean
14  resources abroad in the Boskalis companies.
15      Q.  And so it is your testimony that Stuyvesant    09:29
16  provided or served a role in Bean Environmental to
17  provide them with resources that would not otherwise
18  have been available to Bean Environmental?
19      A.  Did I hear you say --
20      MR. CRAIG:  Hold on.  I object to the form of    09:29
21  the question.
22      You may answer.
23      THE WITNESS:  Did you say survey or service?
24  BY MS. BAVAND:
25      Q.  Service.    09:29

Page 21

1      A.  Service, okay.  Yes, ma'am, that's correct,
2   ma'am.
3      Q.  What type of resources are you referring to?
4      A.  Several, being mechanical in the sense of
5   equipment.  So mechanical, I mean hardware, as you    09:29
6   call it, the steel, clamp shells, electronical
7   equipment and what have you.
8      And another, and that's more the software side
9   of it, that's knowledge and experience, things that
10  the Boskalis organization, or at least the    09:30
11  environmental part of the Boskalis organization was
12  much better trained for or geared up for.
13      Q.  And on the Hylebos project, did Stuyvesant
14  provide to Bean Environmental resources such as
15  mechanical equipment and knowledge and experience?    09:30
16      A.  Yes, ma'am.
17      Q.  And how was the knowledge and experience
18  provided, if you know?
19      A.  How to answer that in a correct way?  Partly
20  by, by transferring knowledge verbally in, in an    09:30
21  exchange of information with the client and his
22  resident engineer; partly of course by, by fax and by
23  e-mail; in the form of, of doing, doing estimates and
24  productions and work methods; providing all this
25  information directly or indirectly through Stuyvesant, 09:31

6  (Pages 18 to 21)

b9d60dc7-9f49-4f54-8007-d73d3f79e257

August 17, 2006

| Page 22 |
| --- |

1   but sometimes also in direct contact between Bean
2   Environmental and Boskalis, and the client in a kind
3   of triangle. So as well verbally as in written, but,
4   but mainly at that stage in the start of the works, it
5   was, say, the software side of it, the knowledge side   09:31
6   of it.
7        Q. Did Stuyvesant -- and let's be clear. When I
8   refer to Stuyvesant, I'm referring to Stuyvesant
9   Dredging, Inc., and when I refer to Bean Stuyvesant,
10  I'm referring to that joint venture as you call it.   09:32
11       A. Yeah, yeah, understood, ma'am.
12       Q. Did Stuyvesant provide any of its employees
13  for work on the Hylebos project?
14       MR. CRAIG: Object to the form of the
15  question. You may answer.   09:32
16       THE WITNESS: No, ma'am. But let me be clear
17  on that: Simply because Stuyvesant itself did not
18  have the resources, but Boskalis had the resources.
19  And if you refer to Stuyvesant as being an affiliate
20  of Boskalis and have an access to those resources,   09:32
21  then the answer is yes.
22  BY MS. BAVAND:
23       Q. Did employees of Boskalis work on the Hylebos
24  project?
25       A. Yes, ma'am --   09:32

| Page 23 |
| --- |

1        MR. CRAIG: Same objection. You may answer.
2        THE WITNESS: Yes, ma'am. There were, as a
3   good example, it was, for instance, our project
4   manager -- sorry -- if I say our project manager it's
5   due to my involvement on the job and my   09:33
6   responsibilities for that job.
7        We had a project manager called
8   Mr. Van den Adel who was an employee. He was on the
9   payroll of Boskalis, as an example, but also there
10  were other people in the survey and, and in the   09:33
11  checkup and maintenance of equipment that were
12  involved, that were people from the Boskalis payroll,
13  yes.
14  BY MS. BAVAND:
15       Q. And how did, how -- in what manner did --   09:33
16  we'll use Mr. Van den Adel as an example. You
17  testified he was an employee of Boskalis. How did he
18  get on the -- strike that.
19       Did he, did he -- was he loaned out or was he
20  hired through Bean or -- strike that -- through   09:34
21  Stuyvesant for work on the Hylebos project?
22       A. Yes, he was. Because in a legal way, we, we
23  have to, as Dutch people we cannot just start working
24  in the United States. We have to go through an
25  American entity. And Boskalis had an American entity   09:34

| Page 24 |
| --- |

1   called Stuyvesant. And under that, it had the right
2   to employ people in the U.S. And the Stuyvesant people
3   that were rented in through Boskalis were in a second
4   step brought in to the practical working organization
5   of Bean Environmental or Bean Stuyvesant, or whatever   09:34
6   interest we had.
7        Q. Did -- so Mr. Van den Adel, an employee of
8   Boskalis, was rented, to use your term by Stuyvesant
9   Dredging, Inc.; is that correct?
10       A. That's correct, ma'am.   09:35
11       Q. Do you know whether there was an agreement
12  between Boskalis and Stuyvesant Dredging, Inc., for
13  the renting of Mr. Van den Adel or other Boskalis
14  employees?
15       A. Yes, ma'am. The Boskalis people were rented   09:35
16  out -- at -- towards Stuyvesant -- not at Stuyvesant,
17  but from Boskalis to Stuyvesant at a cost base. So
18  depending on their, their costs and their costs
19  depend, of course, on their level in the company and
20  their function in the company, those salary costs and   09:35
21  travel costs were born by Boskalis and, I call it,
22  invoiced towards Stuyvesant.
23       Q. Was there an agreement between Boskalis and
24  Stuyvesant specific to the Hylebos project for the
25  purposes of renting an employee?   09:36

| Page 25 |
| --- |

1        A. No, ma'am.
2        Q. Was there an agreement, a standing agreement
3   in place between Boskalis and Stuyvesant for the
4   renting of employees on various projects?
5        A. I would say yes, ma'am, in so far that if   09:36
6   there was a need for people in the United States in
7   one of the working companies in the working relation
8   that there was between Stuyvesant and Bean in several
9   occasions, then we as Bean Stuyvesant or as the
10  working company could call on the resources of   09:37
11  Boskalis, the pool of people, if needed and then
12  standard people would come out to, to help us out.
13       So there's not an agreement for a fixed rate
14  or a fixed quantity of people, but there was an
15  agreement that Boskalis would provide through   09:37
16  Stuyvesant the needs that we had, if we had those
17  needs within the United States.
18       Q. So if, say, Bean Stuyvesant had the need for a
19  Boskalis experienced individual.
20       A. Yes.   09:37
21       Q. Would an agreement be formulated for -- and
22  this is in relation to, say, one particular project --
23  would an agreement be formulated at that time between
24  Stuyvesant and Boskalis to retain or to rent that
25  employee for that particular project?   09:37

7 (Pages 22 to 25)

b9d60dc7-9f49-4f54-8007-d73d3f79e257

## Page 74

1      MR. CRAIG: Let me look at what they show to
2  you first.
3      THE WITNESS: Thank you.
4  BY MS. BAVAND:
5      Q. Have you -- take a look at the document. Have  11:23
6  you seen this document before?
7      A. Not in this layout as spreadsheet, but the
8  figures on and the relation is something that, that
9  comes to my mind again, yeah.
10     Q. You'll see on the top it says "CF Bean, LLC,"  11:23
11 and then it says "100 percent CF Bean owned."
12     A. Yes, ma'am.
13     Q. What, what is that "100 percent CF Bean owned"
14 relate to? Do you see -- do you know where it -- to
15 which it applies?                               11:23
16     MR. CRAIG: Object to the form of the
17 question.
18     THE WITNESS: As far as I know, it is related
19 to CF Bean, LLC.
20 BY MS. BAVAND:                                  11:24
21     Q. Okay. That CF Bean LLC is 100 percent CF Bean
22 owned?
23     MR. CRAIG: Same objection.
24     THE WITNESS: That's, that's what I conclude
25 on this.                                        11:24

## Page 75

1  BY MS. BAVAND:
2      Q. Okay. If you look on the, on the right hand
3  area here, it says, "Bean Stuyvesant, LLC."
4      Do you see that?
5      A. Yes, ma'am.                             11:24
6      Q. And you see "50 percent Bean owned, 50 percent
7  SDC owned."
8      A. Uh-huh.
9      Q. Do you see that?
10     A. Yes, ma'am.                             11:24
11     Q. What is SDC?
12     A. Stuyvesant Dredging Company, I guess, yeah.
13     Q. So was it your understanding that Stuyvesant
14 Dredging Company had a 50 percent ownership interest
15 and Bean had a 50 percent ownership interest in this  11:24
16 Bean Stuyvesant, LLC?
17     MR. CRAIG: Same objection.
18     THE WITNESS: That's how you read this, yes,
19 ma'am.
20 BY MS. BAVAND:                                  11:24
21     Q. Okay. Are you familiar with Bean Meridian
22 Holding? Have you heard of that entity before?
23     A. I heard of that entity, but I didn't work with
24 it.
25     Q. Are you familiar with what business they do?  11:25

## Page 76

1      A. No, ma'am.
2      Q. If you look above the Bean Meridian Holding
3  box, you see "75 percent Bean Horizon owned and
4  25 percent SH owned."
5      First of all, are you familiar with the entity  11:25
6  Bean Horizon?
7      A. No, ma'am, I'm not. And I don't see it in the
8  chart either.
9      Q. Oh, I'm sorry. Look right above the Bean
10 Meridian Holding box, there is a --               11:25
11     A. Yeah, there is, there is the 75 Bean Horizon,
12 but where is Bean Horizon?
13     Q. I'm asking -- I don't see anywhere else. I'm
14 just asking --
15     A. Neither do I.                            11:25
16     Q. I'm sorry. I'm asking you whether you are
17 familiar with that --
18     A. No, ma'am.
19     Q. -- entity?
20     A. I'm not, no.                            11:25
21     Q. And then are you familiar with what is
22 referred to here as "SH"? Do you know what entity SH
23 is?
24     A. SH is that Stuyvesant Holding, I think.
25     Q. What's Stuyvesant Holding?                11:26

## Page 77

1      A. Ma'am, I cannot give you good definition of
2  that. It must be part of the Stuyvesant dredging
3  organization, but -- there is a relation there, but I
4  don't know what it means exactly.
5      Q. Did you have any title or duties for an entity  11:26
6  by the name of Stuyvesant Holding?
7      A. Not that I'm aware, ma'am.
8      (Mr. Evans conferring with Ms. Bavand.)
9      Q. As my colleague pointed out after I put my
10 glasses on, I can see a little bit more clearly.   11:27
11     Do you see that to be SII as opposed to an SH?
12     A. Where are you, ma'am?
13     Q. I'm looking at the, when we were talking about
14 Stuyvesant Holding, SH. And looking a little bit more
15 closely at it, do you see it as an SII?           11:27
16     A. Stuyvesant -- the last "I" would be
17 Incorporated, I guess, but that's all I can guess.
18     Q. Are you not aware of any Stuyvesant entity
19 that goes by the acronym SII?
20     A. No, ma'am.                              11:27
21     Q. Okay. Were you aware of any Stuyvesant entity
22 having an ownership interest in Bean Environmental?
23     A. Yes, ma'am, I, I'm aware of that because we
24 talked about it in the start. And I know that there
25 is a Stuyvesant interest in Bean Environmental. I   11:28

b9d60dc7-9f49-4f54-8007-d73d3f79e257

August 17, 2006

| | Page 78 |
|---|---|

1 know it differs from the Bean Stuyvesant thing, but
2 there is an interest there.
3    Q.  Do you know what percentage of ownership
4 interest a Stuyvesant's entity has in Bean
5 Environmental?            11:28
6       MR. CRAIG:  Object to the form.
7       THE WITNESS:  No, I read here that it should
8 be 25 percent of a Stuyvesant company.  That's what I
9 read on this page, but --
10 BY MS. BAVAND:               11:28
11    Q.  And you're referring to the bottom, right-hand
12 corner?
13    A.  Yeah, yeah, yeah.  But it might be influenced
14 by all the figures that are on top.
15    Q.  Okay.              11:29
16       MR. CRAIG:  Mr. Van de Ven, I'll remind you to
17 only testify about what you actually know.
18       THE WITNESS:  I don't know.  Besides what I
19 see here, this -- I don't know how much the interest
20 was or is in -- I know there's an interest, but I do   11:29
21 not know how much.
22 BY MS. BAVAND:
23    Q.  And sitting here today, do you know which
24 Stuyvesant entity has the interest in Bean
25 Environmental?            11:29

| | Page 79 |
|---|---|

1    A.  No, ma'am.  If I, if I turn this around, no, I
2 don't know.
3    Q.  Sitting here today, you don't know whether
4 Stuyvesant Dredging, Inc., has an ownership interest
5 in Bean Environmental?        11:29
6    A.  No, ma'am.  No, ma'am.
7       (The document referred to was marked by the
8       Reporter as Exhibit 24 for identification.)
9 BY MS. BAVAND:
10    Q.  Mr. Van de Ven, the Court Reporter has handed   11:30
11 you what's been marked as Exhibit 24.  It is an e-mail
12 from, top portion, an e-mail from you to Mr. Lally
13 dated November 29, 2003.
14       If you would please read the top portion of
15 the e-mail and I'd like to ask you a couple of      11:30
16 questions.
17    A.  Yeah.
18    Q.  Okay.  First of all, I'd like to ask you about
19 the first paragraph there.  You reference the B'vor.
20 Are you referring to the dredge Bonacavor by that --   11:31
21    A.  Yes.
22    Q.  -- abbreviation?
23    A.  Yes, ma'am, Bonacavor.
24    Q.  And when you say "Bonacavor will have to be
25 recalculated again also," what do you mean by the word   11:32

| | Page 80 |
|---|---|

1 "recalculated"?
2    A.  I think we have to -- in my opinion, we had to
3 --and I think we have done as well -- we had to
4 recalculate the production cycle of the Bonacavor
5 because of what's stated after that.  Because we      11:32
6 developed a handy tool to reach more depth.
7    Q.  What tool was that?
8    A.  It must have been the extension stick of the,
9 of the grab, of the HPG grab.
10    Q.  Were you involved at all in the development of   11:32
11 the extension stick of the HPG grab?
12    A.  No, ma'am, not in the mechanical or technical
13 development.
14    Q.  The next sentence states then:
15        "My only two reasons to go back to the      11:33
16        Bonacavor approach are (a) a good stable
17        pontoon and (b) in case of non flying of
18        M'river (because some idiot goes for
19        half and no quality) equipment
20        occupation."              11:33
21        What do you mean by the paragraph B there?
22 What, what's the --
23    A.  In case of non flying of Miami river, is that
24 what you --
25    Q.  Yeah, what is the non flying of Miami river?   11:33

| | Page 81 |
|---|---|

1    A.  It's my way of, in a popular way, saying if
2 the contract Miami river does not come off the ground.
3    Q.  At this time, were, were you contemplating
4 employing the Bonacavor for use on the Miami river
5 project?              11:33
6    A.  Yes, ma'am, we were.
7    Q.  And in suggesting that one of the reasons to
8 go back to the "the Bonacavor approach," are you
9 saying that one reason to go back to the Bonacavor
10 approach is if the Bonacavor cannot be used on the      11:34
11 Miami river, then it could be used on the Hylebos?
12    A.  Yes, ma'am, that's correct.
13    Q.  In the next full paragraph, what is it that
14 you're discussing within that paragraph, the one that
15 begins with:              11:34
16        "I know and realize that the 0.1 feet
17        is an A, and I realize also why,
18        remembering that discussion, us not
19        accepting that the trial penetration was
20        not, repeat not, in our accuracy of      11:35
21        .75 feet."
22    A.  Uh-huh.
23    Q.  What, what is, what is it that you're trying
24 to communicate in that paragraph?
25    A.  Mr. John Lally was our local engineer on the   11:35

21 (Pages 78 to 81)

b9d60dc7-9f49-4f54-8007-d73d3f79e257

August 17, 2006

Page 102

1  the Hylebos?
2      A. No. One of the equipment companies of Bean,
3  but I don't know which one.
4      Q. Was it Bean Environmental or do you not know?
5      A. It was not Bean Environmental because I would    13:10
6  have known due to the Boskalis interest in Bean
7  Environmental. It was not Bean Environmental. Bean
8  Excavation or Bean Dredging, I don't know.
9      Q. Okay. Does Boskalis have any other companies
10  of which you are aware, U.S. companies, that it holds    13:10
11  an interest in, other than Stuyvesant Dredging
12  Company, Bean Environmental, or Bean Stuyvesant?
13      A. In the U.S., I --
14      Q. Yes, sir.
15      A. No, sir. To my best knowledge they have no    13:11
16  other companies where they have interest in.
17      Q. All right. The Bonacavor had, you testified
18  earlier, an HPG bucket?
19      A. Yes, sir, it has.
20      Q. And that's a horizontal profile grab bucket?    13:11
21      A. That's correct, sir.
22      Q. Okay. And was that bucket manufactured here
23  in Holland?
24      A. Yes, sir. It was manufactured here in
25  Holland, yes.                                        13:11

Page 103

1      Q. Were you involved in any aspect of the
2  administration of ordering the bucket and having it
3  manufactured?
4      A. Yes, in a sense that I confirmed from the U.S.
5  side that the bucket had to be manufactured, yes.    13:12
6      Q. To certain specifications and delivered by a
7  certain date?
8      A. That we did through our Technical Department.
9  We had a Technical Department in our organization.
10  And those specified the needs of the delivery time,    13:12
11  but those needs were given in by the operation people
12  by us to them, and then transmitted to Boskalis in
13  Holland, yes, so they came from our department.
14      Q. Does Boskalis have a manufacturing division or
15  department?                                          13:12
16      A. No, sir, they have Technical Department.
17      Q. So Boskalis did not manufacture the HPG
18  bucket?
19      A. No, sir, they did not.
20      Q. Did Boskalis the HPG bucket from another Dutch  13:12
21  company that manufactured it?
22      A. Yes, sir, they made a manufacture at the
23  specialized company here.
24      Q. Who was that company that manufactured the HPG
25  bucket; do you know?                                13:13

Page 104

1      A. I do not recall that -- I do not recall. I
2  know it's an outside company, but I don't recall the
3  name.
4      Q. Do you remember where they were located, the
5  outside company that manufactured the HPG bucket?    13:13
6      A. No, sir. No, I don't recall. I can get that
7  information, but then I have to dig back into my files
8  at that time. It might be near by.
9      Q. You've maintained those files at your home in
10  retirement or are you talking about files that are    13:13
11  kept at Boskalis?
12      A. No, the files that I'm talking about are my
13  notebooks during my period that I was working in the
14  United States, and those notebooks are all in the U.S.
15      Q. Was it Royal Boskalis Westminster that         13:14
16  purchased the HPG bucket from the company that
17  manufactured it?
18      A. Whether it was the Royal Boskalis? No, it
19  would have been, I think, Boskalis International
20  because the Royal Boskalis is the company that's on    13:14
21  the stock market, and that's a holding company. So
22  it's another Boskalis company, I think in this case
23  Boskalis International.
24      Q. Okay. So what did Boskalis International do
25  with the HPG bucket when it received it from the    13:14

Page 105

1  company that manufactured it, other than presumably
2  pay the company that manufactured it for the bucket?
3      A. On behalf of Boskalis International, the
4  Technical Department of Boskalis secured it in the
5  same building. They, they on behalf of Boskalis    13:15
6  International accepted the bucket with, I think, with
7  a -- how do you call it -- with an inspection seeing
8  whether all conditions were fulfilled.
9      Q. All right. So would that have been done here
10  in Papendrecht?                                      13:15
11      A. That would have been done here in Papendrecht,
12  yes.
13      Q. Okay. Then the bucket's got to get to the
14  United States, and specifically to Tacoma, Washington;
15  correct?                                             13:15
16      A. It ended up over there, sir, yes.
17      Q. I think we all know that.
18      A. Yeah.
19      Q. So then did Boskalis International rent or
20  sell the bucket to some other entity?                13:15
21      A. To my best knowledge, the bucket was invoiced
22  to Stuyvesant in the normal way as we discussed an
23  hour ago, which was the flow of paperwork to
24  Stuyvesant, and Stuyvesant invoiced it to the, to the
25  Equipment Maintenance Department of Bean, and from    13:16

27 (Pages 102 to 105)

b9d60dc7-9f49-4f54-8007-d73d3f79e257

August 17, 2006

---

Page 106

1  there in the internal administration, it was brought
2  to the budget of, of the job with that code of that
3  work that that job had and on its own code.
4      Q.  Now, when you say Boskalis International would
5  invoice for the HPG bucket to Stuyvesant Dredging,    13:16
6  would that be on a rental basis, or a sale, or some
7  other kind of arrangement?
8      A.  I, I recall that it was a total buying
9  package.  So it was sold for the total price of the
10 construction.                           13:17
11     Q.  Sold to Stuyvesant Dredging Company?
12     A.  Yes, which in turn sold it to the Bean
13 organization.
14     Q.  Do you know which Bean organization?
15     A.  I think Bean Dredging because that is the    13:17
16 company that basically looks after the equipment, but,
17 but I cannot guaranty that and I have to look into
18 that same paper flow again.
19     Q.  It wasn't Bean Environmental?
20     A.  It was not Bean Environmental, no.          13:17
21     Q.  So there would be paperwork referencing the
22 sale of the bucket from the manufacturer to Boskalis
23 International, paperwork for bucket from Boskalis
24 International to Stuyvesant Dredging Company, and
25 paperwork for the sale of the bucket from Stuyvesant  13:17

---

Page 107

1  Dredging company to a Bean entity that we know is not
2  Bean Environmental?
3      A.  Yes, sir, that's correct.  Yeah.
4      Q.  Okay.  The Bonacavor was equipped with a crane
5  monitoring system, better known as CMS?           13:18
6      A.  CMS, yes, sir.
7      Q.  And is that both hardware and software?
8      A.  Yes, sir, that's both.
9      Q.  Okay.  Was that equipment rented or sold by
10 Boskalis International for use on this project, to    13:18
11 your knowledge?
12     A.  To my best knowledge, that was sold as well.
13 As a package, it was sold to and through the same
14 routing as we just described for the grab.
15     Q.  Boskalis sells its CMS system as opposed to   13:18
16 licensing a temporary use of it?
17     A.  Not if it is intended as a temporary use.  But
18 for the Bonacavor, it is not intended as a temporary
19 use.  It stays on board.  It stays with that equipment
20 because you hope to do more work with it.          13:19
21     Q.  So the --
22     A.  I mean, we hope.
23     Q.  I'm sorry.  So the CMS system installed on the
24 Bonacavor was sold to whomever owns the Bonacavor?
25     A.  Yes, sir.                             13:19

---

Page 108

1      Q.  And I think as we went over before, you're not
2  sure who owned the Bonacavor?
3      A.  No, I'm not sure, sir.
4      Q.  And once again there would be paperwork
5  reflecting that sale of the CMS system from Boskalis   13:19
6  International to Stuyvesant Dredging, to a Bean entity
7  that we know is not Bean Environmental.
8      A.  One small difference with the grab, the CMS
9  system is developed in-house in Boskalis, where the
10 grab is manufactured outside Boskalis.             13:19
11     Q.  And by the grab, you're referring to the HPG?
12     A.  Sorry, the HPG bucket, yeah.
13     Q.  Okay.  I wanted to ask you just a couple of
14 follow-up questions about your role as Operational
15 Manager for the Hylebos project.                 13:20
16         Do you recall that testimony?
17     A.  (No audible response.)
18     Q.  You fulfilled that role?
19     A.  Yes.
20     Q.  In return to you for acting as Operational     13:20
21 Manager for the Hylebos project, who paid you?
22     A.  You mean which company paid my salary; is that
23 the question?
24     Q.  Who paid you for acting as Operational Manager
25 for the Hylebos project, is my question.           13:20

---

Page 109

1      MR. CRAIG:  Object to form.
2  BY MR. EVANS:
3      Q.  If anyone paid you.
4      MR. CRAIG:  Object to form.
5  BY MR. EVANS:                              13:21
6      Q.  I assume you didn't work for free, or correct
7  me if I'm wrong?
8      MR. CRAIG:  Object to form.
9      THE WITNESS:  I received my salary as usual
10 through Boskalis -- or from Boskalis.  And that salary  13:21
11 was invoiced to the Bean companies through Stuyvesant.
12 And then the, the Bean company charged that cost to
13 several job sites where I was active in.  But that's
14 an internal, an internal thing that last step.
15 BY MR. EVANS:                              13:21
16     Q.  Including the Hylebos project?
17     A.  Yes.  Yes, that's where the 9 percent was
18 for, it's overhead.
19     Q.  So when the Hylebos project came along and you
20 became the Operational Manager for the project, you    13:21
21 didn't receive any additional compensation for serving
22 in that role, your salary remained constant; would
23 that be correct?
24     A.  That's correct, sir.  No difference.
25     Q.  You were asked a number of questions about    13:22

28  (Pages 106 to 109)

b9d60dc7-9f49-4f54-8007-d73d3f79e257

# EXHIBIT G



**Marisa M. Bavand**
E-Mail: mbavand@groffmurphy.com

August 22, 2006

**Via E-Mail and Regular Mail**

William F. Cronin, Esq.
Corr, Cronin, Michelson, Baumgardner & Preece LLP
1001 Fourth Avenue, Suite 3900
Seattle, WA 98154

      Re:    Arkema, Inc. / Hylebos Waterway Remediation

Dear Bill:

      During the course of the Holland depositions, testimony confirmed that records exist which originate both with Bean entities, and Boskalis entities that are directly related to the Hylebos project, Bean's claim for damages against the HHCG and that are responsive to Plaintiffs' discovery requests.

      We question why these documents have not been produced to date, and continue to be troubled by Bean's repeated failure to produce documents that go to the heart of Bean's claims in this case. Documents that I reference include:

1. Rinus van de Ven's notebooks related to the Hylebos project: Mr. Van de Ven testified that he maintained a series of notebooks related to various projects on which he was involved, which include documents related to the Hylebos project. He testified that he left his notebooks in the United States upon his retirement.

2. Rinus van de Ven's reports and/or correspondence to Boskalis: Mr. Van de Ven testified that he regularly reported to his superior at Boskalis, Mr. Sanders, regarding projects in the United States on which Boskalis equipment or personnel were being used, including the Hylebos project. He also testified that he reported to Jim Bean orally and in writing. He has no written communications between Mr. Van de Ven and Mr. Bean. He further stated that Ancil Taylor reported to Mr. Bean. We do not have written communications between Mr. Taylor and Mr. Bean.

3. Boskalis entered into agreements and invoiced Bean entities or Stuyvesant Dredging, Inc, related to employees and/or equipment on the Hylebos project. Mr. Van de Ven testified that Boskalis invoiced Stuyvesant Dredging, Inc., or Bean entities for equipment or

William F. Cronin, Esq.
August 22, 2006
Page 2

personnel "rented out" by Boskalis to those entities. He also testified that Stuyvesant Dredging and/or Bean entities, will then invoice those costs to another Bean entity and ultimately to the particular project. Bean failed to produce these integral invoicing records. In fact there are no internal records showing the "renting" of employees or equipment from Boskalis, and then down through Bean entities to the Hylebos project. No invoices or records provided to date even reference any of the Boskalis employees that worked on the project, including Gerard Hoogewerff, Onno Sheffe, or the various other Boskalis employees. We know from emails that Boskalis employees charged their time to the Hylebos project. Where are the records that document the charges through the Boskalis/Stuyvesant/Bean entities?

4. Documents supporting the sale of the HPG bucket and CMS equipment. Mr. Van de Ven testified that the HPG bucket was manufactured in Holland and purchased by Boskalis, and that Boskalis then sold the HPG bucket to Stuyvesant Dredging and then to one of the Bean entities. It was ultimately charged to and used on the Hylebos project. He also testified that the CMS system was sold by Boskalis to Stuyvesant and then it also was sold to one of the Bean entities for use on the Bonacavor during the Hylebos project. We have no records of these sales.

5. Project book keeping records and all of Tom Davis' files related to any equipment or employees used on the Hylebos project, and all Hylebos cost accounting records.

6. Any internal Bean equipment rental rates (for rental between Bean companies).

7. Records of any costs being charged or invoices between Bean Stuyvesant and Bean Environmental which are referenced in the Bean Services Agreements related to the project.

8. Records of any costs being charged or invoices between Bean Stuyvesant and Stuyvesant Dredging related to the project.

9. All files, records and documents within Boskalis related to work done on the Hylebos project. This includes records and files from Gerard Hoogewerff and Onno Sheffe. We are entitled to all electronic documents, all CAD files, all internal emails, all correspondence and all agreements. It is clear that Mr. Hoogewerff and Mr. Sheffe have maintained files and there are existing questions regarding the cross sections and basis of the calculations performed by Boskalis employees for the Hylebos project.

With respect to Boskalis documents requested, during previous communications, you indicated that the Defendants would not produce any Boskalis files because Boskalis is a "third party" and Defendants have "no control" over Boskalis. As you should know, during the depositions of Ancil Taylor, John Lally and Rinus van de Ven, the witnesses testified that Boskalis is in fact a part owner of Bean Environmental, and also has ownership interests in

William F. Cronin, Esq.
August 22, 2006
Page 3

several other Bean entities. Moreover, during Mr. Hoogewerff's deposition in Holland, Mr. Craig asserted the attorney-client privilege for communications between Mr. Hoogewerff and Bean employees, in which Mr. Clay Beery was cc'd. Mr. Evans questioned Mr. Craig as to why he was asserting the attorney client privilege on a communication where Mr. Hoogewerff (an employee of "third party" Boskalis) was included. Mr. Craig continued to assert the privilege.

Please let me know by August 23 as to whether Defendants will continue to maintain the position that Boskalis is a third party, over which Defendants have no control. If you continue to maintain that position, Plaintiffs believe that our CR 37 "meet and confer" requirements are met. Also, please confirm that all other requested documents will be produced immediately. If I do not hear from you on the issue by August 23, I will assume that you continue to assert the same position and that no additional documents will be produced. I require a quick deadline for your response due to pending court deadlines for filing discovery motions. Please respond in writing as I am traveling until August 26.

Please be advised that Plaintiffs reserve their right to supplement expert reports and rebuttal expert reports based on information obtained from newly produced documents. Plaintiffs also reserve the right to request additional depositions or the continued deposition of individuals as needed based on information provided in the documents responsive to Plaintiffs' discovery requests that Defendants have failed to produce despite repeated demands.

Very truly yours,

GROFF MURPHY TRACHTENBERG
& EVERARD, PLLC

*Sent Without Signature to Avoid Delay*

Marisa M. Bavand


cc:    John Evans/Tom Falkner
       Kristi Favard

# EXHIBIT H

**From:** Cronin, William [mailto:wcronin@ccpcronin.com]
**Sent:** Monday, June 05, 2006 2:04 PM
**To:** Evans, John
**Cc:** Craig, Kevin; Lesnick, Ed
**Subject:** Discovery of Boskalis

My client is unwilling to assume an obligation to either produce witnesses or documents from a third party such as Boskalis. On the other hand, we will try to work with you regarding scheduling any depositions that you are able to arrange of Boskalis employees.


**NOTICE:**
This electronic message transmission contains information which may be confidential or privileged.  The information is intended to be for the use of the individual or entity named above.  If you are not the intended recipient, please be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.  If you received this electronic transmission in error, please notify the sender and delete the copy you received.

## CERTIFICATE OF SERVICE

I, Fotini Antonia Skouvakis, herby certify that a copy of the **Declaration of Thomas W. Falker and Exhibits A – H in Support of the Declaration of Thomas W. Falker** were served electronically via CM/ECF this 15th day of September, 2006, upon the following:

Brian E. Farnan, Esquire
Phillips, Goldman & Spence, P.A.
1200 North Broom Street
Wilmington, DE 19806

Fotini Antonia Skouvakis (Bar I.D. 4793)

1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

8

GENERAL METALS OF TACOMA, INC., a
Washington Corporation; and ARKEMA INC.,
a Pennsylvania Corporation,

Plaintiffs,

v.

BEAN ENVIRONMENTAL LLC, a Delaware
limited liability company; and BEAN
DREDGING LLC, a Louisiana limited liability
company,

Defendants.

NO. CV05-5306 RBL
(Western District of Washington)

SUPPLEMENTAL DECLARATION OF
THOMAS W. FALKNER IN SUPPORT
OF PLAINTIFFS' MOTION TO
COMPEL

9
10
11
12
13
14
15
16
17

I, Thomas W. Falkner, declare and state:

18

1.    I am an attorney with the law firm of Williams Kastner & Gibbs PLLC, and

19

represent Plaintiff General Metals of Tacoma, Inc. ("General Metals") in this matter.  I am over

20

the age of eighteen, have personal knowledge of the matters set forth herein and am competent

21

to testify.  I am not a party to this matter.

22

2.    This supplemental declaration is submitted in support of Plaintiffs' Reply In

23

Support Of Plaintiffs Motion to Compel Deposition and Document Production of Boskalis

24

Westminster, Inc., which follows Boskalis Westminster Inc.'s objection to a subpoena served

25

by Plaintiffs General Metals and Arkema, Inc. (collectively, the "HHCG").

SUPPLEMENTAL DECLARATION OF THOMAS W. FALKNER IN
SUPPORT OF PLAINTIFFS' MOTION TO COMPEL -1
(CV05-5306 RBL)

**Williams, Kastner & Gibbs PLLC**
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

1906723.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3.       Mr. Dugas states, in his sworn declaration, that "SDC has already turned over all relevant, responsive documents *to the parties* for production."  Dugas Decl. ¶ 5 (emphasis added).  Mr. Dugas made a similar statement in an earlier declaration filed approximately 10 days ago in New Orleans.  In reality, however, responsive documents were not previously produced, as evidence by the fact that just two days ago some randomly organized documents from Stuyvesant Dredging were produced to the HHCG, which was *after* Mr. Dugas signed his declarations declaring that everything had already been produced "to the parties."  Also inadvertently included with the documents produced is an unbates stamped document, stating "To Clay from Bob Dugas."  A true and correct which is attached hereto as Exhibit A

        The foregoing statement is made under penalty of perjury under the laws of the United States of America, the State of Delaware, and the State of Washington and is true and correct.  Signed at Seattle, Washington, this 15th day of September, 2006.

_____
Thomas W. Falkner

Williams, Kastner & Gibbs PLLC
Two Union Square, Suite 4100 (98101-2380)
Mail Address: P.O. Box 21926
Seattle, Washington 98111-3926
(206) 628-6600

# EXHIBIT A

To Clay
From
Bob Dugas

## CERTIFICATE OF SERVICE

I, Fotini Antonia Skouvakis, herby certify that a copy of the **Declaration of Thomas W. Falker and Exhibit A in Support of the Declaration of Thomas W. Falker** were served electronically via CM/ECF this 15th day of September, 2006, upon the following:

> Brian E. Farnan, Esquire
> Phillips, Goldman & Spence, P.A.
> 1200 North Broom Street
> Wilmington, DE 19806

Fotini Antonia Skouvakis (Bar I.D. 4793)